**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS OF SOUTHEAST TEXAS, INC;  AND ASSOCIATED BUILDERS AND CONTRACTORS, <br><br>　　**Plaintiffs**<br><br>　　**vs.**<br><br>JULIE SU, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, in her official capacity, JESSICA LOOMAN, ADMINISTRATOR, DIVISION OF WAGE AND HOUR, U.S. DEPARTMENT OF LABOR, in her official capacity, and UNITED STATES DEPARTMENT OF LABOR,<br><br>　　**Defendants.** | § § § § § § § § § § § § § § § § § § § § § § § | **CASE NO. 1:23-CV-00396-MJT**<br><br>**JUDGE MICHAEL J. TRUNCALE** |

**PLAINTIFFS' AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs ASSOCIATED BUILDERS AND CONTRACTORS OF SOUTHEAST TEXAS, INC. ("ABCSETX"), and ASSOCIATED BUILDERS AND CONTRACTORS, INC. ("ABC National") (collectively "Plaintiffs"), by and through their undersigned counsel, for their Amended Complaint against the Defendants, herein state as follows:

**NATURE OF THE ACTION**

1.　　Plaintiffs bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 500–596, 701–706; the Davis–Bacon Act, 40 U.S.C. § 3141–3148; the Small Business

Regulatory Enforcement Fairness Act (SBREFA), 5 U.S.C. § 601–613; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202. Plaintiffs are challenging a final rule—actually a series of rule revisions—promulgated by the United States Department of Labor ("Department"), ironically entitled, "Updating the Davis–Bacon and Related Acts Regulations Final Rule" (hereafter the "Rule"), 88 Fed. Reg. 57526 (August 23, 2023).

2.    Far from "updating" the Department's enforcement of the Davis-Bacon Act, the Rule instead returns to failed policies of the 1970s, rescinding important reforms that were kept in place for 40 years by six different administrations on a bi-partisan basis. The Rule also improperly departs from authoritative judicial interpretations of the Davis-Bacon Act and seeks unlawfully to expand the Act's coverage and enforcement provisions.

3.    In addition to violating the Act's plain language, the Rule rewrites many of the Department's longstanding policies in an arbitrary and capricious manner, in violation of the APA and SBREFA. The Department has failed to consider important aspects of the problems it purports to address and has offered explanations for its new rules that run counter to the evidence. The Department has also relied on factors that it should not have considered, while failing to consider reasonable alternatives, ignoring longstanding reliance interests of the regulated construction industry, and grossly underestimating the adverse impact on small and disadvantaged businesses. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43; *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016).

4.    The Rule was also issued under the authority of an improperly appointed official, Deputy Secretary of Labor Julie Su, who purports to continue acting indefinitely as Secretary of Labor, without the constitutionally required advice and consent of the Senate. The Rule is invalid

2

on that independent ground. *See* U.S. Const. art. II §2; *Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1124 (D. Mont. 2020).

**PLAINTIFFS' STANDING**

5.      Plaintiff ABCSETX is a non-profit trade association of more than two hundred construction-industry contractors and related firms who operate in Southeast Texas and around the country. Many ABCSETX members perform work on federally funded projects covered by the DBA and the new Rule. They share the philosophy that construction work, both public and private, should be awarded and performed through fair and open competition based on merit, regardless of labor affiliation. Headquartered within this judicial district at 2700 Twin City Highway, Nederland, Texas, ABCSETX is a separately incorporated affiliate of the national construction industry trade association Plaintiff ABC National.

6.      Plaintiff ABC National represents more than 22,000 member contractors and related firms both in Texas and throughout the country, who share the philosophy that work in their industry should be awarded and performed through fair and open competition based on merit, without regard to labor affiliation. ABC and its 68 chapters, including ABCSETX, represent members in all specialties within the U.S. construction industry, including many members who regularly perform construction projects covered by the Davis-Bacon Act.

7.      Fair enforcement of the Davis–Bacon Act is essential to Plaintiffs ABCSETX and ABC as organizational entities. ABC National members won 55% of the $147 billion in direct prime construction contracts exceeding $25 million awarded by federal agencies during fiscal years 2009-2022.[1] These federal contractors provide subcontracting opportunities to large and

---

[1] Data Source: FY2022 Prime United States NAICS 23 Contracts Greater Than or Equal to $25M, data from USASpending.gov (accessed 1/13/23) and cross-referenced with ABC Membership Database annual report (created 12/20/22),

3

small contractors in the specialty trades, many of whom are also ABC members. Separately and together, ABC members deliver high-quality taxpayer-funded construction projects on time and on budget for their federal government customers.

8.      While some of ABC National's members are among the largest contractors in the country, the majority of ABC's and ABCSETX's members are small businesses. That makeup is consistent with the findings of the U.S. Small Business Administration's Office of Advocacy, which has reported that the construction industry has one of the highest concentrations of small businesses in the economy: 82% of all construction firms have fewer than 10 employees, and nearly 81% of the construction workforce is employed by a small business. In fact, construction companies employing fewer than 100 construction professionals compose 99% of construction firms in the United States and account for 69% of all construction employment.[2]

9.      The Rule frustrates Plaintiffs' organizational mission and is causing both Plaintiffs to divert their resources to deal with the Department's inflationary and arbitrary wage determinations, as well as the improper expansion of the Act's coverage, and the Department's failure to provide adequate guidance to ABC-member contractors performing government-funded construction work. *See* ABC National's extensive comments on the Proposed Rule, publicly posted at www.regulations.gov,[3] and incorporated by reference in this Amended Complaint.

10.     The Rule also harms both Plaintiffs and their mission by diverting them and their resources from providing valuable services to their members. Plaintiff ABC National has been the

---

[2] U.S. Census County Business Patterns by Legal Form of Organization and Employment Size Class for the U.S., States and Selected Geographies: 2021, https://data.census.gov/table/CBP2021.CB2100CBP?q=CBP2021.CB2100CBP&hidePreview=true.
[3] Comments of Associated Builders and Contractors (May 17, 2022), http://www.regulations.gov/WHD-2022-001-40849 [hereafter "ABC Comments"].

voice of the merit-based construction industry for more than eighty years. ABCSETX performs the same mission in Southeast Texas from its headquarters located in this District. Both associations provide their members with a full range of services, including training on real-world operational and business challenges, construction best practices, safety, workforce development, and construction technology. ABC National also supports a network of 68 chapters, including ABCSETX, in their own educational and workforce-development programs. Yet if the Rule remains in effect, Plaintiffs will have to scale back these services, or even stop providing some of them, and instead devote additional resources to helping members navigate the Rule's confusing and counterintuitive changes.

11.     Multiple members of both Plaintiff associations, including the members named in this Amended Complaint, have expressed alarm and confusion over the Rule's requirements with respect to the arbitrary new process for issuing prevailing wage determinations, as well as expanded off-site coverage, imposition of coverage by law, and modified application process for the approval of fringe benefits. Plaintiffs have already been forced to conduct outreach services and explain to their members how to avoid running afoul of the new requirements. The time they spend explaining the rule is time they cannot spend giving practical advice on topics such dealing with heat stress, navigating construction and design challenges, or developing the next generation of skilled construction workers. *See OCA-Greater Houston v. Texas*, 867 F.3d 604, 610–12 (5th Cir. 2017) (holding that plaintiff, a voting-rights group, suffered an injury when challenged law interfered with its ability to explain voting procedures and forced it to instead spend time explaining the requirements of the challenged law).#

12.     Like Plaintiff ABC, Plaintiff ABCSETX conducts regular training and sponsors events for its members. It also provides its members with educational resources and online training

5

tools, as well as a formal apprenticeship training program. These activities will be diminished or curtailed as Plaintiff ABCSETX is forced to respond to alarm and confusion among its members about the Rule. Plaintiff ABCSETX has already heard from members, including the members named below in this Amended Complaint, who are concerned about the Rule's draconian penalties and surprise coverage provisions, which could result in unexpected coverage and back liability. Rather than offering training and resources devoted to topics like safety and workforce development, as it offers today, ABCSETX will instead have to spend time and money developing materials on best practices for mitigating the Rule's harmful effects (for example, materials explaining how to determine whether a contract is covered by the Davis-Bacon Act or a Related Act even if the contract and publicized specifications do not specify coverage). This diversion of time and resources will diminish Plaintiff ABCSETX's ability to pursue its goal of fostering a safer and more knowledgeable construction industry in Southeast Texas.

13.     In addition to direct organizational harm incurred by ABC and ABCSETX on their own behalf, Plaintiffs are also harmed by the Rule in their representative capacity as trade associations representing construction contractors in Texas and all over the country who bid on and perform government-funded construction projects covered by the Davis–Bacon Act and the Rule. Plaintiffs each have standing to bring this action on behalf of their members under the three-part test of *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because (1) Plaintiffs' members would otherwise have standing to sue in their own right; (2) the interests at stake in this case are germane to Plaintiffs' organizational purposes; and (3) neither the claims asserted nor the relief requested requires the participation of Plaintiffs' individual members. *See also Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 380 (5th Cir. 2021) (finding that trade association had standing to challenge rule of Consumer

Product Safety Administration on behalf of its members); *Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 2023 U.S. Dist. LEXIS 159398 (E.D. Tex. 2023), appeal filed, No. 23-40650 (5ᵗʰ Cir.) (association standing found based on member declarations); *Associated Builders & Contractors of SE. Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *6 (E.D. Tex. Oct. 24, 2016) (finding that ABC and its SETX chapter had standing to challenge certain Federal Acquisition Regulations and guidance from the Department of Labor on behalf of their government contractor members).

14.     Among other harms caused by the Rule to ABCSETX's members located in Texas, and to ABC's nationwide members, the Rule will force ABC-member contractors to adopt government-determined wages and benefits rates that are inflated above their locally prevailing wage and benefit rates, contrary to the intent of the Davis–Bacon Act. The Rule will needlessly raise taxpayer-funded construction costs, resulting in fewer infrastructure projects and improvements by federal, state, and local governments as well as private companies receiving federal funding subject to Davis-Bacon Act requirements. The Rule will also undermine ABC-member contractors' productivity and their most efficient use of skilled labor, disrupting their business models.

15.     More specifically, the Rule will impose union wage rates and jurisdictional rules on the majority of government procurements, even though 88.3% of the U.S. construction workforce, and an even higher percentage among ABC's member workforces, perform their construction on a nonunion or "merit" basis. In achieving this inevitable outcome, the Rule will

impose hidden union classification rules and work practices on ABC-member nonunion contractors, under the so-called "*Fry Brothers*" standard referenced repeatedly in the Rule.[4]

16.    This combination of increased adoption of union scale rates and unpublished work rules will cause many ABC member contractors to incur increased, non-reimbursable administrative costs and to incur great risk of unknown penalties up to and including debarment for failing to adhere to the Department's arbitrary new rule(s), thereby discouraging competition from small businesses and minority-owned, women-owned and disadvantaged firms, due to increased compliance risks and costs.

17.    Equally harmful are the Rule's expansion of coverage to include types of workers and work locations beyond construction laborers and mechanics at the site of the work. The Rule offers little or no guidance as to how the new provisions will be enforced thereby increasing the administrative burdens and risks to ABC's non-union contractor members.

18.    Also directly harmful to ABC members are the new enforcement provisions of the Rule, further discussed below, which among other things will for the first time impose liability on contractors and subcontractors without regard to the existence of Davis-Bacon contract stipulations, i.e., by "operation of law." The Rule also purports to authorize the Department to "cross-withhold" alleged back payments from contractors on projects other than those where violations have been found to occur departing from statutory authority and decades of enforcement policy.

19.    These harms are immediate, concrete, and imminent. Plaintiffs' members regularly bid on contracts covered by the Davis-Bacon Act and its Related Acts. They also are often awarded

---

[4] *Fry Brothers, Inc.*, WAB 76-1 (1976); Discussed throughout the Rule at 88 Fed. Reg. 57551-55, 57592-95.

8

those contracts and perform covered construction work on federal and federally assisted projects. Plaintiffs' members plan to continue to bid on federal and federally assisted projects and have a reasonable expectation of performing covered construction work in the immediate future. While performing that work, they will be subject to the Department's Rule and its increased regulatory burdens. They are effectively the object of regulation under the Rule, and as such, will be directly injured by its heightened burdens and new regulatory requirements. *See, e.g.*, *Young Conservatives of Texas Found. v. Univ. of N. Texas*, 609 F. Supp. 3d 504, 512 (E.D. Tex. 2022) ("If a plaintiff is an object of a regulation there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 264 (5th Cir. 2015))); *Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 654 F. Supp. 3d 575, 589 (E.D. Tex. 2023) (same).

20.    Plaintiffs both have many members who have been targeted and are directly injured by the Rule.[5]  One such member of ABCSETX and ABC is Aggregate Technologies, Inc. (ATI), a concrete-cutting and demolition contractor with offices in Houston, Texas.[6] ATI also has offices in Baton Rouge, Louisiana, and Orlando, Florida. Like other ABC members, ATI participates in federal and federally assisted construction in East Texas and elsewhere. These projects have

---

[5] As was held in *Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 2023 U.S. Dist. LEXIS 159398, at *14, "Only one plaintiff needs to have standing for the court to issue relief to all plaintiffs against the same defendant on the same legal theory…."; and ""when an association sues on behalf of its members, the association inherits the standing of any single member with standing, provided the lawsuit is germane to the organization's mission and the member's participation is unnecessary." *Id*. at *14.

[6] Declarations in support of the facts alleged herein to support Plaintiffs' standing will be provided by each of the Plaintiffs and their member companies identified in this Amended Complaint, in support of Plaintiffs' motion for summary judgment.

included bridge and runway repair, underwater hyrodemolition, and structural beam removal projects. ATI plans to continue participating in construction projects subject to the Davis-Bacon Act and Related Acts. It is therefore an object of regulation under the Rule and will face increased regulatory burdens if the Rule is allowed to stay in effect. Those burdens include additional compliance costs, higher direct labor costs, increased uncertainty about coverage and work rules, and competitive harms. Like other ABCSETX and ABC members, ATI is a merit-based contractor that competes on efficiency and flexibility. Its ability to do so will be damaged by the Rule, which biases wage determinations toward collectively bargained wage rates and work rules.

21.    Another adversely affected member of both ABCSETX and ABC is Central Electric Ent. & Co. (CE), a family-owned business based in San Antonio, Texas. CE specializes in commercial electrical construction, but also performs ground-up construction, renovations, historical remodels, and energy upgrades (the last of which is now covered under the Davis-Bacon Act and Related Acts by virtue of the Rule). CE's clients include both private companies and government entities. CE is fully qualified to perform work on Davis-Bacon Act and Related Act-covered construction projects. It has participated in such projects in the past and plans to continue participating in those projects. As a result, CE is an object of regulation under the Rule and will be subject to expanded regulatory burdens including enhanced potential penalties in the form of cross-withholding and debarment, as well as harm to its ability to compete for contracts on a merit-based model and the resultant increased difficulty in securing work on covered projects. At minimum, CE will have to adjust its business model to make up for its decreased ability to compete on the strength of its efficient and flexible workforce, as the Rule insulates less efficient, non-merit-based contractors from the same degree of competition. CE will also have to invest more resources in investigating and determining whether the Davis-Bacon Act and Related Acts apply

10

to a general contract. As a subcontractor, it can no longer rely on the text of those contracts alone, as the Rule threatens to impose coverage without notice as a matter of law.

22.    Another ABC member injured by the Rule is McKelvey Mechanical, Inc., a Native American- and woman-owned small business in the construction industry. McKelvey is a member of Plaintiff ABC as well as Plaintiff ABC's Alabama chapter. McKelvey often bids on federal projects and works on four to six covered projects each year. These projects have included work for many federal agencies, including the Veterans Administration. Absent relief from this Court, McKelvey's work on covered projects will be subject to the Department's new Rule. The Rule will force McKelvey to comply with the increased regulatory burdens described in this Amended Compliant, including the requirement to pay inflated prevailing wages, to report payrolls for new types of workers and for workers working away from the immediate site of the work, to adjust its business practices to match collectively bargained work practices dictated by union job classifications, and to submit its fringe benefit plans to a new approval procedure adopted under the Rule. McKelvey will also have to employ and train additional, unreimbursable administrative staff to comply with these additional regulatory burdens.

23.    Another affected ABC member is Cajun Industries Holdings, LLC, a nationally recognized construction leader providing fully integrated, self-performed Engineering, Procurement, and Construction (EPC) services to some of the largest companies in the world, as well as the federal government. Though Cajun's core geographic market is along the Gulf Coast, it performs this work throughout the country. Cajun is a member of Plaintiff ABC and several local ABC chapters. Cajun regularly performs work on construction contracts covered by the Davis-Bacon Act and the Related Acts. In the past, it has performed covered work for multiple federal agencies, including the Army Corps of Engineers. It plans to continue performing that work in the

future. It will therefore be forced to comply with the Rule's new regulatory mandates. As a regulatory object of the Rule, Cajun will be injured by those mandates. It will have to, among other things, incorporate the Rule's inflated costs into its advance planning; conduct additional research to determine whether the Act could apply to a contract under bid (as it will no longer be able to rely on the advertised specifications); include work on off-site secondary sites in its calculations and reporting obligations; hire additional staff to comply with these regulatory burdens; adjust its previously successful business model to address the increased prevalence of collectively bargained wage rates and work rules related to union job classifications; invest additional resources in investigating and discovering what those union work rules might be (as the Department does not publish them in advance); and face increased competition from non-merit-based firms, which under the Rule will be insulated from competition from merit-based contractors like Cajun that could previously compete with more efficient labor models.

24.    Another affected member is Caddell Construction, a leading global general contractor offering a menu of project management and construction services for commercial and government clients, including the federal government. Caddell is a member of Plaintiff ABC and Plaintiff ABC's Alabama Chapter. In the past, Caddell has performed construction works on many covered construction projects, including projects located in East Texas. On those projects, it has been required to pay Davis-Bacon Act prevailing wages and report its covered payrolls to the contracting agency. It is actively working on covered projects and seeking to perform others. It performs that work using employees in various construction trades and classifications. And as a general contractor, it often subcontracts with other contractors employing workers in Davis-Bacon Act-covered trades. Like the other affected members, Caddell will be harmed by the Rule's increased regulatory burdens. It will have to pay inflated wages, invest more in advance

12

investigation to determine coverage and union work rules, hire additional staff to handle the enhanced reporting obligations associated with expanded coverage, and suffer competitive harms by losing its ability to compete with a more efficient, merit-based labor model. In addition, it reasonably expects disruption to its workforce and labor model as some employees become subject to inflated prevailing-wage determinations under the Rule, while others continue to perform work under Caddell's traditional merit-based approach. The resulting tension will harm its ability to recruit and retain a talented workforce and threatens to overturn its existing compensation model.

25.     Another affected member is American Electrical Contracting, Inc. (AEC), a full-service electrical contracting company. Based in Jacksonville, Florida, AEC performs construction work covered by the Davis-Bacon Act and Related Acts in Florida and other states. It is a member of Plaintiff ABC and ABC's north Florida chapter. Like other affected members, AEC is a merit-based contractor that competes for federal and federally funded work in part based on its efficiency, flexibility, and cost effectiveness. The Rule will harm its model in part by removing or blunting its efficiency advantages through artificially inflated wage determinations tied to collectively bargained rates. The Rule will also impose additional compliance burdens, including the burden to pay prevailing-wage rates and report wages for work done at off-site locations, as well as reducing AEC's ability to take credit for fringe benefits it provides to its employees. At minimum, the Rule will force it to submit those benefits to a new approval process, which will require AEC to expend additional resources in administration. Those resources will include hiring additional staff to handle the increased burden. That burden is certain to occur, and AEC plans to continue participating in federal and federally assisted construction work covered by the Davis-Bacon Act and Related Acts. At the same time, as a merit-based contractor, AEC will continue to be at a heightened risk of being accused of misclassification on covered contracts, as those contracts will

13

increasingly be based on collectively bargained rates and work rules, which are not published and are often difficult for merit-based contractors to discover in advance. At minimum, AEC will be forced to invest additional resources to investigate those work rules and protect itself against misclassification claims.

26. Another affected member is Cianbro Corporation, a leading national general contractor. Cianbro is 100% employee owned and offers a comprehensive menu of construction services and project management for commercial and government clients, including the federal government. It performs mechanical, civil, electrical, instrumentation, telecommunication, thermal, fabrication, and coating services, among many others. It often performs modular construction projects, including work on a petrochemical modular construction, prefabricated electrical projects, and other pre-construction and modular projects. It regularly works on and completes federal and federally funded work, having received $235.7 million in awards over seven federal transactions in the past twelve months. Cianbro plans to continue participating in and completing federally funded projects covered by the Davis-Bacon Act and the Related Acts. So like other members, it will face increased regulatory burdens under the Rule. Those burdens include not only expanded coverage beyond the site of the work (and the accompanying requirements that expansion entails), but also new risks associated with heightened cross-withholding and debarment penalties under the Rule. Those potential penalties will force Cianbro and other ABC members to invest additional resources on monitoring and compliance to avoid unexpected liability and potentially the loss of business. And like other members, Cianbro will face competitive harms, as it will no longer be able to gain leverage with its more efficient merit-based labor model. Instead, it will have to compete at artificial collectively bargained rates and

14

work rules—rules which favor unionized firms and insulate those firms from more efficient competitors like Cianbro.

27.     This is not an exclusive list of harms imposed by the Rule on Plaintiffs and their members in Texas and around the country. The ABC and ABCSETX members identified above, and many others in Texas and around the country, are threatened with imminent, direct injury from each and every aspect of the Rule addressed in this Amended Complaint. ABC and ABCSETX both have standing as associations representing their injured members, as set forth above.

## DEFENDANTS

28.     Defendant Julie Su is nominally the Acting Secretary of the Department (the "Secretary"). Defendant Jessica Looman is the Administrator of the Division of Wage and Hour. The Department, and the Wage and Hour Division specifically, published the Davis-Bacon Rule in the Federal Register. Su and Looman are sued in their official capacities and the relief sought extends to all of their successors, employees, officers, and agents. Defendant Su has not been confirmed by the U.S. Senate to serve as Secretary of Labor, as required by the Constitution.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 (federal question) because the Plaintiffs' causes of action arise under and allege violations of federal law, including the APA, 5 U.S.C. §§ 701–706 (APA jurisdiction to review agency actions); the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202 (declaratory relief); the Davis–Bacon Act, 40 U.S.C. § 3141–3148; and the United States Constitution. *See Univ. Research Assoc., Inc. v. Coutu*, 450 U.S. 754, 761, n.10 (1981), and cases cited therein; *see also Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1058 (D.C. Cir. 2007), and additional cases cited therein.

15

30.    This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §§ 2201–02 and the provisions of the APA, 5 U.S.C. §§ 701–06.

31.    Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because one or more of the Plaintiffs are based within the judicial district of this Court.

# FACTUAL BACKGROUND

## A.    The Department's Previous Enforcement of the Davis–Bacon Act

32.    The Davis–Bacon Act was enacted in 1931 and subsequently extended to 71 related acts funding government construction projects, for the purpose of protecting local wages on government construction projects from suppression by non-local contractors. At the time, a nationwide economic depression had created a surplus of available workers; and available workers greatly outnumbered available jobs. Congress worried that these conditions would allow non-local contractors to import and employ workers at wage rates below the rates then prevailing in the local market. Congress therefore required contractors on federal contracts to pay at least the wage prevailing within the locality. *See, e.g.*, 40 U.S.C. § 3142; *Bldg. & Const. Trades' Dep't, AFL-CIO v. Donovan*, 712 F.2d 611, 613–14 (D.C. Cir. 1983) (citing S. Rep. 332, 74th Cong., 1st Sess. pt. 2, at 4 (1935)).

33.    As subsequently amended, the Davis–Bacon Act requires that the "advertised specifications for every contract in excess of $2,000 to which the Federal Government or the District of Columbia is a party, for construction, alteration, or repair, including painting and decorating, of public buildings and public works … which requires or involves the employment of

16

mechanics or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics." 40 U.S.C. § 3142(a). The 71 related acts extend the Act's minimum wage and related requirements to federally funded construction projects. *See, e.g.*, the Federal–Aid Highway Acts, the Housing and Community Development Act of 1974, and the Federal Water Pollution Control Act.[7]    Most recently, Congress passed the Inflation Reduction Act (IRA), which for the first time imposed the prevailing wage requirements of the Davis-Bacon Act on privately funded "clean energy" projects, in exchange for significant tax incentives. Pub. L. 117-169, 136 Stat. 1818 (2022). Davis–Bacon Act requirements have also been extended to projects funded by the CHIPS Act, a recent law aimed at promoting domestic semiconductor and related manufacturing projects. *See* Pub. L. 117-167, 136 Stat. 1366 (2022).

34.    The Davis–Bacon Act further mandates that the minimum wages specified above "shall be based on the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed." 40 U.S.C. § 3142(b).  Every covered contract as defined above must stipulate that "the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work . . . the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications." *Id.* § 3142(c).

35.    During the early years of the Davis–Bacon Act's enforcement, construction unions controlled a substantial majority of skilled trades in performing construction work in many parts of the country. Herbert R. Northrup et al., George Mason Univ. John M. Olin Inst. For Emp.

---

[7] A full list of the 71 Related Acts can be found at 29 C.F.R. Part 5, Subpart A eCFR :: 29 CFR Part 5 Subpart A -- Davis-Bacon and Related Acts Provisions and Procedures.

Practice & Pol'y, *Construction Union Tactics to Regain Jobs and Public Policy* 10–11 (2008); Jeff Grabelsky, *Building and Construction Trades Unions: Are They Built to Win?* Social Policy. Winter 2004, at 35. In subsequent decades, however, the unions' market share in the construction industry declined precipitously. As reported by the Department's own Bureau of Labor Statistics, the percentage of workers covered by union agreements fell to 34.8% by 1980 and currently stands at 11.7%. *See Union Membership and Coverage Database from the Current Population Survey: Note, Historical Tables: Private Construction*, 56 ILR Rev. 349, 349–54 (2003) (updated annually at unionstats.com), https://www.unionstats.com/Private-Construction.htm. *See also* Steven G. Allen, *Declining Unionization in Construction: The Facts and Reasons*, 41 ILR Rev. 343, 345 (1988).

36.     In 1979, the General Accounting Office (GAO) (subsequently renamed the Government Accountability Office) published a report titled "The Davis-Bacon Act Should be Repealed." Comp. Gen. Rep. No. HRD 79-18 (April 27, 1979). Among other criticisms, the GAO found that "after nearly 50 years the Department of Labor has not developed an effective program to issue and maintain current and accurate wage determinations," describing a system in which the Department accepted as "prevailing" voluntary submissions from union contractors amounting to as little as 30% of work reported in surveyed civil subdivisions. GAO further reported that the Department's enforcement of the Davis–Bacon Act "results in unnecessary construction and administrative costs" and "has an inflationary effect on the areas covered by inaccurate wage rates and the economy as a whole." *Id.*

37.     In response to the GAO report and other critics of the Department's enforcement of the Davis–Bacon Act at that time, the Reagan Administration issued regulations reforming the Department's process for setting wage determinations, including among others the following

18

changes relevant to this Amended Complaint: (1) setting a 50% threshold for how much of the workforce must be paid a single wage for that wage to become the "prevailing wage" (previously set at 30%); (2) strictly limiting the importation of urban rates for projects in rural areas; and (3) limiting the use of wages paid on other covered federal projects in the determination of prevailing rates to prevent bias in the base rate. These regulations were reviewed and approved by the D.C. Circuit as being consistent with the statutory definition of "prevailing" wages in *Building and Construction Trades' Department, AFL-CIO v. Donovan*, 712 F.2d 611 (D.C. Cir. 1983).

38.    Even with these reforms, the Department's wage survey process has continued to overstate the extent to which union wage rates "prevail" in Department wage determinations. Though the union market share nationally has fallen to 11.7%, union rates have been found to "prevail" in a disproportionate share of the Department's wage determinations around the country. *See* Rule, 88 Fed. Reg. at 57546. This statistical anomaly has arisen because the Department's Wage and Hour Division has refused to apply scientific wage survey methods long used by the Department's Bureau of Labor Statistics and instead uses voluntary responses that are biased in favor of larger, more unionized construction projects who are more likely to participate in government wage surveys.

39.    Nevertheless, the current Administration undertook the challenged rulemaking for the evident purpose of *increasing* the percentage of union wage determinations found to be prevailing in Texas and across the country, contrary to the statutory goal of identifying wage rates that actually "prevail" in each civil subdivision, without regard to labor affiliation. *Id*. The Department itself acknowledges this effect, asserting that (unrepresentative) collectively bargained rates will now be used to set the prevailing rate in nearly twice as many cases (nearly seven out of ten). *See* 88 Fed. Reg. at 57533, 57710.

19

**B.**      **The Department's 2022 Rulemaking Proceeding**

40.      On March 18, 2022, the Department published its Notice of Proposed Rulemaking. *See Updating the Davis-Bacon and Related Acts Regulations*, 87 Fed. Reg. 15698 (Mar. 18, 2022) ("Proposed Rule"). The Proposed Rule offered more than fifty significant changes to existing Davis–Bacon Act regulations regarding how the Department determines, mandates, and enforces prevailing wages on all covered contracts.

41.      Belying the pretense that the Proposed Rule intended to "update" the Department's enforcement of the Davis–Bacon Act, the revisions in large part reverted to failed policies reformed by the Reagan Administration or overturned by court decisions. At virtually every turn, the Proposed Rule sought to inflate the prevailing wage rate above the rates paid by the overwhelming majority of construction contractors; to impose new or expanded coverage of the Act to additional types of workers or work locations; and to infringe on the due process rights of contractors in the Act's enforcement. Among other things, the Proposed Rule sought to (a) return to the pre-1982 "30 percent" standard; (b) combine wage rates from rural, urban, and remote civil subdivisions contrary to the plain language of the statute; (c) expand Davis–Bacon coverage to workers and activities away from the statutorily covered "site of the work"; and (d) impose Davis–Bacon Act obligations and cross-withholding by operation of law, even when an underlying contract omitted the required stipulations.

42.      Plaintiff ABC filed detailed comments opposing the proposed rule revisions publicly posted at www.regulations.gov, cited above at n.3. Nearly 41,000 other comments were filed as well, many of which opposed the rule changes as violating the Davis–Bacon Act, failing to consider reasonable alternatives, failing to provide adequate justification for the changes proposed, and failing to properly assess the harm to small and disadvantaged businesses. *See*

Comments re: Updating the Davis Bacon and Related Acts Regulations, Office of Advocacy, U.S. Small Business Administration (March 17, 2022), https://www.regulations.gov/comment/WHD-2022-0001-40925.

### C.     The Department's Rule

43.     On August 23, 2023, the Department published its final Rule in the Federal Register. *See* Updating the Davis-Bacon and Related Acts Regulations, 88 Fed. Reg. 57526 (Aug. 23, 2023). With limited exceptions, the Rule adopts the Proposed Rule's flawed mandates.

44.     Specifically, the Rule incorporates the Proposed Rule's 30-percent standard. That standard will allow the Department to establish as the "prevailing wage" any single wage that is paid to at least 30 percent of the covered workers whose wage rates are voluntarily reported in a given civil division (usually a county), reinstating a definition of the term "prevailing" previously rejected by the Department itself and by the D.C. Circuit in *Building & Construction Trades v. Donovan, supra*. The Department's preamble to the new Rule further asserts that the discredited modal application of the 30-percent standard is somehow more reflective of prevailing rates than the Department's longstanding use of a majority (50-percent) standard, followed by a "weighted average." Under the new Rule, the Department will use a weighted average to set the prevailing wage only when no single wage is paid to a mere three out of ten reported workers, a rate that is by definition different from and typically higher than that paid to 70 percent of the local workforce. *See* 88 Fed. Reg. at 57723.

45.     The Rule likewise changes the Department's approach to calculating prevailing wages in urban and rural counties. When survey data is too sparse to calculate the prevailing wage in a single county, the Department may combine data from multiple adjacent counties. But under the 1982 regulations, the Department declared that it would not combine data from urban and rural

21

counties. The reason is simple: urban wages and response rates tend to be higher than the rates prevailing in rural counties. Now, however, the Rule abandons that common-sense approach and allows the Department to conflate urban and rural responses, as well as data from remote locations with different labor conditions and wage rates. The Rule asserts that such conflation—contrary to the plain statutory language—is necessary in "appropriate" cases and denies the inevitable inflationary effects. *See* Fed. Reg. at 57562.

46.     The Rule compounds that error by expanding its coverage to include rates paid under state prevailing-wage laws. Some states have their own prevailing-wage laws for public projects. Many of those laws calculate prevailing wages differently from the Davis–Bacon Act and result in "prevailing" rates even more unrepresentative than the Rule's baseline proposal. By allowing the Department to include rates calculated under these laws, the Rule skews Davis–Bacon rates even further from the wages actually paid to most workers.  *See* 88 Fed. Reg. at 57558–59.

47.     Similarly, the Rule expands the regulations to cover certain workers and activities previously exempt from the Davis-Bacon Act. For example, the Rule now alters the statutory definition of the term "construction" by including certain forms of "transportation" between related worksites (newly termed "primary" and "secondary" worksites). The Rule also applies the Act to new classes of workers, including certain surveyors, truckers, and workers engaged in prefabrication activities and/or material suppliers away from the construction worksite, as well as to certain "green energy" construction projects, such as weatherization and the installation of solar panels.  *See* 88 Fed. Reg. at 57733, 57597–98.

48.     The Rule also purports to impose Davis-Bacon Act coverage on contracts in which no Davis-Bacon Act stipulations are included. That is, under the Rule, a contract no longer has to state that it includes a prevailing wage or any other Davis-Bacon Act requirement, notwithstanding

the plain language of the Act requiring such contractual stipulations, as noted above. Instead, those requirements will now be imposed as a matter of law, without notice to contractors and/or subcontractors. *See* 88 Fed. Reg. at 57662.

49.    Each of these and other changes identified in ABC's attached comments was (and is) unlawful. The Rule thus departs from the plain words of the Davis-Bacon Act. It stretches the Act to cover new types of activity, ignores established judicial interpretations, and flouts Congressional intent. The Rule also disregards industry conditions, practical consequences, and the reliance interests of the regulated community. The Defendants have done all this without giving adequate weight to settled expectations, prior guidance, or longstanding practice. And on balance, the Rule does nothing to advance the Davis-Bacon Act's goal of protecting truly prevailing local wages. In numerous respects the Rule substitutes inflated wages for the rates actually prevailing in many civil subdivisions in Texas and around the country, by any ordinary definition of that statutory term. The Rule thus violates the plain language of the Davis-Bacon Act and is unlawful, arbitrary, and capricious in violation of the APA and SBREFA, as further explained in each count below.

## COUNT ONE

**The Rule is Contrary to Law**
**(40 U.S.C. § 3142; 5 U.S.C. § 706(2)(A), (C))**

### A. Definition of Prevailing Wage

50.    Plaintiffs incorporate by reference each of the preceding paragraphs.

51.    The Davis-Bacon Act requires the Department to identify the "prevailing wage" within the civil division where a covered construction project will be performed. This prevailing wage is then incorporated into contracts for construction. Contractors must pay covered workers at least the prevailing wage. 40 U.S.C. §§ 3142, 3145.

23

52.     The word *prevailing* has an established meaning. It has been applied by the Department in the same way for forty years; and that definition was approved by an Article III court. *See Donovan*, 712 F.2d at 629. Such judicial interpretations are authoritative and binding; they say what the law is. *See Gutierrez-Brizuela*, 834 F.3d at 1143. The Department cannot now change the law through regulatory artifice.

53.     The Rule is premised on the false supposition that the DC Circuit's definition of the statutory term "prevailing" was somehow wrong, and that weighted average rates do not reflect prevailing wages under the statute.

54.     To the contrary, it is the Rule that clashes with the established, common sense meaning of *prevailing*, as authoritatively interpreted by the court. And it is the court's definition, not the discredited meaning assigned to the term by the Rule, that is consistent with common English usage. "Prevailing" connotes a "significant degree of commonality"—something "widespread or predominant." In no sense does the statutory term connote an aberration or minority. Any wage, then, paid only to an unrepresentative minority of workers is by definition not *prevailing*. This was true when Congress passed the Act, contrary to the claim in the Rule. *See, e.g.*, *prevailing*, Merriam-Webster, Webster's Collegiate Dictionary (5th ed. 1936) ("Very generally current; most frequent; predominant"); *prevailing*, Oxford English Dictionary, Vol. VIII (1933) at 1334 ("2. Predominant in extent or amount; most widely occurring or accepted; generally current"). *See also Determination of Wage Rates Under the Davis-Bacon & Serv. Cont. Acts*, 5 U.S. Op. Off. Legal Counsel 174 (1981).

55.     The Department's claim that the definition of prevailing used for the past forty years is wrong as a matter of the statutory definition is contradicted by the Department's own website.     See     *Prevailing     Wages*,     U.S.     Dep't     of     Labor,

https://flag.dol.gov/programs/prevailingwages (defining *prevailing wage* under the Immigration and Nationality Act) ("The prevailing wage is the average wage paid to similarly employed workers in a specific occupation in the area of intended employment."). So while the Department now claims that *prevailing* does not mean "average," the Department itself uses the term that way. It cannot claim that its new interpretation matches ordinary meaning.

56.    Because the Rule allows the Department to make wage determinations based on a non-prevailing wage rate, it exceeds the Department's authority and violates the plain terms of the Davis-Bacon Act.

### B. Conflation of Urban and Rural Rates

57.    The Department also departed from the plain meaning of *prevailing* by conflating wage data from urban and rural counties.

58.    The Davis – Bacon Act requires the Department to make wage determinations for each "civil subdivision" of a state. 40 U.S.C. § 3142(b). The Department has long made those determinations at the county level. But the Department's survey techniques may occasionally produce too little data to make a determination within a single county. In that case, the Department will expand its search to include neighboring counties. Drawing data from each county, it will combine wage rates and make a single wage determination covering all of them. 29 C.F.R. § 1.7(a).

59.    There is, however, an important limitation. When the Department combines county data, it does not count rural and urban counties together. The reason is simple: urban and rural wage rates tend to differ, with urban rates generally higher. Similarly, contractors in urban counties tend to respond at a higher rate. So if urban and rural counties are combined, urban rates will swamp out rural ones and, more important, inflate rural wage determinations above the wages generally paid to workers in rural counties. 29 C.F.R. § 1.7(b); 47 Fed. Reg. at 23647.

60. For that reason, in 1982, the Department banned rural-urban combinations. It found that such combinations were "inappropriate" because they would result in inflated and unrepresentative wage determinations. And in the more than four decades since, the Department's rules have maintained that distinction. *See* 29 C.F.R. § 1.7(b); 47 Fed. Reg. at 23647; *Mistick Constr.*, 2006 WL 861357, at *2 (U.S. Dep't of Labor Admin. Rev. Bd. March 31, 2006).

61. The Rule now abandons that common-sense interpretation of the Act. The Rule fails, however, to square its new policy with the Davis–Bacon Act's plain language. The Act requires the Department to make prevailing wage determinations for each relevant "civil subdivision" of a state. The Department has long applied that term at the county level. But the Department's new approach will allow it to look beyond the county level whenever it deems cross-county comparisons appropriate. In effect, then, the Department has read the "civil subdivision" limitation out of the statute. It has—without statutory authorization—given itself the freedom to choose the level of determination on an ad hoc basis. *See* 88 Fed. Reg. at 57583.

62. The Rule fails to explain, much less justify, its departure from the Act's text and core purpose. The Rule is therefore unlawful and should be set aside.

### C. Imposition of Coverage by Law

63. The Davis-Bacon Act ties its coverage specifically to qualifying contracts. It requires agencies to incorporate certain specifications in all qualifying construction contracts. Those specifications include the local prevailing wage. The Act then requires contractors who agree to those contracts to abide by the specifications, including the prevailing-wage specification. The Act does not, however, operate as a general wage-and-hour law. It does not cover contractors or workers simply because they work in a specific region, activity, or industry. It covers them only when they perform work under a covered contract. 40 U.S.C. § 3142.

26

64.     For that reason, the Department has long applied the Act to a contractor or subcontractor only when the applicable contract and/or subcontract contains the required specifications. That is, a contractor must pay the prevailing wage only when the contract and advertised specifications require it to pay that wage. If the specifications are omitted, they are ineffective. *See* Op. No. B-144901, 40 Comp. Gen. 565, 570, 1961 WL 1636, at *6 (Apr. 10, 1961) ("The conditions established by the [Davis–Bacon] Act are effective only when, as expressly directed, they are included in the 'advertised specifications.'").

65.     There are good reasons for that rule. Not only does the Act premise coverage on the appropriate specifications, but a contractor may have no notice of the specifications unless they are included in a contract. A contractor might reasonably rely on the contract to state the full set of obligations for a particular project. The contractor may have no reason to suspect it is liable for a prevailing wage unless the wage is specified.

66.     This notice problem has been exacerbated in recent years by the proliferation of "related" acts imposing Davis-Bacon requirements on federally funded construction projects authorized by other statutes.  Even worse, the recently enacted Inflation Reduction Act for the first time incorporates and imposes Davis-Bacon's prevailing wage requirement on privately funded "clean energy" construction projects, which are not administered by any government agency, if said private developers want to receive enhanced tax incentives. It also extends to projects funded through the CHIPS Act—a $39 billion infusion into the national construction market—further widening its impact on the national construction market.

67.     The Final Rule departs from the statute by imposing Davis-Bacon Act coverage as a matter of law. Even if the construction contract omits the relevant specifications, the Rule holds the contractor liable. 99 Fed. Reg. at 57662. Because this aspect of the Final Rule again contradicts

27

the plain language of the Davis-Bacon Act, which conditions coverage on contractual specifications, it exceeds the Department's authority and violates the Act.

68.    Relatedly, the Rule redefines and expands the scope of the Act's coverage of "prime contractors" to include corporate affiliates without regard to indicia of control; and further authorizes "cross-withholding" (without contractual or statutory authorization) of back wages allegedly owed on a different project from that which the prime contractor allegedly owes such wages, without benefit of due process.

### D. Expansion of Coverage

69.    While broad, the Davis-Bacon Act limits its own coverage in several ways. For one, it applies only to employees at the "site of the work." It likewise applies only to employees who qualify as "mechanics or laborers." And it covers those mechanics and laborers only when they perform under a contract for "construction, alteration, or repair." 40 U.S.C. § 3142.

70.    The Rule ignores these statutory limitations. It expands Davis-Bacon Act coverage beyond the worksite by applying the Act to certain "transportation" activities. It expands coverage to non-laborers and non-mechanics, including certain surveyors, flaggers, and truck drivers. It also pushes the Act's coverage down the supply chain, roping in certain prefabrication work performed off site, which numerous courts have previously rejected. *See* 88 Fed. Reg. at 57615, 57621-25, 57708, 57732.

71.    These expansions violate the Davis-Bacon Act's plain terms. For example, the Rule significantly expands the definition of the "site of the work." The Davis – Bacon Act limits its prevailing-wage requirements only to activities performed at the site of the work. That language means what it says: the statute covers only work performed at the physical project site. Courts have repeatedly emphasized that plain meaning and rejected the Department's attempts to expand

28

coverage to off-site work. Yet in the Rule, the Department again tries to expand coverage to include certain off-site activities and facilities.

72.    The Rule purports to cover off-site facilities when those facilities are dedicated "entirely, or nearly entirely, to the construction of one or more 'significant portions' of a particular public building or work." These facilities would be covered even if they preexisted the project itself. The Davis-Bacon Act specifically and intentionally limits its coverage. The Department's expansions ignore those limits. They also ignore repeated and authoritative judicial interpretations. Courts have repeatedly rejected the Department's efforts to stretch the Act to cover new kinds of work in the past. Those efforts, like the Rule, departed from the Act's plain words. And for that reason, courts rejected them. *See, e.g.*, *District of Columbia v. Dep't of Lab.*, 819 F.3d 444 (D.C. Cir. 2016); *L.P. Cavett Co. v. U.S. Dep't of Labor*, 101 F.3d 1111 (6th Cir. 1996); *Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994); *Bldg. & Const. Trades Dep't AFL-CIO v. U.S. Dep't of Lab. Wage Appeals Bd. (Midway)*, 932 F.2d 985 (D.C. Cir. 1991).

73.    Because the Rule seeks to extend coverage to workers and types of work excluded by the Davis-Bacon Act's plain terms, it exceeds the Department's authority and violates the Act.

74.    All of the foregoing violations of the Davis-Bacon Act will directly injure Plaintiffs and their members, for reasons discussed above. Contrary to the language of the statute, the Rule will increase the administrative burdens and risks of non-compliance imposed on ABC member contractors; it will bring more projects and types of work under the Act's coverage, raising direct and indirect costs associated with performing that work. It will also dissuade ABC members from performing covered work at all, costing them valuable projects and opportunities. And it will injure Plaintiffs directly by forcing them to undertake substantial additional education and outreach to

explain to their members the new coverage boundaries of the Act and the potential implications for members when they undertake these newly covered types of work.

75.     In effect, the Rule puts its thumb on the scale for collectively bargained rates, raises direct labor costs, increases (non-reimburseable) compliance costs, and damages the ability of Plaintiffs' members to compete on efficiency and flexibility, thereby undermining their ability to secure and perform covered work. These types of economic and competitive injuries are cognizable under Article III and confer standing on Plaintiffs to challenge the rule. *See Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368, 379–80 (5th Cir. 2021) ("The Supreme Court regularly recognizes probable economic injury resulting from government actions that alter competitive conditions." (citing *Clinton v. City of New York*, 524 U.S. 417, 433 (1998))); *LifeNet, Inc. v. United States Dep't of Health & Hum. Servs.*, 617 F. Supp. 3d 547, 560 (E.D. Tex. 2022) (holding that the plaintiff had standing to sue when Medicaid reimbursement regulation for air ambulance providers like the plaintiff put its "thumb on the scale" for less favorable contractual terms).

76.     In addition, Plaintiffs and their members are deeply involved in the bidding process for federal and federally assisted construction projects. Plaintiffs' members bid on covered contracts, perform work on covered contracts, and so are subject to regulations governing covered contracts. Indeed, they are effectively the objects of regulation under those contracts. They are the parties who must pay wages in accordance with prevailing-wage determinations, follow job rules and classifications in accordance with those determinations, report payrolls for covered laborers and mechanics, and potentially pay penalties for underpayment, misclassification, or any other error or violation running afoul of the regulations. So even though the regulations impose obligations on them through the mechanisms of agency requirements and contracts, those

obligations flow down on them and dictate their business practices and decisions. They are as much an object of the regulations as agencies or laborers and mechanics. And as such, they suffer cognizable harms merely by virtue of the increased regulatory burden imposed by the Rule. *See, e.g.*, *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258 (5th Cir. 2015) (explaining that the object of regulations suffers injury by virtue of the increased regulatory burdens); *Texas v. Brooks-LaSure*, No. 6:23-CV-161-JDK, 2023 WL 4304749, at *6 (E.D. Tex. June 30, 2023) (same).

## COUNT TWO

### The Rule is Arbitrary and Capricious
### (40 U.S.C. § 4142; 5 U.S.C. § 706((2)(A), (C))

77.     Plaintiffs incorporate by reference each of the preceding paragraphs.

78.     In addition to exceeding the Department's statutory authority and violating the Davis–Bacon Act's plain terms, the Rule is arbitrary and capricious. It ignores relevant industry conditions, fails to adequately explain its sharp change in policy, and denies that policy's inevitable effects.

79.     As noted above, under the APA, an agency "must . . . provide good reasons" for rescinding or revising a longstanding rule or policy. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43 (1983) (noting that an agency rule may be arbitrary and capricious where the agency has "offered an explanation for its decision that runs counter to the evidence before the agency"). Indeed, the agency "must provide . . . a 'detailed justification' to explain why it is changing course" and an agency may not "casually ignor[e]" its previous findings and "arbitrarily chang[e] course." *Id. See also Coalition for Workforce Innovation v. Walsh,* 2022 U.S. Dist. LEXIS 68401 (E.D. TX Mar. 14, 2022), vacated as moot on other grounds.

**80.** An agency action reversing longstanding policy is arbitrary and capricious if the agency has "relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41–43 (1983). *Accord Sierra Club v. U.S. Env. Prot. Agency*, 939 F.3d 649, 663–64 (5th Cir. 2019). The agency also acts arbitrarily when it fails adequately to consider reasonable alternatives to the change in policy; and where it fails to consider the reliance interests of the regulated community. *Id. See also Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *Encino Motorcars, LLC v. Navarro*, 579 U.S. at 221-22. The Rule fails all of the foregoing criteria for arbitrary and capricious rulemaking.

**A. Reinstating the 30 Percent Rule Is Arbitrary and Capricious**

81. As stated above, the Rule's definition of *prevailing* conflicts with the statute's plain meaning. But even if the Rule were somehow reconciled with the statute, the Rule must also be found unlawful under the APA because the Department's justifications for reversing decades of policy with regard to the 30-percent rule are completely arbitrary and will result in wage determinations less reflective of the wages paid to workers in the relevant civil subdivisions. The Department failed to justify that inevitable result.

82. Specifically, the Rule fails to recognize that its new 30 percent standard is more likely to produce an unrepresentative wage rate. The rate is more likely to reflect a collectively bargained rate, even when unionized workers do not constitute a majority—or anything close to it—of the construction workers in the area covered by the Department's wage determinations.

83.     Again, under the new standard, the Department will adopt as the prevailing wage any single rate paid to 30 percent or more of workers in the locality. That rate by definition captures only a minority of the relevant labor market and imposes a rate that is typically higher than the rates paid to 70 percent of the reported local workforce.

84.     The wage determination process adopted in the Rule has also been shown to overrepresent collectively bargained rates. Collectively bargained rates tend to be more uniform because unions often negotiate uniform labor standards with multiple contractors. Those standards spread a single union wage across multiple employers, increasing the likelihood that the collectively bargained rate will meet the Department's threshold. Collectively bargained rates tend to be higher than the rates generally seen in the local labor market. Worse, these rates are automatically increased according to the contract. That means the rates are not only unrepresentative, but they also become more so over time. So to the extent the Department's rules make it easier to set the prevailing wage based on a single rate, they make it more likely that the prevailing wage will be an unrepresentative, collectively bargained rate. And by imposing a 30 percent (instead of 50 percent) threshold, the Rule does just that. *See* Comp. Gen. Rep. No. HRD 79-18 (April 27, 1979).

85.     The Department never acknowledges this disconnect. Instead, it insists that the proper method for determining the prevailing wage is to identify the most commonly paid single wage. 88 Fed. Reg. at 57534. But if the prevailing wage were nothing more than the single most common rate, it would be nothing more than a mathematical mode that would control the wage determination even if it were an outlier—even if their rate was highly unrepresentative and in no sense "prevailing." The Rule ignores that simple logic.

33

86.    To avoid absurd results, the prevailing rate must mean more than a minority modal rate. It must denote a rate that actually reflects the wages paid in the local labor market. It must in some sense *predominate*. *See Determination of Wage Rates Under the Davis-Bacon & Serv. Cont. Acts*, 5 U.S. Op. Off. Legal Counsel 174 (1981) (stating that the prevailing wage must be a "predominant" wage).

87.    The Rule also clashes with the Department's own approach to the word *prevailing* in other related contexts, where the Department has defined *prevailing* to look first to an "average" wage. For example, under certain visa programs where the Department is also called upon to set prevailing wage rates, it does so by using an "arithmetic mean." The Department itself, then, has acknowledged that *prevailing* does not require a modal calculation. *See* 29 C.F.R. § 656.40(b)(2).

88.    The Department also failed to explain its new standard in light of changing industry conditions. Most obviously, it failed to square its new policy with two concurrent trends: declining unionization and increasing wage dispersion.

89.    As discussed above, when the Department originally implemented its 30 percent rule in 1935, unionization rates in the construction industry stood at 85 percent. Northrup, et al. High unionization rates made it more likely that a single wage would be paid to a predominant percentage of the workforce in a given locality.

90.    By the 1980s, however, unionization rates in the construction industry had fallen to roughly 35 percent. Wages were therefore less uniform, even within a single locality. The 30 percent rule had therefore become increasingly likely to produce a wage determination out of step with the wages generally paid to covered workers. Instead, it was more likely to reflect a uniform, collectively bargained rate paid to only a minority of workers—a minority that was less and less reflective of the total labor force. *See* Hirsch & Macpherson, *supra*, at 349–54.

91.     Those changes in part spurred the 1982 reforms. The Department recognized that the 30 percent rule was no longer producing (if it ever had produced) wage determinations reflecting true prevailing wages. The Department therefore discarded the rule in favor of a majority approach. Only if a majority of workers were paid a single wage would that wage be deemed the prevailing wage. Otherwise, the Department would determine prevailing wages by calculating a "weighted average" or reported wages in the civil subdivision—an approach that more properly considered all workers instead of an unrepresentative minority. *See* 47 Fed. Reg. at 23645–48. *See also* Procedures for Predetermination of Wage Rates, 46 Fed. Reg. 41444, 41445 (1981).

92.     Yet now, without any change in the underlying trends, the Rule discards the Reagan reforms. It reverts to a rule designed to focus on only a minority of workers. And it does so at a time when that minority is even less likely to be representative of the local construction workforce as a whole. Unionization rates in the industry today stand at less than 12 percent. So to the extent the rule sets wage determinations based on collectively bargained rates, it necessarily sets them according to the wages earned by only a fraction of the workforce. The Department has not explained, let alone justified, its decision to ignore economic reality. *See* 88 Fed. Reg. at 57537–38.

93.     The Rule also ignores economy- and sector-wide trends. It fails to acknowledge that because unionization rates in the construction industry have declined, the Department's focus on codifying collectively bargained rates will put wage determinations more out of line with the wages paid to most workers. It also fails to recognize greater wage dispersion among all workers, making a strictly modal analysis less appropriate today than ever. That is, fewer and fewer workers make exactly the same wage. By focusing only on workers who do make the same wage, the Department moves its wage determinations farther away from the wages of most workers.

94.     In addition to the departures from the Act's plain language discussed above, the Rule is also arbitrary and capricious because it ignores flaws in the Department's data-collection methodology. These flaws include unscientific survey methods, overrepresentation of union rates, and overweighting of urban rates in comparison to rural ones.

95.     The Department determines the wages paid to workers in a given locality based largely through surveys. It distributes wage surveys to area contractors and asks them to report the wages paid to certain job classes. The Department then counts the responses received and sends reminders to contractors who do not respond. But if a contractor still fails to respond, its wage rates are not accounted for. *See* 88 Fed. Reg. at 57560–61; U.S. Govt. Accountability Office, Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey 19 (2011).

96.     This procedure creates a self-selecting data pool. Those contractors most likely to respond are the contractors who most affect wage determinations. And the contractors who respond the most are unionized contractors. *See* ABC Comments at 44–45 (reviewing evidence and studies of overrepresentation).

97.     This overrepresentation exacerbates the problem. Union wage rates are more uniform, and union firms show up more often in Department data. Those facts help explain how, even though unionized firms employ fewer than 12% of the construction workforce, unionized pay rates determine more than half of all wage determinations.[8]

98.     The Department has ways to solve this problem. It could use wage data from its own Bureau of Labor Statistics, which collects data using more scientific procedures. Or it could

---

[8] *See* James Sherk, Labor Department Can Create Jobs by Calculating Davis–Bacon Rates More Accurately 4 (2017) https://www.heritage.org/sites/default/files/2017-01/BG3185_0.pdf (stating that while "[o]nly 14 percent of construction workers are covered by union contracts . . . the GAO reports that 63 percent of Davis–Bacon rates are union rates.").

use statistical sampling or imputing techniques to correct gaps in its data. Or it could adopt one of the other myriad suggestions commenters, including ABC, urged it to adopt during the regulatory process. Yet it chose none of those options. Instead, it adopted a new policy designed to make its determinations less representative, even while knowing that its methodology was already producing unrepresentative data.

99.    The errors do not end there. Though the Rule refuses to use BLS data to set initial prevailing wages, it will nevertheless use BLS's Employment Cost Index (ECI) data to automatically update its rates going forward. In other words, though the Rule asserts that BLS data is inadequate for its initial calculations, it uses BLS data—based on the same underlying sampling and surveying techniques—to inflate the data going forward. *See* Fed. Reg. 57573. This approach would be rational only if the Department's goal were to set the highest possible rates—higher than those that truly prevail in each civil subdivision. That is a goal at odds with the Davis–Bacon Act's plain meaning. *See* 40 U.S.C. § 3142.

100.    The Department claimed that these errors were irrelevant to the Rule because they concerned only the accuracy of its wage data, not its new definition of *prevailing wage*. But in fact, they are relevant because the errors compound the Department's statutory error. They make it more likely that wage determinations will reflect not the wages generally paid to workers, but those paid to a small subset of workers at unionized firms.

101.    Because the Rule fails to address any of these issues, it is arbitrary and capricious. It should be declared invalid and set aside.

### B. Conflation of Urban and Rural Rates

102.    As explained above, the Rule changed the definition of *prevailing* by allowing the Department to combine wage-survey data from urban and rural counties. That change will overcount urban-county wages and undercount rural ones. The Department failed to justify that

effect—or even acknowledge its basic truth. Therefore, even if the Rule is not deemed to violate the Act on this point -though it certainly does violate the Act—the Rule is arbitrary and capricious under the APA and must be set aside for that reason.

103.    The Rule also fails to justify its new approach in light of the inevitable inflationary effect it will have on rural wage determinations. Like most of the Rule's changes, this new policy will push wage determinations well above the wages actually prevailing in many counties. Higher wage rates and overrepresentation in urban counties will drown out true rural wage rates. Rural contractors will therefore be forced to pay wage rates well beyond those generally paid in their localities. The result will be not to protect local wage rates, as the Davis–Bacon Act intended, but to inflate those rates to match (or even exceed) neighboring—or even remote—rates.

104.    For that reason and the reasons stated above, the Rule was arbitrary and capricious. It should be declared invalid and set aside.

### C. Expansion of Coverage

105.    As discussed above, the Rule expands Davis-Bacon Act coverage beyond the statutorily covered "site of the work." But in expanding the prevailing wage requirements beyond the construction worksite, the Department has also acted in an arbitrary and capricious manner by expanding coverage to workers and/or activities that have been previously found by the Department and/or the courts not to be covered construction site "laborers and mechanics," including certain surveyors, flaggers, and truck drivers. It also pushes the Act's coverage down the supply chain, roping in certain prefabrication work performed off site, which courts have previously rejected. *See* 88 Fed. Reg. at 57615, 57621-25, 57708, 57732.

106.    In taking these actions, the Rule again has failed to justify its reversals of decades of law and policy, failed adequately consider the reliance interests of the regulated industries, acted

38

in a manner inconsistent with the facts, and failed to consider reasonable alternatives. For these reasons and those previously stated above, the Rule should be declared invalid and set aside as arbitrary and capricious under the APA.

107.    For example, as noted above, the Rule significantly expands the definition of the "site of the work." Courts have repeatedly rejected the Department's attempts to expand coverage to off-site work. Yet in the Rule, the Department again tries to expand coverage to include certain off-site activities and facilities. It purports to cover off-site facilities when those facilities are dedicated "entirely, or nearly entirely, to the construction of one or more 'significant portions' of a particular public building or work." These facilities would be covered even if they preexisted the project itself. The Rule asserts that this expansion is necessary to address certain advances in construction methods and technologies. But it fails to reconcile the expansion with the decisions of the courts and fails to justify the change in policy as required by the APA.  The phrase "site of the work" has been litigated, interpreted, and liquidated into a fixed meaning in repeated decisions by the U.S. courts of appeals. The Rule cannot now ignore those decisions and impose a new meaning based on nebulous policy judgments. *See* 88 Fed. Reg. 57617–22; *Midway*, 932 F.2d at 992; *Ball, Ball & Brosamer*, 24 F.3d at 1452–53; *L.P. Cavett*, 101 F.3d at 1115.

108.    The Rule also expands coverage to include workers located off-site, such as certain flaggers. Flaggers are workers who, among other things, control traffic by directing other workers and vehicles. The Rule asserts that these workers are covered even when they work away from the principle construction site—in particular, when they work at a "location adjacent or virtually adjacent to the primary construction site." 88 Fed. Reg. at 57620. That expansion clashes with the Davis–Bacon Act's plain words, which again, limit coverage to the site of the work. It also clashed with well-established judicial precedent, which has rejected prior attempts to push coverage

39

beyond the worksite. *See* 40 U.S.C. § 3142; *Midway*, 932 F.2d at 992; *Ball, Ball & Brosamer*, 24 F.3d at 1452–53; *L.P. Cavett*, 101 F.3d at 1115.

109.    The Rule likewise expands coverage to include certain materials suppliers. Suppliers who operate off-site and provide materials to the worksite are exempt from the Davis–Bacon Act's requirement. Those suppliers may on occasion perform ancillary tasks on site associated with delivering or picking up materials. By longstanding interpretation and practice, those ancillary or incidental tasks do not trigger Davis–Bacon Act coverage as long as they fall below a 20% threshold. That is, material-supply workers who spend less than 20% of their time on ancillary or incidental tasks remain exempt. The Rule acknowledges that the 20% rule is well known to and understood by the regulated community. Even so, it abandons the standard for a supposed "bright line" test. This new test will exempt a material supplier only when the supplier's "only obligations for work on the contract or project are the delivery of materials, articles, supplies, or equipment." Likewise, the supplier's facilities must be located away from the construction site and be (a) established before opening bids for the contract, or (b) supply projects other projects at the same time. The test will drag in material suppliers who have, until today, been exempt from Davis–Bacon Act requirements and structured their operations accordingly. The Rule offers no rational, much less compelling, justification for that expansion. *See* Fed. Reg. at 57623.

110.    Similarly, the Rule arbitrarily extends coverage to most surveyors, except for those with professional licenses, departing from rulings over the past 50 years that members of survey crews are not "laborers or mechanics" covered by the Act. Labor Secretary Goldberg so held during the Kennedy Administration, stating that workers would be covered only to the extent they performed manual work such as clearing brush and sharpening stakes, which he said "are not commonplace." The Rule arbitrarily mischaracterizes the history of interpretations of the Act as

40

applied to surveyors and ignores the fact that work of most surveyors is predominately intellectual, analytical, and judgmental, not physical or manual. Because the Rule seeks to extend coverage to workers and types of work excluded by the Davis-Bacon Act's plain terms, it exceeds the Department's authority and violates the Act.

### D. Restrictive and Discriminatory Treatment of Non-Union Fringe Benefit Plans

111.    In addition to inflating wage determinations, the Rule also raises direct benefit costs. Under a principle called "annualization," the Department requires Davis–Bacon contractors to offset credits for fringe benefits according to the proportion of time a worker spends on private, non-Davis–Bacon work. This requirement is designed to ensure that contractors cannot take credit against their prevailing-wage obligations for benefits attributable to private work. The rule increases administrative costs and reduces the incentive to provide certain fringe benefits. Contractors therefore often provide benefits attributable directly to hours on Davis—Bacon contracts, such as hourly contributions to retirement plans. Those benefits have, until now, been exempt from annualization. *See* 88 Fed. Reg. at 57644–45.

112.    Now, however, the Rule makes even those kinds of benefits more burdensome. With narrow exceptions, it requires contractors to apply for an exemption. Only if the Department grants an exemption can contractors avoid annualization. And the Department will grant an exemption only if the benefit meets certain criteria, including that the benefit be "non-continuous in nature." *See* 88 Fed. Reg. at 57644–45. The Rule also codifies a burdensome rule requiring approval of self-funded insurance plans which are standard in the non-union construction industry. 29 C.F.R. 5.28. No justification exists for imposing an advance approval requirement on insurance plans that meet the Department's criteria for *bona fide* fringe benefits.

113.    Those requirements are new, burdensome, and unjustified. They will only increase administrative costs and discourage contractors from offering certain fringe benefits. That effect, in turn, will exacerbate the problems the Department says it is trying to address. And by driving up costs and administrative burdens, it will further undermine the ability of Plaintiffs' members to compete on a merit basis.

### E. Lack of Severability

114.    The Rule is an effort (self-described) to "comprehensively" redesign the way the Department determines, implements, and enforces prevailing wages under the Davis-Bacon and related acts.[9] Each part of the Rule contributes to the same final product: a prevailing wage higher and less representative than the rates truly paid in civil subdivisions across the country, and an enforcement process designed to impose unfair burdens and risks on merit contractors. Therefore, notwithstanding the Department's claims that the Rule's provisions are severable from each other, with certain limited exceptions, in reality the Rule is non-severable and should be set aside in its entirety.

115.    Section 706(2) of the APA directs courts to set aside any final agency action that is, among other things, arbitrary, capricious, or contrary to law. Section 551 defines agency action to include all or part of a final rule. Because of that definition, where invalid parts of a rule are woven into a comprehensive regulatory plan or scheme, such that the remaining parts are incapable of "independent life," a court will set aside the entire rule. *See Texas v. Becerra*, No. 5:21-CV-300-H, 2023 WL 2754350, at *32 (N.D. Tex. Mar. 31, 2023) (quoting *Franciscan Alliance, Inc. v. Azar*, 414 F. Supp. 3d 928, 945, n.7 (N.D. Tex. 2019).

---

[9] 88 Fed. Reg. 57694 ("[T]he Department notes that this is the first comprehensive update of the DBRA regulations in four decades, and as such covers a wide range of diverse topics.").

116.    Here, the Rule's invalid provisions are part of such a comprehensive scheme. The Rule's new 30-percent rule, conflation of urban and rural rates, redefinition of the "site of the work," and other expansions of coverage and punitive enforcement all contribute to the same final product: a higher, less representative prevailing wage, implemented and enforced in a discriminatory manner that increases the burdens on small, primarily non-union construction businesses. The changes work in tandem to produce a comprehensive new scheme that cannot be logically separated from each other or the remaining parts of the rule, all of which aim at the same result.

117.    Because the Final Rule's provisions are part of a comprehensive scheme, they cannot be logically severed. They are all invalid and must be set aside in total. *Becerra*, 2023 WL 2754350, at *32 (setting aside final rule because it was issued in excess of statutory authority and was arbitrary and capricious); *Chamber of Comm. Of United States v. United States Dep't of Lab.*, 885 F.3d 360, 388 (5th Cir. 2018) (same); *Nio v. United States*, 385 F. Supp. 3d 44, 68–69 (D.D.C. 2019) ("Generally, when a court finds that a challenged action is arbitrary and capricious, the remedy is vacatur.").

118.    This scheme harms Plaintiffs and their members. As described, the Rule expands coverage to new worksites and types of activities. Plaintiffs' members and their subcontractors engage in those kinds of activities, including construction work off-site at facilities now covered by the Rule. Plaintiffs' members also bid on and perform work under contracts subject to the Department's new fringe-benefit approval process. That process alone will force Plaintiffs' members to submit their benefits to a new bureaucratic process—a process that will require them to hire new staff, train existing staff, or both to understand and comply with the Rule. Because Plaintiffs' members are injured by this new burden and therefore seek a uniform remedy vacating

the entire Rule. Because that remedy will address their injuries, they have standing to seek vacatur of the entire, inseverable Rule. *See Texas Ass'n of Manufacturers*, 989 F.3d at 379–80 (holding that plaintiffs harmed by possibility of reduced sales under Consumer Product Safety Commission regulation had standing to challenge entire rule because plaintiffs sought to vacate the rule for irregularities under the APA and vacatur would remedy their alleged injuries). *See also WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) (holding that having established injury resulting from part of an invalid rule, plaintiffs had standing to seek vacatur of the entire rule); *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) (same); *Ass'n of Am. Railroads v. Dep't of Transp.*, 38 F.3d 582, 586 (D.C. Cir. 1994) (holding that increased regulatory burden was sufficient to confer standing on plaintiffs who were the object of regulation).#

**COUNT THREE**

**Violation of the Regulatory Flexibility Act and APA**

(5 U.S.C. § 601–612)

119.    Plaintiffs incorporate each of the preceding paragraphs by reference.

120.    The Regulatory Flexibility Act, 5 U.S.C. §§ 601 et seq., requires that agencies issuing rules under the Administrative Procedure Act must publish a final regulatory flexibility analysis assessing the negative impact of the rule on small businesses and to consider less burdensome alternatives. This analysis also requires the agency to respond to "any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule." 5 U.S.C. § 604(a)(3). The final regulatory analysis must "demonstrate a 'reasonable, good-faith effort' to fulfill [the Regulatory Flexibility Act's] requirements." *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88—89 (D.C. Cir. 2001); *see also Associated Fisheries of*

44

*Me., Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997) ("Congress, in enacting section 604, intended to compel administrative agencies to explain the bases for their actions.").

121.    The Rule fails to satisfy those requirements in several ways. For one, it fails to provide a reasoned explanation of its assessment of several significant economic issues raised in public comments. Notably, the Department received evidence that it severely underestimated the amount of time a human resources staff member will spend reviewing the rulemaking. This evidence included a statement that the 432-page Proposed Rule (a total of 118,450 words) would take 8.3 hours per person at an average silent reading rate. The Department ignored evidence that contractors cannot comply with the Rule's new and complex provisions without extensive involvement and retraining of many departments outside human resources. The affected aspects of constriction contracting directly impacted by the Rule include payroll, estimating, contracts, legal, operations, supervision, corporate risk management, and executive management in general. The Department failed to consider or address the impact on any of these areas of concern to small businesses.

122.    Even so, the Rule concludes that a single human resources staff member will only need to spend 4 hours and cost $200 per contractor (at 4 hours of human-resources staff time at $50) to review the new 800-page rule. It is unreasonable to expect that a human-resources professional would only need to read and understand 800 pages of obtuse rulemaking involving government contracts. The Rule is nearly 250,000 words, which would take almost 18 hours for the average American reader, at 238 words per minute, to finish.[10] In addition, the new rule is likely to require many small businesses to hire costly labor lawyers, at significantly more than $50 an hour, to review and provide compliance recommendations.

---

[10] https://www.sciencedirect.com/science/article/abs/pii/S0749596X19300786.

123.    Compliance and familiarity will be especially challenging for small businesses, including many of Plaintiffs' members, because they have no experience navigating this bureaucratic regulatory regime.

124.    The Rule fails to address these problems. Though it summarizes the concerns raised by regulated parties, it never addresses those concerns on the merits. Instead, it simply discounts the increased burden by assuming that some affected parties will avoid participating in public contracting entirely. *See* 88 Fed. Reg. at 57705 (stating that "because some of the firms in the cost calculation will not bid on a Davis-Bacon contract and therefore will not spend any time reviewing [the 800-page final rule]" an estimate of 4 hours is "more appropriate").

125.    This conclusion is astonishing. It asserts, in effect, that the Department can ignore costs to small businesses simply by making its rules too complex for small businesses to understand. By driving small businesses out of the market for public contracts, it can treat the costs to small businesses as zero. That conclusion is not only arbitrary and capricious, but contradicts the letter and spirit of the Regulatory Flexibility Act.

126.    To be sure, the Regulatory Flexibility Act is a procedural statute. It requires agencies to make a "good-faith effort" to carry out the statute's mandate. But if good faith means anything, it means that the agency may not offset regulatory burdens with the "savings" gained by driving some small businesses out of the market. If that were true, agencies could comply with the statute simply by raising costs on small businesses until all such businesses were excluded. In effect, it would turn the Regulatory Flexibility Act into the administrative equivalent of the imperial Roman army: "They make a desert and call it peace."[11]  *See Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-CV-00066-C, 2016 WL 3766121, at *38 (N.D. Tex. June 27, 2016) (holding that

---

[11] Tacitus, *Agricola* XXX.

plaintiffs stated a claim under the Regulatory Flexibility Act when they alleged that the agency relied on unjustified and irrational economic assumptions) ("Plaintiffs have made a substantial showing that DOL's New Rule will impose a significant economic impact on a substantial number of small businesses and that DOL failed to conduct a proper regulatory flexibility analysis.").

127.    The Rule also violates the Regulatory Flexibility Act by failing to properly respond to the comments filed by the Small Business Administration (SBA) in response to the proposed rule as required under 5 U.S.C. § 604(a)(3).

128.    On May 17, 2022, the SBA's Office of Advocacy, an independent office within the SBA, submitted public comments on the Proposed Rule stating the Department's analysis was deficient: "Advocacy is concerned that the added costs and complexities in this proposed rule will make it more difficult for small contractors and subcontractors to comply with the DBRA. This may have the unintended consequence of discouraging small businesses from participating in federal construction contracts." SBA's Office of Advocacy Public Comments Updating the Davis-Bacon and Related Acts Regulations, 87 Fed. Reg. 15698 (March 18, 2022)., https://advocacy.sba.gov/wp-content/uploads/2022/05/SBA-Advocacy-Davis-Bacon-Act-Comment-Letter.pdf.

129.    SBA's Office of Advocacy concluded that the Proposed Rule failed in at least three ways. First, it undercounted the number of small businesses affected by the proposal. Second, it "severely underestimated the administrative burdens and compliance costs of this rule for small businesses." Third, it failed to examine less burdensome alternatives. The Rule responds to none of these criticisms.

130. By failing to provide a reasoned response, the Rule violates the Regulatory Flexibility Act and again violates the APA. The Rule is therefore arbitrary, capricious, and not in accordance with law. It should be set aside. *See* 5 U.S.C. §§ 604(a)(3), 706(2)(A).

131. This failure will injure Plaintiffs and their members, many of whom are small businesses. Because the Department failed to consider the interests of small businesses, it produced a rule that does not reflect their concerns and that imposes higher costs than justified. Had the Department adequately considered their interests, it would have instead produced a rule with lower compliance costs and more flexibility (for example, with respect to the annualization of benefit programs).

## COUNT FOUR

### Violation of the Appointments Clause
### (5 U.S.C. § 601–612)

132. Article II of the U.S. Constitution empowers the President to appoint "Officers of the United States." This power is significant, as officers wield significant governmental power. Among other things, they lead federal agencies, develop national policy, and direct federal civil servants. The founders therefore placed strict limits on the appointment power. Most important, they required the President to obtain the advice and consent of the U.S. Senate. *See* U.S. Const. art. II § 2.

133. This advice-and-consent requirement serves multiple purposes. For one, it acts as a check on presidential favoritism. It also prevents the President from appointing unfit candidates. And it lends stability and predictability to the administration of government. It is not a mere formality; it is a foundational pillar in the Constitution's scheme for protecting private liberty. *See*

The Federalist No. 76 (A. Hamilton); *Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1124 (D. Mont. 2020).

134.    For that reason, courts have rejected efforts to circumvent the advice-and-consent requirement. They have allowed the President to appoint "acting" officials only under procedures authorized by Congress itself—and even then, only temporarily. They have refused to allow the President to appoint acting officials outside of approved channels. And they have never allowed the President to circumvent the requirement by appointing such officials indefinitely. *See Bullock*, 489 F. Supp. 3d at 1126.

135.    The Secretary of Labor is an officer of the United States. As such, he or she may be appointed only with the advice and consent of the Senate. In March 2023, then-Secretary of Labor Marty Walsh resigned. In his place, President Joe Biden nominated Deputy Secretary of Labor Julie Su. The President submitted her nomination to the Senate for approval. *See* Press Release, President Biden Nominates Julie Su for Secretary of the Department of Labor (Feb. 28, 2023),    https://www.whitehouse.gov/briefing-room/statements-releases/2023/02/28/president-biden-nominates-julie-su-for-secretary-of-the-department-of-labor/.

136.    The Senate held initial hearings on Su's nomination. The Senate did not, however, vote to confirm or reject her.

137.    Su's nomination expired with the end of Congress's 2023 session. Yet the administration not only failed to put forward a different, more acceptable candidate; it instead renominated Su. And it did so despite public opposition from senators of both parties and a consensus that Su did not have sufficient support to be confirmed. *See* Letter from Sen. Bill Cassidy, Ranking Member, to Sen. Bernie Sanders, Chair, U.S. Senate Committee on Health, Education, Labor, and Pensions (Feb. 13, 2024) [Cassidy Letter to Sanders],

https://aboutblaw.com/bcJd (observing that both Democratic and Republican senators opposed Su's nomination and raising concerns that her renomination was an attempt to circumvent the constitutionally required advice-and-consent process).

138.   Since then, Su has continued to act as the Secretary of Labor. She has now served for nearly a year without being confirmed—the longest such period of any nominee from a president whose party holds a majority in the Senate. And in the meantime, she has purported to exercise all the powers of that office, including the power to direct subordinate civil servants in the Department of Labor. In particular, the Rule was issued while she purported to lead the Department and wield the Secretary's powers.

139.   It is clear that Su will not receive the Senate's consent. She has acted as the Secretary for nearly a year without receiving a vote. And public reports have confirmed that key senators will not vote to confirm her. As a result, leading senators have called on the President to withdraw her nomination and submit an acceptable candidate. *See* Letter from Sen. William Cassidy to President Joseph Biden (July 19, 2023), https://www.help.senate.gov/imo/media/doc/julie_su_nomination_letter1.pdf; Cassidy Letter to Sanders, *supra*.

140.   The President has refused to do so. Instead, he has left Su to run the Department without the Senate's consent. He has signaled no intent to submit a new, acceptable nominee. Instead, he intends to circumvent the advice-and-consent requirement by leaving Su in office indefinitely. *See id.* ("White House officials have communicated to the press that your administration does not have the votes in the Senate to confirm Julie Su's nomination.").

141.   That scheme violates the Appointments Clause. It effectively removes the Senate from the confirmation process. If allowed, it would license the President to appoint officers with

little to no external check. The President could choose acting officers—who would wield all the powers of confirmed officers—and simply leave them in place for the duration of the administration. Such artifices would threaten individual liberty and mock the Constitution's design. *See Bullock*, 489 F. Supp. 3d at 1126 ("The President cannot shelter unconstitutional 'temporary' appointments for the duration of his presidency through a matryoshka doll of delegated authorities.").

142.    Since Su's nomination, the Department has relied on 29 U.S.C. § 552, which defines the duties of the Deputy Secretary of Labor. Among those duties is to serve as the acting Secretary of Labor during vacancies resulting from "death, resignation, or removal from office." That statute, however, allows the Deputy Secretary to exercise the Secretary's powers only on a temporary basis. It does not purport to allow the Deputy Secretary to serve as Secretary indefinitely with no good-faith effort to fill the position with a permanent nominee.

143.    Nor, indeed, could the statute authorize such a maneuver. If the statute licensed such behavior, it would have effectively created a new appointment mechanism—an appointment by default. Such an appointment is alien to the Constitution, which allows indefinite appointments only by advice and consent. Congress could not license the administration to dispense with advice and consent any more than it could license the administration to write its own budget. Advice and consent is both a power and duty of the Senate—one it cannot waive. *Cf. Clinton v. City of New York*, 524 U.S. 417, 439-40 (1998) (holding that Congress could not license the president to veto individual line items of a budget bill because Congress, not the president, was responsible for authorizing federal appropriations).

144.    Because Su has not received the consent of the Senate, she has not been confirmed as the Secretary of Labor. She cannot continue to exercise the powers of that office indefinitely.

She cannot continue to direct the Department's functions, including its regulatory functions. She has no constitutional authority to continue leading the Department. And because she lacks constitutional authority, she cannot license, direct, or approve binding rules on the Department's behalf.

145.    The Rule was issued under Su's purported authority. Because she has no such authority, the Rule is invalid. *See Bullock*, 489 F. Supp. 3d at 1130 (granting declaratory and injunctive relief against agency actions taken under acting official improperly put in office without the advice and consent of the Senate).

146.    Because the Final Rule was issued without valid authority, it is void in its entirety. Its provisions are not severable because they all suffer the same constitutional infirmity. They should be set aside in their entirety. *See* 5 U.S.C. § 706(2)(B) (requiring a court to set aside final agency action that violates the Constitution); *Behring Reg'l Ctr. LLC v. Wolf*, 544 F. Supp. 3d 937 (N.D. Cal. 2021) (vacating entire rule issued under purported authority of acting secretary not properly appointed in accordance with Federal Vacancies Reform Act).

## **REQUESTS FOR RELIEF**

147.    Plaintiffs ask that the Court enter a declaratory judgment declaring that the challenged Rule is invalid; vacate and set aside the Rule in its entirety; and permanently enjoin Defendants from implementing or enforcing the Rule.

148.    The Court should also award Plaintiffs their costs and expenses, including reasonable attorneys' fees under the Equal Access to Justice Act or otherwise; and award such other further and additional relief as is just and proper.

Dated: February 21, 2024

Respectfully submitted,

*/s/ Maurice Baskin*
Maurice Baskin

LITTLER MENDELSON, P.C.
1301 McKinney Street
Suite 1900
Houston, TX
(713) 951-9400
(713) 951-9212
ajharper@littler.com

Maurice Baskin (*pro hac vice* pending)
Alex MacDonald (*pro hac vice* pending)
LITTLER MENDELSON, P.C.
815 Connecticut Ave., N.W.
Washington, D.C. 20006
(202) 772-2526
mbaskin@littler.com
amacdonald@littler.com

ATTORNEYS FOR PLAINTIFFS

**CERTIFICATE OF SERVICE**

I hereby certify that on Feb. 21, 2024, the foregoing Amended Complaint was electronically filed with the Clerk of the Court, using the ECF system, thereby sending notification of such filing to counsel for Defendants:

Cynthia Liao
Arjun Mody
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., N.W.
Washington, D.C. 20005
Cynthia.F.Liao@usdoj.gov
Arjun.a.mody@usdoj.gov

/s/Maurice Baskin