# EXHIBIT 1



VIA ELECTRONIC SUBMISSION

May 17, 2022

Amy DeBisschop
Director
Division of Regulations, Legislation, and Interpretation
Wage and Hour Division
U.S. Department of Labor, Room S-3502
200 Constitution Avenue NW
Washington, DC 20210

**RE:    Docket No. WHD-2022-0001, Updating the Davis-Bacon and Related Acts Regulations Proposed Rule [RIN: 1235-AA40]**

Dear Ms. DeBisschop:

Associated Builders and Contractors hereby submits the following comments to the U.S. Department of Labor's Wage and Hour Division in response to the DOL's request for comments in the above-referenced Notice of Proposed Rulemaking published in the Federal Register on March 18, 2022, at 87 Fed. Reg. 15698.

## About Associated Builders and Contractors

ABC is a national construction industry trade association representing more than 21,000 member companies. ABC and its 69 chapters help members develop people, win work and deliver that work safely, ethically and profitably for the betterment of the communities in which ABC and its members work.

ABC's membership represents all specialties within the U.S. construction industry and is comprised primarily of general contractors and subcontractors that perform work in the industrial and commercial sectors for government and private sector customers.[1]

The vast majority of ABC's contractor members are small businesses. This is consistent with the U.S. Census Bureau and U.S. Small Business Administration's Office of Advocacy's findings that the construction industry has one of the highest concentrations of small businesses (82% of all construction firms have fewer than 10 employees)[2] and industry workforce employment (more than 82% of the construction industry is employed by small businesses).[3] In fact, construction companies that employ fewer than 100 construction

---

[1] For example, see ABC's 32nd Excellence in Construction Awards program from 2022:
https://www.abc.org/Portals/1/2022%20Files/32ND%20EIC%20program--Final.pdf?ver=2022-03-25-115404-167.
[2] U.S. Census Bureau 2019 County Business Patterns:
https://data.census.gov/cedsci/table?q=CBP2019.CB1900CBP&n=23&tid=CBP2019.CB1900CBP&hidePreview=true and
https://www.census.gov/programs-surveys/cbp/data/tables.2019.html.
[3] 2020 Small Business Profile, U.S. Small Business Administration Office of Advocacy (2020), at Page 3, https://cdn.advocacy.sba.gov/wp-content/uploads/2020/06/04144224/2020-Small-Business-Economic-Profile-US.pdf.

professionals compose 99% of construction firms in the United States; they build 63% of U.S. construction, by value, and account for 68% of all construction industry employment.[4]

In addition to small business member contractors that build private and public works projects, ABC also has large member general contractors and subcontractors that perform construction services for private-sector customers and federal, state and local governments procuring construction contracts subject to the DBA and 71 Related Acts and other government acquisition policies and regulations. For example, ABC members won 57% of the $128.73 billion in direct prime construction contracts exceeding $25 million awarded by federal agencies during fiscal years 2009-2021. These federal contractors provide subcontracting opportunities to large and small contractors in the specialty trades and deliver taxpayer-funded construction projects on time and on budget for their federal government customers.

ABC's diverse membership is bound by a shared commitment to the merit shop philosophy in the construction industry. The philosophy is based on the principles of nondiscrimination due to labor affiliation and the awarding of construction contracts through open, competitive bidding based on safety, quality and value.

## Background

On March 18, 2022, the DOL published a proposed rule changing regulations for the DBA and 71 Related Acts (herein after referred to as the DBA), which affect ABC members performing work on federal and federally assisted construction contracts covered by the DBA.

The rule proposes more than 50 significant changes to existing regulations affecting how the DOL WHD determines, requires and enforces prevailing wages on covered taxpayer-funded construction contracts. In its proposed rule, DOL estimates DBA regulations apply to $217 billion in federal and federally assisted construction spending per year—which is roughly 63% of all public construction put in place[5]—and provide government-determined wage rates for an estimated 1.2 million U.S. construction workers.[6]

Because the proposed rule will have far-reaching effects on local, state and federal government procurement stakeholders, taxpayers, ABC members and other construction businesses pursuing contracts and building federal and federally assisted construction projects, on March 25, ABC urged the DOL to extend the current 60-day comment period deadline of May 17 to provide adequate time to analyze the proposal, solicit member feedback and provide meaningful input on the proposal.[7] On April 22, the extension request was

---

[4] U.S. Census County Business Patterns by Legal Form of Organization and Employment Size Class for the U.S., States, and Selected Geographies: 2019, Available at https://thetruthaboutplas.com/wp-content/uploads/2021/07/Construction-firm-size-by-employment-2019-County-Business-Patterns-Updated-071321.xlsx.

[5] Of note, the NPRM's *Table 3 – Number of Potentially Affected Workers*, uses 2019 data from USAspending.gov to determine the number of workers and value of contracts awarded covered DBA because it was pre-COVID. In 2019, the U.S. Census Bureau data, available at https://www.census.gov/construction/c30/historical_data.html, states there was $344.346 billion worth of public construction, meaning the DBA applied to roughly 63% of all public construction spending. By way of comparison, $217 billion is 62% of the value of $346.23 billion worth of public construction put in place in 2021, according to U.S. Census Bureau data.

[6] See discussion: https://www.federalregister.gov/documents/2022/03/18/2022-05346/updating-the-davis-bacon-and-related-acts-regulations#p-19 and https://www.federalregister.gov/d/2022-05346/p-711

[7] https://www.regulations.gov/comment/WHD-2022-0001-0038

arbitrarily and capriciously denied without adequate explanation by the WHD, in violation of the Administrative Procedure Act.[8]

Due to the unreasonable time constraints imposed by the DOL, we are unable to comment on every single rule change in the NPRM because many are hidden in supposed "non-substantive clarifications" or "codifications" that make unacknowledged, substantive reversals of longstanding policies. The DOL's failure to correct the many due process and statutory violations in the portions of the NPRM addressed here have a cascading effect negatively impacting other changes that are interrelated with the obviously defective changes. ABC believes the only way to address the problems identified with the current NPRM is to issue a second NPRM and allow additional comments before proceeding to any final rule.

## Summary of ABC's Response to the Proposed Rule

As discussed in extensive detail in ABC's comments, for decades, the Government Accountability Office,[9] DOL Office of Inspector General,[10] think tanks,[11] taxpayer advocates[12] and construction industry stakeholders[13] have criticized the DOL WHD methodology used to determine prevailing wages as well as the DOL WHD's enforcement of DBA regulations on taxpayer-funded construction projects covered by the DBA. The NPRM fails to acknowledge or address these criticisms; in many instances, the proposed changes to DOL's DBA rules will only make things worse, violating both the DBA statute, the APA, the Small Business Regulatory Flexibility Act, and other laws.

Private and public sector critics of DBA regulations assert that the DBA's regulatory shortcomings:

1) Force contractors to adopt government-determined wage and benefits rates that do not reflect locally prevailing wage rates;
2) Needlessly raise taxpayer-funded construction costs;
3) Result in fewer infrastructure projects and improvements;
4) Stifle construction industry job creation and broader economic benefits;
5) Undermine construction industry productivity and the efficient use of skilled labor;

---

[8] https://downloads.regulations.gov/WHD-2022-0001-5513/content.pdf

[9] See, e.g., "Davis-Bacon Act Should Be Repealed", April 27, 1979; "Davis-Bacon Act: Process Changes Could Raise Confidence that Wage Rates Are Based on Accurate Data", May 31, 1996; "Davis-Bacon Act: Labor Now Verifies Wage Data, but Verification Process Needs Improvement", Jan. 11, 1999; "Davis-Bacon Act: Methodological Changes Needed to Improve Wage Survey",  March 22, 2011.

[10] See "Report to the Wage and Hour Division: Better Strategies Are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Prevailing Wage Rates." DOL Office of the Inspector General. March 29, 2019; and, "Concerns Persist with the Integrity of Davis-Bacon Act Prevailing Wage Determination," DOL Office of Inspector General, 04-04-003-04-420, March 30, 2004.

[11] See e.g., James Sherk "Labor Department Can Create Jobs by Calculating Davis-Bacon Rates More Accurately," The Heritage Foundation, Jan. 2017  and George C. Leef, 2010. "Prevailing Wage Laws: Public Interest or Special Interest Legislation?," Cato Journal, Cato Journal, Cato Institute, vol. 30(1), pages 137-154, Winter.

[12] See Rep. Bob Good's (R-Va.) press release on H.R. 2218, the Repeal Davis-Bacon Act, April 14, 2021: https://good.house.gov/media/press-releases/rep-good-introduces-two-bills-confront-corrupt-union-bosses and Rachel Greszler, "Why Congress Must Cancel the Davis Bacon Act," The Heritage Foundation, April 7, 2021.

[13] See written congressional testimony by ABC General Counsel Maury Baskin before House Education and Workforce Subcommittee on Workforce Protections, June 18, 2013, https://www.abc.org/Portals/1/Documents/Newsline/2013/ABC%20Testimony_Baskin_House%20EW%20Wkfc%20Protections%20Subcmte_Hearing_061813_FINAL.pdf and hearing transcript at https://www.govinfo.gov/content/pkg/CHRG-113hhrg81435/html/CHRG-113hhrg81435.htm.

6) Disproportionately adopt union collective bargaining agreements as the government-determined prevailing wage;
7) Unfairly give unionized firms an advantage when competing for public works contracts;
8) Discourage competition from small businesses, minority- and women-owned and disadvantaged firms disproportionately by imposing onerous paperwork burdens and added regulatory costs; and
9) Increase compliance risks on contractors and federal, state and local governments building projects funded by federal dollars subject to DBA requirements.

Accordingly, ABC supports meaningful legislative and regulatory reform to the DBA to mitigate its negative effects on construction industry employers and employees, taxpayers, government officials procuring public works contracts and other stakeholders.[14]

ABC's calls for meaningful reform are intended to provide regulatory clarity to the regulated community; eliminate needless red tape in the government contracting process; increase contracting opportunities for small businesses discouraged from competing for public works project contracts covered by DBA regulations; ensure construction workers are paid a truly prevailing wage and benefit rate on an hourly basis reflecting area standards, as required by the Davis-Bacon Act statute of 1931; and provide value to hardworking taxpayers by controlling the excessive cost of taxpayer-funded construction contracts.[15]

In the absence of meaningful reforms, ABC has called for full repeal of the DBA[16] and has opposed legislative and regulatory efforts to expand the scope of the DBA—and its costly regulatory burdens—onto public and private construction projects in which it has not been previously required. Likewise, ABC has called for reforms and repeal to state and local prevailing wage regulations suffering from similar flaws as the federal DBA.[17]

Unfortunately, the DOL's proposed rule includes more than 50 significant policy changes to DBA prevailing wage regulations that together will needlessly increase the cost of construction, discourage competition from small businesses and create confusion, regulatory uncertainty and new red tape burdens for contractors pursuing contracts subject to the DBA as well as government stakeholders procuring taxpayer-funded construction contracts.

The DOL's rule proposes sweeping changes that are essentially organized into three buckets:

1) Changing the DOL WHD's DBA wage determination process;
2) Expanding the scope of DBA regulations applying to new types of construction projects and categories of workers performing construction and nonconstruction related activity; and

---

[14] According to the findings of a March 2021 survey of ABC members, 88% of respondents do not support prevailing wage laws and the Davis-Bacon Act in its current form.
[15] According to the findings of a March 2021 survey of ABC members, 82% of respondents support reform to prevailing wage laws. An August 2021 survey of ABC member federal contractors found just 19% oppose prevailing wage reforms.
[16] According to the findings of a March 2021 survey of ABC members, 83% of respondents support full repeal of prevailing wage laws. An August 2021 survey of ABC member federal contractors found just 25% oppose full repeal of the Davis-Bacon Act.
[17] Since 2015 six states—Arkansas (2016), Indiana (2015), Kentucky (2017), Michigan (2017), West Virginia (2016) and Wisconsin (2018)—have repealed their state prevailing wage law, dropping the total number of states with a prevailing wage law to 28. For information on the 28 state prevailing wage laws, visit ABC State Prevailing Wage Law Database, available at https://www.abc.org/Portals/1/2021%20Files/State%20Prevailing%20Wage%20Law%20Research%20Database%20Updated%20060121.xlsx?ver=2021-06-29-114958-697.

3) Increasing DBA regulatory compliance requirements, enforcement policies and penalties on contractors.

In the "wage determination" bucket, the DOL proposes 14 changes to the methodology used by the WHD to determine the prevailing wage. Almost all of these changes are likely to result in broader adoption of union wage and benefits rates, despite the fact that unions represent less than 2 out of 10 construction workers in the U.S. construction industry.[18] At the same time, the changes are likely to result in a government-determined prevailing wage that is less likely to be reflective of actual wage and benefits rates and practices paid in a locality.

In addition, the proposed rule fails to address many well-documented and longstanding concerns with the WHD's antiquated, inefficient and costly DBA wage determination process. In fact, the proposed rule will lead to an increase in inaccurate prevailing wage determinations by reversing commonsense reforms made in the 1980s by the Reagan administration. ABC's extensive comments below recommend that the WHD use Bureau of Labor Statistics data and methodologies to compute a timely and accurate prevailing wage, and question why the WHD failed to consider this viable alternative in this NPRM.  [See discussion in Section II on page 7]

In the "scope" bucket, the DOL proposes eight changes that expand the DBA and its accompanying regulatory bureaucracy further into industries whose employers have employees who traditionally do not perform construction duties—defined in the DBA statute as a "laborer or mechanic"—such as surveyors, flaggers, prefabrication and modular manufacturers, material suppliers and truckers—or who have traditionally not been covered by DBA regulations except for in very limited and specific circumstances. The proposal also expands DBA coverage to new types of construction and construction-related activity, such as private green energy projects, public-private partnerships, private projects with improvements to space leased or used by government agencies and additional demolition, surveying and flagging activities. [See discussion in Section III on page 37].

In the "compliance and enforcement" bucket, the proposal makes 28 changes to compliance and enforcement aspects of DBA regulations, which will further reduce competition, create more compliance burdens, increase costs and expose firms to more legal and compliance risks for contractors. [See discussion in Section IV on page 42].

The vast majority of the changes proposed in all three buckets constitute arbitrary reversals of long-settled DOL policies, dating back to the Reagan administration's reforms previously upheld by the D.C. Circuit, and including many more litigation outcomes at the DOL's own Administrative Review Board and numerous court opinions limiting the scope of the DBA or the DOL's regulations. The DOL's issuance of the NPRM on its face violates U.S. Supreme Court authority governing agency reversals of policy.[19]

---

[18] See Bureau of Labor Statistics Union Membership Report, Table 4. Union affiliation of employed wage and salary workers by occupation and industry, 2021, published January 2022, https://www.bls.gov/news.release/union2.t03.htm.
[19] See Department of Homeland Security v. Regents of the University of California, 140 S. Ct. 1891 (U.S. 2020); Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm, 463 U. S. 29 (1983); see also Coalition for Workforce Innovation v. Walsh, 2022 U.S. Dist. LEXIS 68401 (E.D. Tex. March 14, 2022), appeal pending (vacating as arbitrary and capricious the WHD's delay and withdrawal of the previous administration's final rule on independent contractor status under the FLSA).

As further explained below, the NPRM violates settled judicial norms of administrative procedure, is arbitrary and capricious throughout, and should be withdrawn in its entirety for that reason, in addition to its many violations of the DBA's statutory language and intent, and DOL's failure to adequately address the obvious and substantial harms to small businesses in the construction industry caused by the proposed rule.

In addition, the DOL's proposed rule fails to deliver additional regulatory clarity specific to publishing union work rules and collective bargaining agreements that are applicable when union wage rates—and accompanying union work rules and practices—are adopted by the DOL as the prevailing rate. For decades, the regulated community has asked the DOL to publish union trade jurisdictional agreements in order to help contractors comply with this aspect of DBA regulations.

A lack of regulatory clarity has resulted in confusion from government and private sector stakeholders, unintentional violations, and costly litigation resulting in fees, penalties and back pay that undermines a company's ability to be profitable in an industry with extremely low profit margins. Critics of the DBA suggest its omission is intentional.  It is very unfortunate and puzzling that the DOL's WHD has not taken steps to provide this regulatory clarity for decades, nor has it contemplated this commonsense request from the business community in this proposed rule in light of recent roundtable discussions and requests by industry prior to the issuance of the proposed rule. [See discussion in Section V on page 49).

In addition, the DOL's regulatory analysis estimating the cost of this "significant regulatory action"[20] is grossly inadequate and not grounded in fact. The DOL's regulatory analysis claims it will take just 90 minutes "of a human resources staff member's time" to review[21] and implement the regulation,[22] at a cost of $78.97 in Year 1 for each of the contractors the DOL estimates will be affected by this rule. ABC estimates this proposal will collectively cost regulated businesses at least $500 million to $541 million in additional known regulatory costs to evaluate and implement in Year 1, in contrast to the DOL's meager estimate of $12.6 million in Year 1. In addition, the rulemaking does not account for additional annual costs to taxpayers as a result of the adoption of inflated nonmarket rates and reduced competition from small businesses. [See discussion in Section VI on page 51].

These added regulatory burdens and costs are likely to make it difficult for small businesses in the construction industry to win prime contracts and subcontracts financed by taxpayers, in direct violation of the Regulatory Flexibility Act. The DOL's proposal fails to contemplate and address longstanding concerns about the anti-competitive impact of DBA regulations on small businesses. In addition, the NPRM will increase many of the regulatory burdens facing small businesses and discourage them from pursuing federal and federally assisted contracts and exacerbate a troubling trend in federal contracting specific to construction industry small businesses: The number of construction industry small business firms that have been awarded federal contracts shrank by 58% from 2010 to 2020, from 15,114 small businesses to 6,389.

---

[20] The Office of Management and Budget's Information and Regulatory Affairs has determined this proposed rule is a "significant regulatory action" because it meets one of the four criteria of Section 3 (f) of Executive Order 12866. *See* 58 FR 51735, 51741 (Oct. 4, 1993).
[21] See discussion: https://www.federalregister.gov/documents/2022/03/18/2022-05346/updating-the-davis-bacon-and-related-acts-regulations#p-745.
[22] See discussion: https://www.federalregister.gov/d/2022-05346/p-757.

The current NPRM will contribute to an accelerated decline of small business participation in federal construction contracting. [See discussion in Section VII on page 54].

Finally, the DOL's proposed anti-competitive and costly revisions to DBA regulations could not come at a worse time for the construction industry, taxpayers and U.S. economy. The U.S. construction industry currently faces supply chain disruptions,[23] unprecedented materials cost inflation,[24] declining investment in nonresidential structures[25] and a projected skilled labor shortage of 650,000 people in 2022.[26] [27] The DOL's proposal is likely to exacerbate all of these headwinds facing the construction industry, increase costs and fail to improve the timeliness and quality of taxpayer-funded construction projects. In short, the DOL's proposal will ultimately result in less value and job creation from government investment in infrastructure— including the $550 billion of new infrastructure funding via the Infrastructure Investment and Jobs Act[28]—to improve America's roads, bridges, transportation systems, schools, affordable housing and water, energy and broadband utilities. [See discussion in section VIII on page 62].

**I. Sweeping Changes of the Sort Proposed in this NPRM Should be Made Final Only Under the Direction of a Confirmed Wage and Hour Administrator.**

At the outset, ABC is concerned that the broad and controversial changes proposed in the NPRM should be implemented, if at all, only by a confirmed administrator of the WHD. Acting WHD Secretary Jessica Looman has served in that position for more than the 210 days contemplated by the Federal Vacancies Reform Act.[29] While the act contains a provision extending an acting position in the event a nomination for the confirmable position has been rejected, such extensions are constitutionally suspect.[30] The prudent course for the DOL to adopt in this instance is to wait for a confirmed Wage and Hour administrator to take office before proceeding to implement a final rule of the magnitude of the present NPRM.

**II. The proposal makes significant changes to the WHD's prevailing wage determination process, but only makes it worse, without considering numerous reasonable alternatives**

The DOL proposes 14 changes to the methodology used by the WHD to determine the prevailing wage. Almost all of these changes are likely to result in broader adoption of union wage and benefits rates, despite the fact that unions represent less than 2 out of 10 construction workers in the U.S. construction industry.[31] At the same time, the changes are likely to result in a government-determined prevailing wage that is less likely to be reflective of actual wage and benefits rates and practices paid in a locality.

---

[23] Sam Barnes, "Missing Links," *Construction Executive*, April 2022
[24] "Monthly Construction Input Prices Increase in April, Says ABC," ABC News Release, May 2022
[25] "GDP: U.S. Economy Contracts, Investment in Structures Down Again, Says ABC," ABC News Release, April 2022
[26] "ABC: Construction Industry Faces Workforce Shortage of 650,000 in 2022," ABC News Release, February 2022
[27] "Construction Job Openings Increased in March; Demand for Labor Remains Strong, Says ABC," ABC News Release, May 2022
[28] United States, Congress, *The Infrastructure Investment and Jobs Act (P.L. 117-58)*
[29] 5 U.S.C. 3346.
[30] *See Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1126 (D. Mont. 2020) ("The President cannot shelter unconstitutional "temporary" appointments for the duration of his presidency through a matryoshka doll of delegated authorities."); *see also Buckley v. Valeo*, 424 U.S. 1, 126 (1976).
[31] See Bureau of Labor Statistics Union Membership Report, Table 4. Union affiliation of employed wage and salary workers by occupation and industry, 2021, published Jan. 2022, https://www.bls.gov/news.release/union2.t03.htm.

Likewise, the DOL WHD's proposed rule misses an opportunity to modernize the DBA as it fails to address many of the industry and the federal government's well-documented and longstanding concerns with the WHD's antiquated, inefficient and costly DBA wage-determination process. In fact, the proposed rule will lead to an increase in inaccurate prevailing wage determinations by reversing commonsense reforms made in the 1980s by the Reagan administration. ABC's comments recommend that the WHD use BLS data and methodologies to compute a timely and accurate prevailing wage.

*The Proposed Rule Arbitrarily Reverses Previous DBA Reforms*

The proposed rule includes a number of changes that reverse prior reforms and are likely to further distort the accuracy of wage determinations—a process that is already deeply flawed and has been criticized repeatedly by the GAO,[32] the OIG[33] and private sector stakeholders.[34]

Unfortunately, the proposed rule will continue the DBA's unfortunate history of needlessly increasing the cost of federal construction projects. DOL should address the changes outlined below to avoid exacerbating this problem.

First, DOL proposes to redefine the term "prevailing wage" in § 1.2 to return to the "three-step process." This will allow the DOL to identify wages as prevailing in cases where no wage rate is paid to a majority of workers, as long as at least 30% of workers are paid the same rate. In seeking to avoid the "overuse of average rates," the proposed rule will instead establish prevailing wage rates for the entire industry despite up to 70% of workers receiving a different rate.

The DOL's NPRM fails to justify restoration of the 30% rule, reversing President Reagan's signature reform of the DBA, which was upheld by the D.C. Circuit Court. While cherry-picking isolated support for the 30% measurement of "prevailing" rates, the DOL's preamble ignores substantial findings of the GAO and the DOL itself, which found the rule improperly inflated wage rates above the truly prevailing rates. As is also further explained below, whatever merit the 30% rule had 50 years ago, when the market share of construction unions was at or above majority levels in at least some metropolitan areas of the country, the 30% rule has no statistical validity in the current construction market in which the union share of representation within the construction workforce is less than 14% nationally.

The DOL also fails to support its contention that its current use of weighted averages in any way violates the DBA's legislative intent.

Contrary to the NPRM, government officials recognized the severe inflation caused by the 30% rule and its failure to measure truly "prevailing" wage rates when 70% of the construction

---

[32] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, https://www.gao.gov/products/gao-11-152
[33] U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, Report No. 04-19-001-15-001, March 29, 2019, https://www.oig.dol.gov/public/reports/oa/2019/04-19-001-15-001.pdf.
[34] James Sherk, "Labor Department Can Create Jobs by Calculating Davis-Bacon Rates More Accurately," The Heritage Foundation, January 2017

workforce was paid at different rates than what the DOL found to be prevail 60 years ago. J.E. Welch, then-deputy general counsel of the General Accounting Office, testified before a congressional labor subcommittee in 1962 that "the methods and procedures" adopted by the DOL for administration of the DBRA "have not kept pace" with the requirements of the period.[35] The GAO issued a series of reports criticizing the 30% rule throughout the next decade, finding repeatedly that the DOL's application of that rule resulted in many wage determinations that exceeded any semblance of "prevailing" wage rates.

The NPRM also ignores the seminal report issued by the Comptroller General in 1979 documenting the DOL's failure to implement the DBA in a manner which properly calculated truly prevailing wages, largely because of the misapplication of the 30% rule. The report specifically identified the 30% rule as responsible for the calculation of "unrealistic wage rates."

The report stated: "In areas where unions have organized at least 30% of the construction workers, [the union's] wage scales have an excellent chance of becoming the prevailing rate, even though 70% of the rates paid to other workers may vary by small amounts."[36] The GAO report also observed that, as union pay scales set forth in collective bargaining agreements are uniform, whereas open-shop contractors generally recognize different skill categories and productivity when establishing compensation, the union's wage scales have a far greater prospect of becoming the prevailing rate.[37]

In formal testimony before Congress shortly following the report's issuance, Comptroller General Staats also identified a number of flaws within the DBRA, namely that "the policies, practices and procedures developed by Labor for establishing wage rates under the act have only rarely implemented the legislative intent."[38] Staats also identified the 30% rule as inflationary, with its use resulting in significantly higher rates than what the majority of workers were receiving.[39]

In light of this history of flawed application of the 30% rule prior to the Reagan reforms, the DOL's assertions in the NPRM that the rescission of the 30% rule in the 1982 rulemaking was "incorrect" is woefully inadequate to justify reversing 40 years of consistent DOL policy on this issue. Contrary to the DOL's position in the NPRM, it is clear to all that the 30% rule results in inflated wages which are inherently <u>not prevailing</u>, and therefore violate the plain language of the DBA.

The NPRM's contrary assertion that the Reagan rescission of the 30% rule and reliance on weighted averages was somehow "inconsistent with the text and purpose of the [Davis-Bacon] Act"[40] itself flies in the face of the D.C. Circuit Court's decision upholding the rescission of the 30% rule.[41] The court expressly upheld the current definition of "prevailing" wages as first a majority and then a weighted average, finding that this definition "is within a common and

---

[35] Special Labor Subcommittee, *Administration of the Davis-Bacon Act*, 1962, p. 283.
[36] Staats Report, at 52.
[37] Ibid.
[38] Staats Testimony, at 6-7.
[39] Ibid. at 32.
[40] See language: https://www.federalregister.gov/d/2022-05346/p-208.
[41] See *Building and Const. Trades' Dept., AFL-CIO v. Donovan*, 712 F.2d 611, 616-617 (1983).

reasonable reading of the term."[42] For this reason alone, the NPRM violates the DBA and the APA by reversing course without a reasonable explanation and ignoring facts contrary to the new position advanced by the WHD.[43]

Second, the proposed rule would eliminate language in § 1.7(b) barring the cross-consideration of metropolitan and rural wage data. Given the higher average wages of metropolitan county data, this is likely to result in wages in nearby rural counties that do not reflect a local prevailing rate, violating the spirit and Congressional intent of the DBA. The DOL states it would rely "instead on other approaches to determine how to appropriately expand geographic aggregation when necessary." These alternative approaches are not clearly described in the rulemaking, leaving it unclear how the DOL will prevent blending of urban and rural wage data that does not accurately reflect area standards. Again, the DOL has offered arbitrary and inadequate explanations to justify this dramatic change in policy from the Reagan reforms that were upheld by the D.C. Circuit Court.[44]

Finally, the DOL proposes to change the regulations on compiling wage rate information at § 1.3 to allow for variable rates that are "functionally equivalent" to be counted together for the purpose of determining whether a single wage rate prevails. This change conflicts with the intended definition of "prevailing wage" and contradicts the ruling of DOL's own Administrative Review Board.[45]

ABC's federal contractor members, who have direct experience complying with DBA regulations, flagged the flaws in these proposals within the NPRM in their responses to an April 2022 survey.[46] Just 12.6% stated that the proposed 30% rule would increase the accuracy of DOL wage determinations, and just 14.4% stated that aggregating metropolitan and rural wage data would have the same result.

*The Proposed Rule Will Inflate Inaccurate Wage Data Using BLS Cost Escalators, Despite Refusing to Adopt BLS Wage Surveys*

Despite failing to reform wage surveys and instead proposing changes that will further decrease their accuracy, the DOL has additionally proposed to revise § 1.6(c)(1) to regularly update certain not-collectively bargained prevailing wage rates based on the BLS Employment Cost Index.

As outlined below, ABC has repeatedly urged the DOL to adopt BLS wage surveys, which use scientific statistical sampling techniques to establish more accurate market wage rates. The proposed rule does not seek to adopt these surveys yet is willing to utilize BLS data for wage increases. This will result in the inflation of flawed wages collected utilizing the current survey process.

---

[42] Ibid. at 616-617 (citing 75 CONG. REC. 12,365 (1932)(remarks of Rep. Connery, floor manager of the 1932 amendments)(endorsing an averaging method for determining the prevailing wage)).
[43] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 2020); *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm, 463 U. S. 29* (1983)
[44] *Building and Const. Trades' Dept., AFL-CIO v. Donovan*, 712 F. 2d at 616-17.
[45] Mistick Construction, ARB No. 04-051, 2006 WL 861357 (March 31, 2006).
[46] "ABC Survey Indicates Members Oppose Davis-Bacon Regulations and Proposed Changes-Submit Your Comments by May 17," ABC Newsline, May 11, 2022.

*DOL's NPRM Will Make It More Likely That DOL's Wage Determinations Will Fail to Find Rates that Actually Prevail*

The DOL proposes defining "prevailing wages" under the DBA in part as "the wage rate paid to a majority (more than 50%) of the laborers or mechanics in the classification on similar projects in the area … [or] [i]f the same wage is not paid to a majority of those employed in the classification, the prevailing wage will be the wage paid to the greatest number, provided that such greatest number constitutes at least 30% of those employed."[47]

This definition is highly problematic because such prevailing wages rarely occur in the modern economy. In general, there is not a "prevailing rate" that a majority—or 30%—of employers pay for a specific job classification in a locality. Instead, employers generally pay individuals with the same job title or occupational classification different wage rates based on their individual skills, productivity, performance and/or experience. Different employers also generally pay different wage rates and offer different combinations of wages and benefits. While occupational wages generally fall within an occupational wage range, local employers rarely pay either a majority or 30% of workers in the same occupation a single rate.

Labor economists have extensively documented that, observationally, similar workers frequently earn quite different wages. An extensive academic literature seeks to explain what causes such "wage dispersion." Leading explanations for wage dispersion include interfirm differences in wage policies and productivity—with larger firms typically paying more than smaller firms—as well as employers rewarding workers for individual characteristics.[48] But the fact that significant wage dispersion exists is uncontroversial in labor economics.

ABC members' experiences confirm academic economists' findings. ABC members rarely pay all employees, or even a majority or 30% of employees, the same wage rate based on job classification or title. Pay instead varies within occupations based on workers' skills, experience, safety and productivity. A 2022 survey of DBA and non-DBA ABC member contractors found that the majority of respondents do not compensate employees based on their trade category and instead compensate employees based on factors including skills, safety and experience to determine individual rates of compensation. Prevailing wages, as the department proposes defining them, are not common practice in the construction industry.

A notable exception to this general rule exists. While nonunion employers—like many ABC members—do not typically set pay based purely on job title or harmonize wage rates with

---

[47] NPRM, proposed modification to 29 C.F.R. § 1.2

[48] See for example Dale Mortensen, "Wage Dispersion: Why Similar Workers are Paid Differently," 2003, MIT Press (substantial evidence of wage dispersion (inter-firm differences in wage policy and productivity cause significant wage dispersion, as do job search frictions); John M. Abowd, Francis Kramarz, and David N. Margolis, "High Wage Workers and High Wage Firms," *Econometrica*, Vol. 67, No. 2., p. 251-333. (March 1999) (person effects are a major source of wage variation, and firm effects also play a notable, though less significant role); John Ichiro Jones, "An Investigation of Industry and Size Effects on Wage Dispersion," *Occupational Employment and Wages*, Vol. 16, No. 2., pp. 22-25 (2003) (significant pay variation within occupations, partly driven by smaller firms paying less than larger firms for workers in the same occupation); George Baker, Michael Gibbs, Bengt Holmstrom, "The Internal Economics of the Firm: Evidence from Personnel Data," *The Quarterly Journal of Economics*, Vol. 109, No. 4., pp. 881-919 (Nov. 1994) (substantial individual variation in pay within pay levels); Steven J. Davis and John Haltiwanger, "Employer Size and the Wage Structure in U.S. Manufacturing," *Annales d'Économie et de Statistique* No. 41/42, pp. 323-367, (Jan.-June 1996) (substantial wage dispersion within the manufacturing sector, with greater wage dispersion in smaller establishments than larger ones);

other local employers, this is a feature of union collective bargaining agreements. Unions typically seek "local labor standards" that set identical wage rates based on job classification across local unionized employers. Economists have consequently long found significantly less wage dispersion in and between unionized employers than nonunion employers.[49]

A single prevailing wage rate, as the DOL proposes defining it, would frequently exist in industries with a significant union presence. This scenario was more common in the construction industry when the DOL last substantively revised its DBA regulations. BLS data show that, between 1977 and 1981, union density in the construction sector varied between 34% and 38%.[50] At that time, defining prevailing wages (in part) as the single wage rate paid to a majority of local workers in a particular job classification was a coherent concept; in many localities, unions had majority market share and could establish such prevailing rates through local labor standards.

That economy no longer exists. Though workers in the construction industry have one of the lowest barriers to unionization of any industry,[51] BLS data shows that union density in the U.S. construction sector has stood at 13.8% between 2015 and 2021.[52] Union coverage within blue-collar construction occupations (e.g., excluding largely nonunion management and administrative positions) is not much higher—just 16.6%.[53] This data suggests construction unions represent 30% of the construction workforce in very few localities in the United States. Prevailing wages, as the DOL proposes defining them, rarely exist.

The DOL's prevailing wage surveys nonetheless often report a single wage rate paid to 30% to 50% of workers in a local occupation. This happens because the DOL uses unscientific and statistically unreliable methods to produce these surveys, and these methods cause the surveys to disproportionately reflect union wage rates. If the DOL used statistically valid methods to conduct its Davis-Bacon wage and benefits surveys, it would rarely ever find a single rate paid to 30% of local workers. ABC suggests the DOL eliminate clauses 1 and 2 of its proposed redefinition of prevailing wage and modify clause 3, such that the revised definition instead reads:

> **Prevailing wage**. The term *prevailing wage* means the average of the wages paid to those employed in the classification, weighted by the total employed in the classification.

[49] See for example Richard Freeman, "Union Wage Practices and Wage Dispersion Within Establishments," *Industrial and Labor Relations Review*, Vol. 36, No. 1, pp. 3-21 (Oct. 1982).

[50] Barry T. Hirsch and David A. Macpherson, "Union Membership and Coverage Database from the Current Population Survey: Note," Historical tables: Private Construction, *Industrial and Labor Relations Review*, Vol. 56, No. 2, Jan. 2003, pp. 349-54 (updated annually at unionstats.com). Available online at https://www.unionstats.com/Private-Construction.htm. Note that union density here refers to total union coverage—both union members and agency fee payers. Union membership was somewhat lower during this period, ranging from between 33% to 36%. Union coverage statistics are not available for 1982.

[51] Construction workers can apply for union membership directly at union hiring halls specific to their trade. If the union hiring hall accepts a worker's application to join a union, the worker can join a union, pay union dues and be dispatched to a unionized contractor performing work on a construction jobsite almost immediately, presuming the union hiring bench is not full and unionized contractors have enough work to require more labor. Nonetheless, for a variety of reasons, today's construction workers have largely chosen not to join unions.

[52] ABC calculations based on Jan. 2015 to March 2022 Bureau of Labor Statistics' Current Population Survey Outgoing Rotation Group data. See Appendix for details.

[53] *Ibid.* Note: "Blue-collar" jobs are broadly workers in the trades, such as electricians, carpenters, plumbers, etc. In this context, managers, administrators and office staff employed in the construction industry have been removed from estimates about unionization in the construction industry in order to focus exclusively on prevailing wages paid to "laborers and mechanics" as defined by the DBA.

This would align the DOL's regulatory definition of "prevailing wages" with the on-the-ground reality in the modern workforce and construction industry.

## 1. The Department's Davis-Bacon Surveys Are Unscientific and Statistically Unreliable

The DOL's Wage and Hour Division uses an unscientific and unreliable methodology to calculate Davis-Bacon prevailing wages. These methods produce Davis-Bacon rates disconnected from locally prevailing construction wages.

*Representative Sampling Needed to Accurately Estimate Wages*

Economic statistics—such as wage rates, unemployment or job creation—can be accurately calculated in one of two ways. First, they can be based on a census that reports data from every participant (often through administrative data or otherwise compulsory participation).[54] If a universal census is not available, accurate estimates can only be calculated through statistically representative sampling. Given a representative sample, economists can apply statistical principles to extrapolate from survey responses to the overall economy. The BLS, for example, calculates the unemployment rate using representative sampling.[55]

Accurately extrapolating from an unrepresentative sample is impossible. Statistical laws do not apply to self-selected or otherwise unrepresentative samples. Self-selected surveys provide information only about those who responded to the survey; they cannot be used to make accurate inferences about nonrespondents. As Nobel Prize-winning economist James Heckman has explained, "Wage or earnings functions estimated on selected samples do not, in general, estimate population wage functions."[56] Any introductory statistics textbook makes the same point.[57] Representative samples are necessary for accurate estimates.

This is why online polls are unreliable. Respondents self-select into these surveys, so the results say more about who chose to participate in the survey than about the world at large. For example, Fox News's audience is generally a more conservative audience than the U.S. electorate as a whole and MSNBC's more liberal. An online poll hosted on the Fox News website would generally show conservative candidates with a huge lead in U.S. elections, and vice versa for liberal candidates on a survey on the MSNBC website. But these self-selected surveys would say nothing reliable about candidates' actual election prospects.

As noted above, the GAO and the DOL OIG have repeatedly criticized the DOL for estimating DBA wages with unrepresentative surveys.[58] Instead of selecting a statistically representative

---

[54] For example, the department's regular reports on weekly and monthly UI claims are based on administrative data from the states. These reports do not suffer from sampling error, as they comprehensively report all UI claims filed in each state. Similarly, the BLS payroll survey is initially based on a survey of employers, but ultimately benchmarked against administrative data on employer payroll tax payments.

[55] The unemployment rate is derived from answers to the Current Population Survey, which the BLS administers in conjunction with the Census Bureau. The Current Population Survey involves a survey of approximately 60,000 U.S. households each month, selected using statistical sampling techniques.

[56] James Heckman, "Sample Selection Bias As a Specification Error," *Econometrica*, Vol. 47, No. 1 (Jan. 1979), pp. 153–154.

[57] See for example Cheryl Ann Willard, *Statistical Methods: An Introduction to Basic Statistical Concepts and Analysis* (Taylor & Francis, 2020). Pp. 3-4 or James McClave, Frank Dietrich, and Terry Sincich, *Statistics*, 7th Ed. (Upper Saddle Hill, N.J.: Prentice Hall, Inc., 1997), pp. 11–15, 131–136.

[58] See, for example, U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations*, Audit Report No. 04-04-003-04-420, March 30, 2004, pp. 12–13, at *http://www.oig.dol.gov/public/reports/oa/2004/04-04-003-04-420.pdf*; U.S. Department of Labor, Office of Inspector General, *Inaccurate Data Were Frequently Used in Wage Determinations*

sample of construction employees or employers, the WHD sends DBA surveys to every construction firm it can identify in a given region.[59] The DOL sends follow-up mailings to firms that do not initially respond, then makes DBA determinations on the data provided by those firms that do.

In theory, if every firm responded, such a census of employers could accurately measure wages. However, response rates to these surveys are low and most firms do not participate. Those that do are not representative of the construction industry as a whole.

As a result, the DOL bases DBA determinations on neither a census nor a representative sample of employers, but a self-selected and unrepresentative sample. This methodology lacks statistical validity.

*DBA Surveys Have Critically Low Response Rates*

Office of Management and Budget agency guidance explains that high-response rates are essential for accurate surveys:

> "A survey's response rate is a valuable data quality and field performance indicator and is probably the most widely cited single number associated with the generalizability of a survey's results. A high response rate increases the likelihood that the survey results reflect the views and characteristics of the target population. Conversely, a low response rate can be an indicator of potential nonresponse bias, which would be detrimental to the accuracy of the results."[60]

OMB guidance directs agencies to take additional steps to verify survey validity if they expect response rates to fall below 80%. The vast majority of federal statistical surveys exceed this threshold.[61] Unfortunately, the DOL's DBA surveys do not even come close.

The GAO and the DOL OIG have long expressed concern that these low response rates undermine the DBA survey's accuracy.[62]

In 2019 the DOL OIG reported that an analysis of seven DBA surveys showed that only 47% of eligible contractors responded to the WHD's requests. An eighth survey was canceled after the WHD sent out 796 requests for wage data and received only 68 responses.[63] The OIG further reported that, for half of DBA classifications, the department could not collect wage data from a

---

*Made Under the Davis–Bacon Act*, Audit Report No. 04-97-013-04-420, March 10, 1997, at *http://www.oig.dol.gov/public/reports/oa/pre_1998/04-97-013-04-420s.htm*; and U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, GAO-11-152, March 2011, at *http://www.gao.gov/new.items/d11152.pdf.*

[59] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, pp. 57–58.

[60] Office of Information and Regulatory Affairs, U.S. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collection*, Originally published Jan. 2006, last modified Oct. 2016, p. 56. https://obamawhitehouse.archives.gov/sites/default/files/omb/inforeg/pmc_survey_guidance_2006.pdf.

[61] *Ibid*, pp. 59-61.

[62] See for example U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, pp. 19-29 and U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, Report No. 04-19-001-15-001, pp. 8-15, March 29, 2019 at https://www.oig.dol.gov/public/reports/oa/2019/04-19-001-15-001.pdf.

[63] U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, pp. 8, 15.

14

single worker in the county the classification covered.[64] WHD officials themselves admit that "achieving a sufficient level of participation from those authorized to provide wage data [is] their most significant challenge related to publishing prevailing wage rates."[65]

*DBA Survey Respondents Are Unrepresentative of the Overall Construction Workforce*

Low response rates can create significant bias if those who respond systematically differ from those who do not, thereby creating an unrepresentative sample.[66] This is exactly what happens with DBA surveys. Larger, unionized firms are systematically more likely to respond to DBA surveys than smaller and nonunion firms. As the GAO has explained:

> "[O]ur review identified persisting shortcomings in the representativeness of survey results … Labor's own procedures manual recognizes nonresponse as a potential source of survey bias and indicates there is a higher risk non-respondents will be nonunion contractors because they may have greater difficulty in compiling wage information or be more cautious about reporting wage data."[67]

WHD staff have reported that smaller, nonunion employers avoid participating in the surveys because they believe the survey process favors larger, unionized firms.[68] WHD officials have also acknowledged that larger firms may be more likely to respond to the DBA surveys because they have more resources (such administrative staff) to complete the surveys than smaller companies do. Stakeholders further report the department's survey form does not reflect nonunion industry practices, and nonunion contractors typically do not keep their data in a manner that facilitates completing the form. So nonunion contractors often throw the forms out rather than complete them.[69]

According to a 2022 ABC survey, the vast majority of DBA and non-DBA ABC member contractors do not participate in DOL DBA wage surveys, illuminating the failure of WHD's process to engage the full contractor community and obtain accurate wage data. Of note, 77% stated they don't participate in DOL DBA wage surveys and cited a variety of reasons for their lack of participation[70] consistent with the GAO findings from the broader construction industry.

Consequently, instead of a statistically representative sample, the DOL's DBA surveys are a self-selected sample of predominantly larger, unionized construction firms. As a WHD official told the DOL OIG, under the DOL's approach "only those who vote, count."[71] Since larger and

---

[64] *Ibid*, p. 11. DBA rates for these counties had to be derived from data on workers in other counties.

[65] *Ibid*, p. 15.

[66] OMB guidance explains that "survey estimates may be biased if those who choose to participate (respondents) differ substantially and systematically in some way from those who choose not to participate (nonrespondents). If these differences are related to critical information from the survey or the census, the results may be misleading or even erroneous." Office of Information and Regulatory Affairs, U.S. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collection*, p. 56.

[67] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, pp. 19-20.

[68] U.S. Department of Labor, Office of Inspector General, *Inaccurate Data Were Frequently Used in Wage Determinations Made Under the Davis–Bacon Act*, p. 19.

[69] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, pp. 25-26.

[70] e.g., Firms don't see the need to participate in the surveys because they don't perform DBA work; they are unaware of the surveys; the surveys are too complicated and time-consuming; firms don't have enough personnel to fill them out; privacy concerns and the opinion that their response will not impact the outcome of the "rigged" wage determination system in their marketplace.

[71] U.S. Department of Labor, Office of Inspector General, *Inaccurate Data Were Frequently Used in Wage Determinations Made Under the Davis–Bacon Act*, p. 19.

unionized firms tend to pay higher wages than smaller, nonunion firms, the DBA survey systematically reports inaccurate rates that do not reflect actual prevailing wages.

*Davis-Bacon Survey Respondents Are Disproportionately Unionized*

The extent to which DBA surveys overrepresent union rates illustrates how statistically unrepresentative they are. The DOL's BLS and the Census Bureau use statistically representative sampling techniques to administer the Current Population Survey. CPS data shows that construction unions represent fewer than 17% of blue-collar workers in the U.S. construction industry.

Under the DOL's current methodology, the DOL uses union rates only if a majority of employees in a job classification in a local area make the identical union rate. With union representation at less than 17% nationwide, unions rarely represent a majority of workers in local construction occupations. Indeed, ABC used CPS data to analyze the proportion of construction workers in the largest 47 metropolitan statistical areas in the United States. Union coverage did not reach 50% in a single MSA.[72] [73]

But despite unions representing just one-sixth of the construction workforce, the DOL's DBA surveys report union rates prevail in most localities and job classifications. ABC obtained data on the DOL's DBA wage determinations through a Freedom of Information Act request.[74] This data shows that, nationwide, 63% of published DBA county-level wage determinations are collectively bargained union rates.[75] [76] The remaining rates are a blended average of union and nonunion data collected in the survey. This proportion has changed little over the past decade.[77]

These figures understate the extent that the DOL's survey disproportionately reports union rates. The DOL is more likely to adopt blended average (hereafter "nonunion") classifications in rural counties with smaller populations and union classifications in urban counties with higher populations. So, union classifications cover an even greater proportion of the construction workforce than their 63% share of county-level rate determinations.

---

[72] ABC analyzed data from the January 2015 to March 2022 Current Population Survey, Merged Outgoing Rotation Group data. ABC examined union coverage (both members and agency fee payers) among workers in blue-collar occupations in the construction industry in metropolitan statistical areas for which at least 200 observations were available over this period. See Appendix for details.

[73] This finding does not rule out the possibility that unions make up a majority of a particular job classification (e.g., carpenters on heavy building projects) in some of these localities. But it does indicate that this occurs infrequently.

[74] ABC requested the data that informed a DOL OIG report on DBA wage determinations. See U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, Report No. 04-19-001-15-001, March 29, 2019 at https://www.oig.dol.gov/public/reports/oa/2019/04-19-001-15-001.pdf.

[75] The OIG data showed that 64,850 out of 134,738 total DBA rate determinations reflect union rates. However, because the union determinations cover on average more counties than those based on survey averages, union rates make up nearly two-thirds of all DBA county-level determinations—482,592 out of 770,973.

[76] In correspondence with ABC, Acting WHD Administrator Jessica Looman and Associate Administrator Brandon Brown provided 2022 data from SAM.gov showing that 42% of DBA wage determinations are union rates (52,715 out of 124,174 rates). This proportion is very similar to the 2018 data used in the DOL OIG report (64,850 out of 134,738 rates, or approximately 48%). As discussed in the preceding footnote, this headline statistic obscures the fact that union rate determinations cover on average more counties than classifications based on survey averages. Using county-level determinations as the unit of observation shows most DBA determinations are based on union rates. Using county-level determinations is a more appropriate unit of observation here because it better accounts for some determinations applying to more workers than other determinations.

[77] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 20.

For example, the data the department provided ABC showed that 42% of county job classifications in Nevada are union rates. However, union rates were significantly more prevalent in Clark County (which encompasses Las Vegas) and Washoe County (which encompasses Reno).[78] Approximately 90% of the construction workers in Nevada work in these two counties. Weighting county job classifications by each county's share of Nevada construction employment raises the effective share of Davis-Bacon classifications to 63%.[79] [80] By contrast, BLS data shows that unions represent just 23.7% of blue-collar construction workers in Nevada. The DOL's DBA surveys are statistically unrepresentative of the construction workforce.[81] They are consequently fundamentally unreliable.

*Sample Sizes Are Too Small for Statistical Reliability*

Low response rates create a second and distinct problem in DBA surveys: Their sample size is too small to be statistically reliable. Even if the DOL used representative sampling techniques, it could not make accurate wage generalizations from the small samples collected for most DBA classifications.

Statistical error increases as sample sizes decrease. For example, a poll of 500 Americans has a margin of error of approximately ± 4% and a poll of 50 Americans has a margin of error of approximately ± 14%.[82] But if the sample size becomes too small, it becomes impossible to calculate a statistical margin of error. Standard statistical inference is based on the central limit theorem.[83] The central limit theorem only applies to samples of about 30 or more observations.[84] A survey with fewer observations not only contains inaccuracies, but statisticians cannot estimate the likely magnitude of those inaccuracies.

The DOL's current standards call for basing DBA rates on data from a minimum of six workers from three contractors. In some cases, the DOL sets DBA rates using data from three workers

---

[78] For example, 197 of the 294 job classifications covering Clark County were union rates. Clark County alone accounts for over 70% of construction employees in Nevada.

[79] See Appendix for details of this calculation.

[80] Nevada also provides an illustrative example of how union determinations are more prevalent when county-classifications are used the unit of observation. The DOL IG data shows that there were 2,261 DBA rate determinations covering Nevada in 2018, and those determinations amounted to 2,727 county-determinations. So, while many determinations covered a single county, some did not. Union rates prevailed in 795 determinations (35%) and 1,133 county-determinations (42%).

[81] Another anomaly in the department's DBA surveys illustrates how unrepresentative they are of the actual construction workforce. It is a well-known fact of labor markets in the United States (and most other industrialized economies) that average wages—both economywide and in specific occupations—are consistently higher than median wages. For example, the Bureau of Labor Statistics' May 2021 Occupational Employment and Wage Statistics survey shows that, nationally, average wages exceed median wages in 51 of 64 detailed construction occupations. Other U.S. datasets like the Current Population Survey show the same pattern.

Under the department's current methodology, the department uses the wage paid to a majority of workers in a local occupation. If no such wage majority exists, the department uses the average of survey responses as the prevailing wage. A wage received by a majority of the workforce is necessarily the median wage. So, if the department's surveys were representative of the construction workforce, prevailing wages calculated as the average of the survey sample would typically be higher than prevailing wages calculated as the majority/median response. Instead, the opposite occurs: Majority/median prevailing wages consistently exceed wages calculated as survey averages. This indicates that the department's surveys are highly unrepresentative of the construction workforce. Again, this primarily occurs because they overrepresent respondents from large, unionized firms whose compensation rates are not representative of the overall economy.

[82] These error margins are at the 95% confidence interval, meaning that the true population mean will fall within the sampled confidence interval 19 times out of 20.

[83] The central limit theorem states that for a sufficiently large sample, the sample mean is normally distributed around the true population mean. Knowing that the sample mean follows the normal distribution allows statisticians to estimate how far off it is likely to be from the population mean.

[84] McClave, Dietrich, and Sincich, *Statistics*, pp. 240–241.

from two contractors.[85] Overall, the GAO reports that the department sets 26% of its DBA rates on data from six or fewer workers and 75% on data from 28 or fewer workers.[86] The median job classification is based on data from 13 workers.[87] The central limit theorem does not apply to samples this small. No pollster would report results from a survey of six or 13 voters. The DOL cannot accurately estimate prevailing wages using such small samples, even if the samples were statistically representative.

*DOL Does Not Use Standard Statistical Methods to Mitigate Nonresponse Bias*

OMB guidance directs agencies to "consult with trained survey methodologists in designing their surveys to minimize nonresponse bias."[88] The DOL does not do this. GAO reports that:

> "Rather than conducting a formal evaluation of the wage survey process and consulting with experts in survey design and methodology, a senior Labor official said the agency based changes on an informal review that drew on staff experiences. While our prior work has shown it is reasonable and desirable to obtain input from knowledgeable staff, technical guidance from experts is considered critical to ensure the validity and reliability of survey results.
> Labor cannot determine whether its Davis-Bacon survey results are representative of prevailing wage rates because it does not currently calculate response rates or conduct a nonresponse analysis."[89]

The DOL's failure to work with survey experts to design its DBA surveys shows. Survey experts have developed statistical methods to minimize the effects of nonresponse bias and improve survey accuracy. OMB expects agencies to use these statistical methods.[90] Statistical agencies like the DOL's BLS surveys routinely use these standard techniques. The DOL's WHD DBA surveys do not. The DOL's DBA surveys depart from standard methods in several respects.

First, survey experts work to make their surveys user-friendly and easy to complete, minimizing the burden on respondents. They often field-test their surveys with employers to make them as user-friendly as possible. The department largely does not pre-test DBA surveys with contractors.[91] And, as discussed above, the DBA survey forms request information in a format that nonunion contractors typically do not use.

Second, statistical agencies weight survey responses. Weighting means adjusting the importance (or weight) given to respondents based on how likely they are to respond. So those groups who were more likely to respond count for less and vice versa. This happens on a regular basis in polling. For example, consider a state with an equal proportion of men and

[85] *Ibid*, p. 12.
[86] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 23.
[87] *Ibid*. Note that GAO found that 49% of classifications were based on data from 12 or fewer employees.
[88] Office of Information and Regulatory Affairs, U.S. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collection*, p. 56.
[89] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 19.
[90] Office of Information and Regulatory Affairs, U.S. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collection*, pp. 7, 26, 58-59, 72.
[91] *Ibid*, p. 27.

women. If a pollster surveyed that state and got a sample with 55% men and 45% women, the pollster would typically adjust the weight given to men's and women's responses so that both groups contributed equally to the final result. The BLS weights responses to its Occupational Employment and Wage Statistics so it does not over- or underrepresent large businesses.[92] Failure to weight survey results can make surveys significantly less accurate.[93] However, the DOL does not weight its DBA surveys by key variables like firm size or union status.

Third, statistical agencies improve survey accuracy through imputation. This means substituting (or imputing) a missing response with a response from a similar respondent or respondents. For example, if a small construction firm does not return the OEWS survey, the BLS would randomly select another small construction firm that did respond and treat its response as the response of the missing firm.[94] This introduces some error into the survey, but much less error than ignoring the nonrespondent entirely.

Ignoring nonrespondents implicitly assumes their response is identical to the overall population average when that is typically not the case. Imputation mitigates this bias.

Continuing the example, smaller construction firms typically pay less than larger ones. Ignoring a small construction firm that did not respond would artificially inflate wage estimates by omitting out a respondent likely to have below-average wages. Imputing a missing small contractor's wages with wages paid by another small contractor corrects this bias.

The DOL's DBA survey does not impute responses from nonrespondents. Instead, the DOL sets extremely low minimum sample size standards (six employees across three different employers) and expands the geographic coverage of its survey until it collects at least that much data. Imputation would be a much better approach, as it would select responses from similar respondents rather than those who simply happen to be geographically adjacent.

*DBA Rates Are Highly Inaccurate*

The DOL calculates DBA rates using samples too small for statistical reliability and without implementing standard techniques to mitigate nonresponse bias. The GAO reports the DOL does not even track DBA survey nonresponses. This methodology is incapable of accurately estimating prevailing wages. Indeed, the DOL has not even made accuracy a goal for the program. As the DOL's OIG has explained, the "DBA wage determinations program lacked performance goals and measures for data quality and accuracy."[95]

---

[92] U.S. Department of Labor, Bureau of Labor Statistics, BLS Handbook of Methods, *Occupational Employment and Wage Statistics: Calculation* https://www.bls.gov/opub/hom/oews/calculation.htm.
[93] For example, a major reason pollsters underestimated then-candidate Donald Trump's chances of winning the 2016 presidential election is because they did not weight respondents by educational attainment. Voters with bachelor's or professional degrees were both more likely to support Hillary Clinton and answer polls than working-class voters. Had pollsters weighted by educational attainment they would have seen that the surveys were oversampling Clinton supporters and the race was highly competitive. See Nate Cohn, "A 2016 Review: Why Key State Polls Were Wrong About Trump," *The New York Times*. May 31, 2017. https://www.nytimes.com/2017/05/31/upshot/a-2016-review-why-key-state-polls-were-wrong-about-trump.html.
[94] BLS imputes responses based on geography, industry and firm employment. See U.S. Department of Labor, Bureau of Labor Statistics, BLS Handbook of Methods, *Occupational Employment and Wage Statistics: Calculation* https://www.bls.gov/opub/hom/oews/calculation.htm.
[95] U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, p.16.

Unsurprisingly then, the DOL's DBA rates do not reflect actual prevailing wages. Numerous studies have documented that DBA rates diverge considerably from actual market wages, and on average exceed market wages. For example, a 2008 study by researchers at the Beacon Hill Institute at Suffolk University found that DBA wage rates vary considerably—both higher and lower—from market pay averages determined by the BLS, with DBA wage rates on average exceeding market rates by 22%.[96] A 2022 BHI study updating its 2008 study found that DBA wage rates were on average, 20.21% more than BLS average wages.[97]

A comparison of DBA hourly wage rates with equivalent estimates from the BLS illustrates the inaccuracy of the DOL's DBA methodology. The BLS OEWS program uses statistically representative survey samples and techniques like imputation and weighting to mitigate nonresponse bias. DBA rates differ greatly from scientifically calculated BLS wage estimates.

BLS OEWS occupational wage estimates are in general not directly comparable to DBA rates because they cover different geographic regions and industries.[98] [99] However, in some cases DBA and OEWS geographical and industrial coverage coincide. In these cases, DBA rates are directly comparable to BLS estimates produced by professional economists and statisticians. Two such cases are San Diego County, California, and the state of Hawaii.[100] The table below presents an "apples to apples" comparison of DBA and OEWS occupational wages in these jurisdictions.[101]

---

[96] Sarah Glassman, Michael Head, David Tuerck and Paul Bachman, "The Federal Davis-Bacon Act: The Prevailing Mismeasure of Wages," *The Beacon Hill Institute*. February 2008. https://www.beaconhill.org/BHIStudies/PrevWage08/DavisBaconPrevWage080207Final.pdf.

[97] William F. Burke, David Tuerck, "The Federal Davis-Bacon Act: Mismeasuring the Prevailing Wage," *The Beacon Hill Institute*, May 2022.

[98] OEWS data is calculated at the national, state and MSA levels, while DBA rates are generally calculated at the county, county group or "super group" levels. DBA county groupings do not generally align with MSA definitions.

[99] DBA rates are generally calculated separately across four different industrial sectors: residential construction, building (nonresidential), heavy industry and highway construction, though in some cases DBA rates are calculated jointly for multiple sectors. By contrast, the main BLS OEWS reports do not provide separate wage estimates for workers in different industries. BLS does present cross-industry research estimates of occupational wages at the state level, but not at the MSA level. This data can be found online at https://www.bls.gov/oes/current/oes_research_estimates.htm.

[100] For both San Diego, California and the state of Hawaii, the department's DBA determinations and OEWS wage estimates have identical geographic and industrial coverage. DBA estimates for San Diego cover only San Diego County. The OEWS provides estimates for the San Diego-Carlsbad metropolitan area—which also consists solely of San Diego county. The department's Hawaii DBA determination covers the entire state, and the OEWS also provides statewide wage estimates for Hawaii. The department's DBA rates for San Diego and Hawaii apply to all four construction types (residential, building, heavy and highway), while the main OEWS wage estimates for these areas also cover all industrial sectors.

[101] The table presents OEWS median hourly wage rates, the appropriate comparison to DBA union rates. Under the current methodology, the department only uses union rates when they are paid to a majority of local workers in an occupation. If a majority of local workers are paid an identical rate, then that rate will mathematically be the median occupational rate of pay. In all occupations listed in the table the DBA rate was a collectively bargained union rate. In cases where DBA rates are an average constructed from a survey, then the appropriate comparator would be OEWS mean (or average) hourly wage.

| Comparison of Davis-Bacon Rates and Median Hourly Wages, San Diego and Hawaii[102] | | | | |
|---|---|---|---|---|
| Jurisdiction | Occupation | DBA Hourly Wage Rate | Median Hourly Wages (OEWS) | Percent Difference |
| San Diego | Cement Masons and Concrete Finishers | $26.34 to $30.07 | $27.80 | 8% to -5% |
| San Diego | Electricians | $37.82 to $54.36 | $29.64 | 83% to 28% |
| San Diego | Glaziers | $45.55 | $23.52 | 94% |
| San Diego | Plasterers | $45.77 | $28.78 | 59% |
| San Diego | Reinforcing Iron Workers | $43.00 | $29.43 | 46% |
| San Diego | Roofers | $37.75 | $29.58 | 28% |
| San Diego | Sheet Metal Workers | $40.62 | $29.99 | 35% |
| San Diego | Drywall Installers | $32.14 to $42.80 | $29.84 | 43% to 8% |
| | | | | |
| Hawaii | Carpenters | $51.25 | $37.05 | 38% |
| Hawaii | Cement Masons | $42.65 | $36.61 | 16% |
| Hawaii | Sheet Metal Workers | $46.22 | $37.62 | 23% |
| Hawaii | Roofers | $42.55 | $24.08 | 77% |
| Hawaii | Plumbers and Pipefitters | $49.38 | $35.38 | 40% |
| Hawaii | Glaziers | $40.50 | $30.08 | 35% |
| Hawaii | Stonemasons | $46.71 | $27.94 | 67% |
| Hawaii | Boilermakers | $37.25 | $36.98 | 1% |
| Hawaii | Floor Layers | $38.77 | $35.92 | 8% |
| Hawaii | Plasterers | $44.21 | $29.94 | 48% |
| Hawaii | Tapers | $43.85 | $48.12 | -9% |

As the table illustrates, DBA rates differ markedly from those produced by statistically valid surveys. DBA rates range from 9% below BLS OEWS estimates (tapers in Hawaii) to 94% above them (glaziers in San Diego). In a handful of cases DBA rates closely approximate BLS estimates (e.g., boilermakers in Hawaii, cement masons and concrete finishers in San Diego). However, DBA rates typically exceed BLS estimates considerably. For example, DBA rates for

---

[102] U.S. Department of Labor, Bureau of Labor Statistics, May 2021 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates, San Diego-Carlsbad, California, and May 2021 State Occupational Employment and Wage Estimates, Hawaii, available online at https://www.bls.gov/oes/current/oes_41740.htm#47-0000 and https://www.bls.gov/oes/current/oes_hi.htm#47-0000; and U.S. General Services Administration, Davis-Bacon Act Wage Determination #HI20220001, Modification 8 and# CA20220001, Modification 5, available online at https://sam.gov/wage-determination/HI20220001/8 and https://sam.gov/wage-determination/CA20220001/5.

stone masons and plumbers in Hawaii are 67% and 40% above OEWS estimates, respectively, while rates for plasterers and sheet metal workers in San Diego are 59% and 35% above OEWS estimates, respectively.

Surveys of ABC members confirm these findings. According to a 2022 survey of ABC member contractors, 88% strongly or somewhat agree that DBA regulations inflate wages and fringe benefits above market rates and 74% strongly or somewhat disagree with the statement that DBA results in wage and benefit rates that reflect local area standards. In addition, the survey found that the majority of active DBA contractors believe the proposed rule's changes will further decrease the accuracy of wage determinations. In addition, 58% say the 30% rule would decrease accuracy and only 12% believe this change will increase accuracy. Finally, 70% of ABC DBA contractors surveyed believe cross-consideration of urban and rural wage data will decrease wage determination accuracy.

The DOL's DBA wage determinations do not come close to reflecting locally prevailing wages. The DOL's survey methodology is incapable of accurately estimating prevailing wages. It will only reflect locally prevailing wages by chance.

## 2. The Department's Proposed Modifications Are Arbitrary and Capricious Because They Are Based on Flawed Data

The DOL has proposed numerous changes that it argues improve the accuracy and relevancy of DBA determinations.[103] The department also proposes returning to using the "30% rule" as the best interpretation of the term "prevailing wage." Making these changes without addressing the fundamental statistical flaws in the prevailing wage determination process would be arbitrary and capricious. The DOL's proposals cannot meet their objectives so long as the DOL WHD continues to use a fundamentally flawed DBA survey methodology. For example:

- Biased and inaccurate wage determinations that are regularly updated using Employment Cost Index data remain biased and inaccurate. Indeed, regular updates will typically make them even less accurate. As previously discussed, numerous studies find DBA surveys overestimate market wages. Subsequent wage growth mitigates this bias by bringing market wages closer to DBA rates. Regularly updating surveyed DBA rates for wage growth without fixing the survey's underlying flaws would consequently tend to exacerbate DBA rates' upward bias.

- ABC does not believe the 30% rule is the best reading of the term "prevailing wage." Nonetheless, the DOL will be incapable of accurately applying this rule under its proposed methodology. The statistically invalid survey methodology the DOL proposes continuing to use is incapable of accurately determining whether a single rate is paid to 30% (or a majority) of local construction workers.

---

[103] For example, the department proposes allowing the use of state and local prevailing wage rates in specified circumstances, regularly updating nonunion wage rates using data from the BLS Employment Cost Index, allowing the use of both rural and metropolitan county data in setting DBA rates, overruling the Administrative Review Board's *Mistick* decision to allow the use of "functionally equivalent" rates of pay for purposes of the three-step rule.

- The DOL's proposed new paragraph §1.3(h) allows the use of state or local prevailing wage rates when they are generated "using a survey or other process that is open to full participation by all interested parties." This language seems to prohibit the use of state or local estimates that are generated by statistically representative sampling, which does not permit participation by entities not selected into the sample. It instead appears to only allow state or local rates when interested parties—such as unionized contractors—can self-select into the survey. The department's language thus appears to only allow the use of state or local prevailing wage surveys that utilize statistically invalid methodologies. This approach cannot improve "the accuracy of wage determinations[.]"

- Including "functionally equivalent" wage submissions and/or combining data from rural and metropolitan counties cannot improve accuracy so long as the underlying wage data comes from a self-selected, statistically unrepresentative sample. Such tweaks do not mitigate the fundamental invalidity of an unrepresentative sample.

The DOL's proposals amount to calculating DBA determinations more precisely while retaining a statistically invalid survey methodology. These reforms cannot succeed. The adage "garbage in, garbage out" applies. Flawed survey input data necessarily produces flawed wage determinations, no matter the peripheral or definitional changes the DOL makes. A self-selected sample of six workers will reflect actual prevailing wages (however defined) only by chance.

The DOL's proposed changes cannot make determinations more accurate unless the DOL also corrects the DBA survey's methodological flaws. Similarly, the DOL cannot enforce the 30% rule accurately using statistically invalid data. Making peripheral or definitional changes to DBA determinations without fixing the DBA survey's fundamental flaws would be arbitrary and capricious.

## 3. Department's Methodology Is Deliberately Designed to Report Union Rates

It should be noted that the DOL's proposed reforms make sense only if their true goal is to cause DBA determinations to more closely track union wage scales, whether or not those rates locally prevail. The DOL's proposed revisions seem designed to accomplish exactly that.

A nonrepresentative, self-selected survey sample with low overall participation but disproportionately high union participation allows unions to dominate survey responses, even when they command only a small share of the local construction market. Retaining this flawed methodology, but switching to the 30% rule, will allow union rates to prevail even more often than they currently do—as the DOL's proposal recognizes. Similarly, utilizing only state and local prevailing wage surveys that allow unions to select into participation ensures that unions can continue to disproportionately dominate the wage determination. Both the DOL's methodology and revisions to it seem designed to report union wage rates, whether or not they actually prevail.

## 4. Using U.S. Bureau of Labor Statistics Data Is a Better Alternative

ABC proposes that the DOL instead produce DBA wage determinations using BLS data. The DOL has recognized the accuracy of BLS data in this rulemaking,[104] proposing to use BLS data from the ECI to adjust wage determinations for non-collectively bargained rates that are outdated.[105] Rather than cherry-picking statistically valid BLS data as well as flawed data from the WHD's unscientific surveys, the DOL should use BLS data for all DBA determinations in the first instance.

Calculating DBA rates with professionally conducted and statistically valid surveys would fix the fundamental methodological flaws that make DBA rates highly inaccurate. Using BLS data would substantially improve the accuracy and timeliness of DBA determinations—two objectives the department states motivated its proposed changes.

*BLS Surveys Are More Accurate Because They Are Conducted Scientifically*

The BLS is a professional statistical agency with internationally recognized expertise in accurately measuring wages.[106] It conducts its surveys scientifically and professionally, without making the basic statistical errors that the WHD does. The BLS's survey methodology is superior to WHD's DBA methodology in several ways.

First, as discussed above, the BLS conducts its surveys using statistically representative sampling. BLS surveys like the OEWS or National Compensation Survey are based on samples designed to statistically represent the entire workforce. Firms or individuals cannot skew the results by self-selecting into participation.

Second, BLS obtains high response rates. BLS goes to great lengths to make its surveys user-friendly and easy to complete. For example, BLS field-tests its surveys to ensure they are not burdensome on respondents. GAO has criticized WHD for not engaging in similar procedures.[107] The BLS also follows up extensively with employers who do not respond, including in some cases on-site visits to employers.[108] As a result, BLS wage surveys have high response rates—much higher than WHD's DBA surveys.[109] [110] For example, before the COVID-19 pandemic, approximately 70% of employers responded to the OEWS survey.[111] In

---

[104] https://www.federalregister.gov/d/2022-05346/p-224
[105] https://www.federalregister.gov/d/2022-05346/p-964
[106] BLS's Division of International Technical Cooperation trains professionals in foreign and international statistical agencies on how to collect, process, analyze, disseminate and use labor statistics.
[107] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 27.
[108] Polly A. Phipps and Carrie K. Jones, "Factors Affecting Response to the Occupational Employment Statistics," U.S. Department of Labor, Bureau of Labor Statistics, Office of Survey Methods Research, November 2007, https://www.bls.gov/osmr/research-papers/2007/pdf/st070170.pdf.
[109] The WHD has raised the voluntary nature of their surveys as a reason they obtain such low response rates. See U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, p. 15. However, ABC notes that BLS surveys are also voluntary and BLS obtains much higher response rates than WHD does. ABC notes the department can obtain high response rates from voluntary surveys if it adopts a user-friendly approach that minimizes the burden on respondents. The department's BLS is currently doing this. The WHD is not.
[110] The WHD argues that they need to engage in extensive clarification of received DBA surveys to derive useful information from them, and that the need for this clarification makes statistical sampling impractical. See *ibid*, Appendix B, p. 10. ABC notes that if the WHD designed more user-friendly surveys that were easier for contractors to accurately complete such extensive clarification would be unnecessary to generate useful data. The BLS does exactly this. The need for extensive clarification is an indictment of the WHD's error-prone survey forms and methodology and an argument for relying on a professional statistical agency to conduct the surveys instead.
[111] U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment and Wage Statistics, *Technical notes for May 2021 OEWS Estimates*. https://www.bls.gov/oes/2019/may/oes_tec.htm.

the construction industry, that figure is approximately 80%.[112] High response rates greatly reduce nonresponse bias.

Third, BLS surveys have very large sample sizes. The OEWS survey, for example, is based on responses from approximately 1.1 million establishments.[113]

Fourth, as also discussed above, the BLS uses standard statistical corrections like weighting and imputation to correct any remaining nonresponse bias. For example, if large firms are more likely to respond to the OEWS than smaller firms, the BLS gives their responses less weight, so they do not disproportionately influence the final result.[114] The WHD does not do this.

Consequently, the BLS's professional wage surveys are more accurate than the WHD's unscientific DBA surveys (which do not even have accuracy as a program goal). The department itself has publicly recognized this fact.[115] The DOL's current DBA determination methodology predominantly reports union rates, despite unions representing only one-sixth of construction workers. Using BLS survey data would allow the DOL to enforce the DBA using wages that actually prevail (however defined).

*BLS Surveys Are More Timely*

One of the DOL's objectives in this rulemaking is to improve the timeliness of DBA wage determinations.[116] Directly using BLS data would improve timeliness more effectively than the department's proposal to periodically update old survey results with subsequent ECI growth.

BLS surveys like the OEWS and NCS are updated annually. Basing DBA determinations on these surveys would eliminate the long delays between WHD surveys that produce outdated wage rates. Using BLS data would ensure that no rates were more than two years old.[117] The DOL has previously acknowledged that using BLS data would improve the timeliness of DBA determinations.[118]

By comparison, the DOL's proposal to periodically adjust surveyed rates by subsequent ECI growth would be both less effective and less accurate.[119] It would be less effective at improving timeliness because the DOL proposes to adjust rates on a rolling basis and no more frequently

---

[112] Polly A. Phipps and Carrie K. Jones, "Factors Affecting Response to the Occupational Employment Statistics," Exhibit 9.

[113] U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment and Wage Statistics, *Technical notes for May 2021 OEWS Estimates.* https://www.bls.gov/oes/current/oes_tec.htm.

[114] U.S. Department of Labor, Bureau of Labor Statistics, BLS Handbook of Methods, *Occupational Employment and Wage Statistics: Calculation* https://www.bls.gov/opub/hom/oews/calculation.htm.

[115] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 6.

[116] The department explains that "outdated and/or inaccurate wage determinations are inconsistent with the intent of the Davis-Bacon labor standards, which aim to ensure that laborers and mechanics on covered projects are paid locally prevailing wages and fringe benefits. Wage rates that are significantly out-of-date do not reflect this intent and could even have the effect of depressing wages if covered contractors pay no more than an artificially low prevailing wage rate that has not been adjusted over time to continue to reflect the wages paid to workers in a geographic area."

[117] OEWS data is updated in March or April of each year with data from the previous May. For example, BLS published the May 2021 OEWS data in March 2022, and will publish new data in the spring of 2023. Published OEWS rates are thus between 10 and 23 months out of date.

[118] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 6.

[119] Note that the ECI is derived from National Compensation Survey data.

than once every three years. Directly using OEWS and NCS data would produce annually updated determinations that would never be more than 23 months out of date.

The DOL's proposal would be less accurate because it involves increasing local occupational wages by average national compensation growth in the construction sector. Of course, construction wages do not grow at a uniform national rate across localities and occupations. Directly using local occupational wage data would better reflect local prevailing wages by accounting for local and occupational variation.

*BLS Data Are Well Suited for Establishing Prevailing Wages*

BLS data is well suited for enforcing prevailing wage requirement standards. The DOL itself has demonstrated this. The DOL enforces the nearly identical statutory requirements of the Service Contract Act using BLS data. The SCA essentially applies DBA requirements to federal service contracts. It requires federal service contractors to pay each class of service employee prevailing wages and benefits, as determined by the secretary of labor.[120] As the DOL is aware, it primarily bases SCA determinations on BLS OEWS and NCS data. The DOL similarly uses OEWS data for the Foreign Labor Certification Program, which requires employers to pay certain highly skilled immigrants at least the prevailing market wage. BLS data can be used to enforce the DBA. Doing so would make the DOL's DBA determinations much more accurate.

The DOL OIG has repeatedly recommended using BLS data for exactly this reason.[121] As the DOL OIG has explained: "We continue to conclude that the solution to the issues of accuracy, representativeness, and timeliness of wage decisions is to change the fundamental methodology [WHD] uses to conduct its surveys."[122]

**5. DOL's Previous Objections to BLS Data Are Baseless**

The DOL has previously provided several reasons for rejecting the OIG's recommendation to use BLS data. All of these objections are without merit and were not addressed or contemplated in this rulemaking.

*Statistical Modeling Can Satisfy Benefits Obligations*

One of the principal objections the DOL has raised is that BLS surveys do not provide all the data necessary to enforce DBA requirements. The DBA requires employers to pay locally prevailing wage and benefit rates. No single BLS survey contains this information. The OEWS estimates occupational wage rates at the MSA level but does not collect benefit data. The NCS collects data on occupational wages and benefits, but this data is generally only available at

---

[120] 41 U.S.C. Chapter 67
[121] See for example U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, pp. 7-8 and *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations*, pp. 16-18, 25.
[122] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations*, p. 4.

the national level.[123] Neither survey individually captures all the data necessary to fulfill the DOL's statutory obligations. In 2001, the DOL concluded that the "BLS does not currently provide an effective, feasible method for collecting fringe benefit data for specific occupations and localities." The DOL has subsequently reiterated this concern.[124]

However, as the DOL OIG and external economists have pointed out, the DOL could obtain all the information necessary to enforce DBA requirements through statistical modeling that combines data from both the NCS and OEWS.[125]

Economists can create statistical models to combine data from different surveys and augment data when direct survey responses are too small for statistical reliability. These models "fill in the gaps" by extrapolating from patterns in the data that has been collected. The BLS has extensive experience in creating such statistical models.

For example, the BLS's Modeled Wage Estimates program currently uses statistical modeling to combine OEWS and NCS data. The NCS collects national-level data on pay by job characteristics (e.g., union vs. nonunion, full-time vs. part-time) and "work levels" but—like fringe benefits—this data is unavailable in the OEWS.[126] The OEWS has data on local occupational wages, but no information on job characteristics or work levels. A BLS statistical model combines data from both surveys to produce local-level estimates of occupational pay by job characteristics and work levels.

Federal employee pay is also based on a BLS model that combines data from the NCS and OEWS. The Federal Employee Pay Comparability Act requires federal pay to track private-sector compensation for similarly complex jobs and to vary according to local wage rates. No single federal survey collects this information. However, the Office of Personnel Management and BLS collaborated to develop a model combining NCS data on pay variation by work level with OEWS data on local occupational wages. Subsequent validation research showed the model works well, producing reliable estimates that were more precise than the previous methods the President's Pay Agent utilized.[127]

The DOL can use statistical models to combine OEWS and NCS data to produce reliable estimates of local occupational wages and benefits. Such statistical models are effective and feasible—as demonstrated by the fact that a similar model is currently used to determine the pay of over two million federal civilian employees.[128] Both the DOL's MWE program and

[123] The NCS survey informs several BLS data products, including the Employment Cost Index and Employer Costs for Employee Compensation.
[124] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* pp. 24-25.
[125] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* p. 17; James Sherk, "Labor Department Can Create Jobs by Calculating Davis–Bacon Rates More Accurately," Heritage Foundation Backgrounder No. 3185, January 21, 2017 at https://www.heritage.org/sites/default/files/2017-01/BG3185_0.pdf.
[126] The NCS collects data on pay by "work levels"—essentially a measure of the duties and responsibilities a job entails that are similar to General Schedule grade classifications. Jobs at higher work levels involve greater responsibilities and more complex job duties than those at lower levels.
[127] Office of Personnel Management, *Annual Report of the President's Pay Agent—2011, Report on Locality-Based Comparability Payments for the General Schedule,* Appendix VI.
[128] ABC points out that a statistical model combining OEWS local wage data and national NCS benefits data would likely produce more reliable estimates than the existing MWE/FEPCA modeling combining these surveys since it would only require using NCS data to estimate a single variable for each local occupation (total fringe benefit costs) rather than multiple variables (pay rates for multiple levels of work within each occupation).

FEPCA model were established after the DOL rejected using BLS data. Considering their demonstrated effectiveness, the DOL should reexamine the feasibility of using BLS data to estimate DBA benefit rates.

Moreover, as the DOL is well aware, the DBA does not require the DOL to calculate separate fringe benefit rates for each locality and occupation. The DOL enforces similar statutory language in the Service Contract Act by using NCS data to calculate a single, nationwide benefit rate for all occupations—currently $4.60 an hour.[129] [130] Employers covered by the SCA must pay their workers at least the locally prevailing wage calculated primarily using OEWS data plus this fringe benefit rate.

The DOL could legally enforce the DBA's similar requirements in the same way. This would involve making prevailing wage determinations using MSA-level OEWS data and calculating a single fringe benefits rate using national NCS data. If nothing else, the DOL could use available OEWS data to set local wage rates and use its current procedures solely to set benefits.

Neither approach would be as accurate as using a statistical model to combine OEWS and NCS data. But either would more accurately estimate prevailing rates of compensation than basing both wages and benefits on statistically unrepresentative samples of a dozen workers.[131] The fact that no single BLS survey provides local wage and benefits data is no impediment to the DOL using statistically valid BLS data for DBA determinations.

*Statistical Modeling Can Supply Missing Wage Data*

The DOL has previously raised a related concern with using BLS data. During the Clinton administration, the DOL concluded that BLS data was not complete enough to use. While the OEWS has a very large sample size nationwide, it often samples too few workers in a particular occupation and MSA to generate statistically reliable wage estimates for that occupation-MSA combination. Unlike the WHD, the BLS does not publish estimates based on unreliably small sample sizes. Consequently, OEWS wage estimates are often unavailable for particular occupations in particular MSAs. For example, OEWS does not currently publish wage estimates for glaziers, roofers, plasterers or pile-driver operators in the Texarkana metropolitan area.[132] The DOL argued that this incompleteness makes enforcing the DBA with BLS data infeasible.[133]

---

[129] The Service Contract Act requires that "contract and bid specification shall contain a provision specifying the fringe benefits to be provided to each class of service employee engaged in the performance of the contract or any subcontract, as determined by the Secretary or the Secretary's authorized representative to be prevailing in the locality." See 41 U.S.C. 6703(2). The Davis-Bacon Act similarly requires contractors to pay at least "the wages the Secretary of Labor determines to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the civil subdivision of the State in which the work is to be performed" and defines those prevailing wages to include both cash wages and benefits. See 40 U.S.C. 3141(2), 3142(b).

[130] U.S. Department of Labor, *All Agency Memorandum No. 237*, July 16, 2021. https://www.dol.gov/agencies/whd/government-contracts/service-contracts/sf98/aam237.

[131] ABC points out that the relevant metric is total compensation requirements (i.e., the combined total cost of wages and benefits) under DBA determinations, as department regulations allow employers to satisfy their fringe benefit obligations through differential cash payments.

[132] U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment and Wage Statistics, *May 2021 Metropolitan and Nonmetropolitan Area Occupational Employment and Wage Estimates: Texarkana, TX-AR.* https://www.bls.gov/oes/current/oes_45500.htm#47-0000.

[133] Bernard Anderson, Assistant Secretary of Labor for the Employment Standards Administration, letter to Congress, Jan. 17, 2001; U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations*, pp. 24-25.

This claim is mistaken for the same reason that the argument about incomplete benefits data is. The DOL can use statistical modeling to reliably estimate missing wage rates. The President's Pay Agent (of whom the secretary of labor is a part) faced the same problem in determining federal locality pay. OEWS data does not cover every occupation-locality combination where the Pay Agent needs data. So OPM and BLS created a regression model to interpolate wages for missing local occupations. This model takes information about the known relationship between data that is available to estimate the missing rates.[134] Validation analysis demonstrated this model had high explanatory power.[135] OPM bases most of federal pay rates on data derived from this model—not survey averages.[136] The DOL could construct a similar model to extrapolate missing wage rates when direct estimates are not available.

*Statistically Modeling Missing Data Would Increase Accuracy*

Such a model would have some margin of error. But it would be much more accurate than the WHD's current approach to handling incomplete data. As the DOL's rulemaking recognizes, even the WHD's minimal data standards—pay information for at least six employees across at least three contractors—are insufficient to generate wage determinations for every occupation in every county. WHD guidance calls for publishing wage determinations when the DOL has met these standards for half of the key job classifications in a construction type.[137] Since rates for particular occupations are often missing, contractors must request "conformances" for these missing occupations.

In these conformances, the WHD picks prevailing wage rates that bear a "reasonable relationship" to the rates issued in the published determination.[138] The government issues thousands of individual conformances a year, subject to general guidelines. But the DOL does not use statistical modeling to improve the accuracy of conformance rates or ensure that they bear the best relationship to the published rates. Instead, WHD staff essentially "eyeball" rates based on their best judgment, subject to general guidelines.[139]

Statistical modeling could estimate prevailing wages and benefits for every construction occupation, industry sector and MSA. This would entirely eliminate the need for conformances—the model would scientifically extrapolate wages for missing occupations based on all available information. Modeled rates that fill in missing data would statistically bear the best relationship to existing rates—not merely a reasonable one. This approach would be more rigorous, scientific and therefore accurate than the WHD's existing ad hoc conformance practices.

---

[134] To take a simplified example, if data showed that occupation A generally made 10% more than the average wage, but that MSA B had 3% below-average wages, and data on occupation A in MSA B was unavailable, the model would estimate that wages for that occupation in that MSA were 7% (10%-3%) above average wage rates.

[135] Office of Personnel Management, Annual Report of the President's Pay Agent—2011, "Report on Locality-Based Comparability Payments for the General Schedule," Appendix II, p. 27.

[136] Office of Personnel Management, Annual Report of the President's Pay Agent—2011, "Report on Locality-Based Comparability Payments for the General Schedule," Appendix VI.

[137] U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates*, p. 8.

[138] 29 C.F.R. § 5.5(a)(1)(ii)(A)(3)

[139] For example, conformances will be based on union or weighted average rates, based on whether union or average rates were used in the category of the classification at issue (e.g., skilled crafts, power equipment operators, etc.). See U.S. Department of Labor, Wage and Hour Division, *All Agency Memorandum No. 213*, March 22, 2013. https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/AAM213.pdf.

Given these facts, the incompleteness of BLS data is no argument against using it. WHD data is also highly incomplete. [140] And the statistical models that would extrapolate rates for missing BLS data would be much more accurate than WHD's existing conformance practices.

*Modeling Missing Data Would Eliminate the Burden of Conformances*

Moreover, ABC notes that using statistical models based on BLS data would solve another problem the DOL seeks to address in this rulemaking more effectively than the DOL's proposal. The DOL proposed reforms "aimed at reducing the need for the use of 'conformances' where the Department has received insufficient data to publish a prevailing wage for a classification of worker—a process that currently is burdensome on contracting agencies, contractors, and the Department."[141]

The department proposes revising 29 CFR 1.3 and 5.5(a)(1) to relieve this burden by allowing WHD to publish conformances as part of its wage determinations in certain circumstances, such as for classifications for which conformances are frequently submitted. These conformances would be based on the same "reasonable relationship" criteria as existing conformances.

The DOL can better meet its objectives in these revisions by calculating DBA rates with BLS data and using statistical modeling to estimate missing rates. Doing so would entirely eliminate the burden conformances impose on contracting agencies, contractors and the DOL. A model could produce estimates for all occupation, industry and MSA combinations, leaving no gaps requiring conformances.

The DOL notes that the WHD can receive up to 10,000 conformance requests a year, a significant burden on agency resources.[142] Statistical modeling would render all these requests unnecessary, not just some of them, as in the DOL's proposal. And modeled rates would be statistically optimized to bear the best relationship to existing rates—not merely a reasonable one. It is surprising that the DOL did not consider this alternative approach, especially given the DOL's involvement in FEPCA statistical modeling. This approach would improve the accuracy of the DOL's DBA determinations, reduce the compliance burden on contractors and relieve strain on WHD resources.

If the DOL nonetheless concludes that statistical modeling with BLS data does not adequately solve the problem of missing wage rates, the DOL should at least use BLS data for those occupations and MSAs where data exists. Direct BLS estimates with statistically reliable sample sizes are clearly superior to the unrepresentative samples of approximately a dozen workers whom WHD currently bases DBA rates on.

---

[140] ABC further notes that WHD rates would be even more incomplete if—like BLS—the agency only published estimates based on samples large enough for statistical reliability. If the WHD simply limited publication to samples large enough for the central limit theorem to apply it would have to withhold three-quarters of its currently published wage estimates. Only a quarter of DBA determinations are based on data from 29 or more workers. See U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey*, p. 23.

[141] https://www.federalregister.gov/d/2022-05346/p-38.

[142] https://www.federalregister.gov/d/2022-05346/p-279.

*BLS Data Can Be Used to Estimate Sector-Specific Wages*

The DOL has previously raised a similar objection to using BLS data—the OEWS does not provide industry sector-specific wage rates at the local level. The DOL typically provides DBA rates for four different types of construction: residential construction, building (nonresidential), heavy industry and highway construction. However, MSA-level OEWS occupational wage data does not differentiate between construction types like residential or highway construction. The DOL has argued this makes BLS data inadequate for DBA enforcement purposes.[143]

This conclusion is mistaken for several reasons. First, the DOL could use statistical modeling to estimate prevailing rates by construction type. The OEWS collects occupational wage data by industry, but due to sample-size constraints only reports estimates at the state and national levels.[144] As with benefits and missing wage rates, the DOL could straightforwardly use statistical modeling to compensate for limited sample sizes and estimate wages by occupation, construction sector and MSA. While economists would have to work through technical details to create this model, it is doable and the DOL has participated in the design of similar models. Such a model would be similar—though not identical—to the current MWE/FEPCA models that combine OEWS and NCS data to estimate occupational pay by levels of work.

Second, WHD is not statutorily required to issue DBA determinations differentiated by these construction types. The statue requires comparing "projects of a similar character"—not the specific approach WHD uses. The DOL can use different approaches, like following BLS industry definitions. The DOL OIG recommended exactly this approach.[145]

The DOL has implicitly recognized it does not need to follow its four-sector approach that any current DBA classifications cover multiple construction types. For example, half of the DBA determinations in the state of California cover two or more construction types.[146] Some determinations, like those covering the state of Hawaii and New York City, cover all four construction types.[147] Unless the DOL believes its current wage determinations are illegal, it must recognize that it has considerable statutory flexibility in how it classifies "projects of a similar character." This flexibility allows it to use BLS data.

---

[143] Bernard Anderson, assistant secretary of labor for the Employment Standards Administration, letter to Congress, Jan. 17, 2001; U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* Appendix B, p. 1.
[144] The OEWS does provide state-level research estimates of occupational wages by industrial sector. See U.S. Department of Labor, Bureau of Labor Statistics, Occupational Employment and Wage Statistics, *OEWS Research Estimates by State and Industry.* https://www.bls.gov/oes/current/oes_research_estimates.htm.
[145] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* pp. 17-18.
[146] 14 of the 28 DBA determinations in the state of California cover multiple construction types. See U.S. General Services Administration, Davis-Bacon Act Wage Determination numbers CA20220020, CA20220001, CA20220012, CA20220014, CA20220015, CA20220018, CA20220022, CA20220024, CA20220026, CA20220007, CA20220021, CA20220004, CA20220002, CA20220025. Available online at https://sam.gov/wage-determination/CA20220020/7; https://sam.gov/wage-determination/CA20220001/5; https://sam.gov/wage-determination/CA20220012/5; https://sam.gov/wage-determination/CA20220014/4; https://sam.gov/wage-determination/CA20220015/4; https://sam.gov/wage-determination/CA20220018/6; https://sam.gov/wage-determination/CA20220022/5; https://sam.gov/wage-determination/CA20220024/7; https://sam.gov/wage-determination/CA20220026/5; https://sam.gov/wage-determination/CA20220007/8; https://sam.gov/wage-determination/CA20220021/4; https://sam.gov/wage-determination/CA20220004/3; https://sam.gov/wage-determination/CA20220002/4; https://sam.gov/wage-determination/CA20220025/5.
[147] U.S. General Services Administration, Davis-Bacon Act Wage Determination #HI20220001, modification 8, available online at https://sam.gov/wage-determination/HI20220001/8 and #NY20220003, modification 2, at https://sam.gov/wage-determination/NY20220003/2.

The DOL's decision to issue wage determinations by the four current construction types it uses is a policy choice, not a legal requirement. This policy preference cannot justify using a statistically invalid methodology that produces prevailing wage rates untethered from reality. The DOL OIG has concluded—and ABC agrees—that the DOL could issue wage determinations that compare "projects of a similar character" using BLS data.[148] If the DOL concludes estimating prevailing wages by construction type using BLS data is impractical or infeasible, then the appropriate response is to use BLS data without estimating separate rates by construction type—as the DOL currently does in some states and localities. It is better to accurately estimate occupational wages across all construction sectors than to issue differentiated rates that systematically report union rates that do not prevail.

*A Funding Shift Could Expand Sample Size and Increase Accuracy*

The DOL can produce even more reliable modeled DBA wage and benefit rates by transferring survey funding from the WHD to the BLS. If the DOL uses BLS data to estimate DBA rates, then the WHD will no longer need to conduct DBA surveys. The WHD could use the funds currently spent on these surveys to contract with BLS to expand the construction samples in the OEWS and/or NCS, with a particular focus on areas, occupations and industries where small sample sizes necessitate reliance on statistical models. Expanding the survey sample size would increase the accuracy and reliability of DBA estimates based on BLS data. If the department believes current BLS survey sizes are inadequate, there is a straightforward solution.

*BLS Data Allows Calculating Prevailing Rates Using Wage Majorities or the 30% Rule*

Another objection the DOL has raised is that BLS data reports average wages, whereas the DOL enforces the DBA using the "majority wage" when one exists (a threshold the department proposes reducing to the 30% rule). The DOL has previously argued that this renders BLS data inappropriate for enforcing the DBA.[149] This objection fails for two reasons.

First, the courts have upheld the DOL's authority to base prevailing wages on average wages, and many DBA rates are already based on survey averages. Using either wage majorities or the 30% rule is a policy preference, not a legal requirement. That preference cannot justify using statistically invalid and systematically unrepresentative surveys that are incapable of accurately measuring prevailing wages under any definition. Put differently, it is better to accurately measure average wages using BLS data than inaccurately estimate majority (or 30%) wages using fantastical numbers from unrepresentative surveys of a dozen workers.

Second, the DOL could calculate majority wages or 30% wages using BLS data. The BLS only publicly reports OEWS wages as an average and at various percentiles of the wage distribution. But the BLS has more granular microdata it does not publicly release. The department could use this microdata to determine if a majority or 30% of workers in a local occupation are paid identical wages (something that rarely happens in the construction

---

[148] *Ibid.*
[149] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* pp. 17.

industry when statistically representative samples are used). Averages have desirable properties for statistical analysis, but economists have developed techniques like quantile regression that facilitate modeling other aspects of the wage distribution. The DOL could use such techniques to estimate and model wages and benefits in those (rare) cases where a majority or 30% of local workers are paid identical rates. This would require using more sophisticated procedures than for average wages, but it can be done. The DOL's policy preference for wage majorities or the 30% rule does not justify or require using statistically invalid surveys.

*DBA Rates Can Be Estimated at the MSA Level*

Another objection to using BLS data, such as the OEWS, has been that it is generally only available at the MSA level. BLS data is generally not available at the more granular county level, except in cases where MSAs are coterminous with a single county (e.g., San Diego County, California). The DBA requires issuing prevailing wages for "civil subdivision[s] of a state."[150] Because this is not generally possible with BLS data, the DOL OIG and GAO have argued DOL would need statutory changes to use BLS data for DBA determinations.[151]

This objection is inconsistent with DOL's routine recognition of "supergroups" in areas spanning multiple counties. . The D.C. Circuit Court of Appeals has expressly upheld the DOL's authority on this point, holding that:

> "Clearly, if a prevailing wage could not be set in a given county by looking only to projects in that county, it was essential to the attainment of the general purpose of Congress—the predetermination of locally prevailing wages—that another mechanism be found. In cases where there is insufficient data from a given civil subdivision to determine a prevailing wage, therefore, the Secretary is acting pursuant to the same kind of delegation of authority that we discussed above with regard to the formula for deriving a prevailing wage from the data collected."[152]

The DOL has previously acknowledged that the DBA allows it to "issue wage determinations for broader geographic areas such as an MSA, and we routinely issue such determinations when sufficient data are not available on a county basis."[153] The GAO and the DOL OIG have documented just how "routine" such determinations are. Just 11% of DBA determinations are based on data from a single county.[154] Nearly half (48%) of DBA wage determinations are based entirely on survey responses from workers outside the county the determination covers.[155]

---

[150] 40 U.S.C. § 3142(b).

[151] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* pp. 17, 20; U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey,* p. 23.

[152] *Building and Construction Trades' Dept., AFL-CIO v. Donovan,* 712 F.2d 611, 613-14 (DC Cir. 1983).

[153] U.S. Department of Labor, Office of Inspector General, *Concerns Persist with the Integrity of Davis–Bacon Act Prevailing Wage Determinations,* Appendix B, p. 2.

[154] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey,* p. 22.

[155] U.S. Department of Labor, Office of Inspector General, *Better Strategies are Needed to Improve the Timeliness and Accuracy of Davis-Bacon Act Prevailing Wage Rates,* p. 11.

The DOL's current rulemaking also recognizes its authority to base DBA determinations on MSA-level data. The DOL proposes combining data from rural and metropolitan counties within the same MSA. This would be illegal if the DBA required using only county-level data for wage determinations.

To be clear, ABC strongly opposes the importation of wage rates on a state-wide basis where such rates do not in fact prevail in the civil subdivision being surveyed. But based upon extant authority, the fact that the BLS produces MSA-level, not county-level, estimates is no legal impediment to using BLS data for similarly grouped DBA wage determinations. Indeed, such an approach would more closely reflect local wages than the DOL's current practices, under which 40% of DBA determinations are improperly based on statewide data.[156]

*The DOL Can Use BLS Occupational Definitions*

A final objection to using BLS data is that it would require the WHD to classify occupations differently. The BLS classifies occupations and measures their compensation using the Standard Occupational Classification system. The SOC provides consistent nationwide occupational definitions: a worker classified as a "carpenter" under the SOC will have the same job duties in Michigan, Massachusetts and Mississippi.

The WHD's DBA determinations frequently use union job classifications. These are not consistent nationwide, typically varying depending on local union work rules. Work performed by a union "electrician" in one city might be assigned to an "electrical assistant" or another job classification in another. In many cases, union job classifications are also more granular than SOC occupational definitions. For example, the SOC has one occupational category for plumbers, pipefitters and steamfitters. The WHD DBA classification for New York City lists separate (union) rates for plumbers, mechanical and equipment servicers, service fitters and steamfitters.[157] The DOL has in the past raised the fact that the SOC does not capture these more detailed crafts as an objection to using BLS data.

This objection is meritless. The DBA does not require using detailed local union job classifications. As the D.C. Circuit Court of Appeals has recognized, "There is no language in the statute that might be said to … mandate the union classification scheme."[158] The DOL has the authority to use national SOC occupational classifications to set prevailing wages. The DOL uses occupational definitions based on the SOC to enforce the Service Contract Act.[159] The DOL can do the same for the DBA.

There is little justification for using local union classifications if doing so comes at the cost of using unrepresentative surveys that do not accurately measure construction wages. It is better to accurately measure prevailing wages under national SOC occupational definitions than inaccurately mismeasure them with local union classifications. As the DOL recognizes in this

---

[156] U.S. Government Accountability Office, *Davis–Bacon Act: Methodological Changes Needed to Improve Wage Survey,* p. 22.
[157] U.S. General Services Administration, Davis-Bacon Act Wage Determination #NY20220003, modification 2, at https://sam.gov/wage-determination/NY20220003/2.
[158] See *Building & Construction Trades Department v. Donovan*, 712 F.2d 611, 627 (DC Cir 1983). See also *Building & Construction Trades Department v. Martin*, 961 F.2d 269, 275 (DC Cir. 1992).
[159] U.S. Department of Labor, Wage and Hour Division, SCA Directory of Occupations, 5th edition, https://www.dol.gov/whd/regs/compliance/wage/SCADirV5/SCADirectVers5.pdf.

rulemaking, accurate wage determinations are necessary to effectuate the purposes of the DBA.

Switching to the SOC occupational definitions would have an additional benefit of increasing competition on federal construction projects. The DOL does not generally publish the collective bargaining agreements containing the work rules and occupational classifications in union DBA rates. This makes compliance with the DBA very challenging for nonunion contractors: They do not know how much they must pay for particular tasks because that information is contained in union contracts they do not have access to. In ABC's experience, this causes many nonunion contractors to avoid bidding on DBA projects. Nonunion contractors want to avoid the steep penalties associated with inadvertently misclassifying workers and paying them the wrong rate. Reduced competition for DBA projects drives up costs for taxpayers. If the DOL switched to national SOC definitions, nonunion contractors would know exactly what tasks belonged, for example, to an electrician or carpenter, and this impediment to bidding on DBA projects would disappear.

**6. DOL Should at Least Use Statistical Methods to Improve WHD Survey Accuracy**

ABC reiterates that the DOL should use BLS data to calculate DBA rates, for example, using a statistical model to combine OEWS wage and NCS benefit data. If the DOL nonetheless decides to retain the WHD survey process, ABC believes the DOL should at least utilize standard statistical methods to mitigate nonresponse bias. Specifically, the DOL should consult with survey experts to redesign the WHD survey and implement weighting and/or imputation based on establishment characteristics, including at least firm size and union status. OMB guidance specifies that:

> "[Agencies] should address what [survey] pretesting has taken place, what its data collection procedures are, how it will maximize response rates, and how it will deal with missing unit and item data …
>
> Agencies must have a statistical basis for generalizing the results beyond the particular sample selected and need to consult a sampling statistician in designing their sample for their survey. Agencies conducting surveys that are intended to produce valid and reliable results that can be generalized to the universe of study, but are not based on probability methods, must clearly justify the statistical methodology …
>
> Whenever … the probability of selection is not equal for all cases, it is essential that weighted response rates be reported. Similarly, agencies should always report weighted response rates for establishment surveys in their ICRs [information collection requests] and describe what is used for the weight."[160]

The WHD's DBA surveys ignore this guidance. As discussed previously, the WHD does not address or attempt to mitigate bias created by missing data and nonresponses at all, instead

---

[160] Information and Regulatory Affairs, U.S. Office of Management and Budget, *Questions and Answers When Designing Surveys for Information Collection*, pp. 7, 26, 59.

utilizing unscientific methods that ensure that "only those who vote, count."[161] The WHD does not weight its results by firm size or union status, nor does it impute missing responses.

The DOL's proposals cannot improve the accuracy of DBA determinations so long as they remain based on unrepresentative surveys that do not utilize standard statistical methods to improve accuracy. And while ABC believes the DOL should not adopt the 30% rule, the DOL cannot accurately implement that rule with WHD's flawed survey methodology. If the DOL wishes to ascertain the wage actually paid to 30% of the construction workforce (and whether such a wage exists) it needs to employ standard statistical methods to improve survey accuracy. It would be arbitrary and capricious for the DOL to make these changes without addressing the fundamental flaws with DBA surveys.

Simply weighting respondents would mitigate a significant portion of the nonresponse bias that plagues WHD's surveys. To take a simplified example, consider a local labor market in which unions represent 20% of construction workers but 40% of WHD survey respondents. The DOL's current (unweighted) methodology gives these union respondents a disproportionate influence over the survey average rate. The 30% rule would select union rates as the prevailing rate, despite only a fifth of the construction workforce making them. Statistical weighting would set the union contribution at 20% of the local workforce, no matter how many union firms completed the survey. This would eliminate disproportionate union influence over the survey results, preventing union rates from prevailing under the 30% rule and from skewing the average under the majority wage rule.

The OMB directs federal agencies to mitigate nonresponse bias. Weighting and imputation are statistical methods that would be straightforward for the department to apply. They are standard operating procedures for federal surveys. The BLS—one of the DOL's subcomponents—has extensive experience implementing these procedures in its own establishment surveys (like the OEWS and NCS). The BLS could help WHD implement these statistical methods.[162] Whatever objections the DOL may have to replacing the WHD survey with BLS data, they do not prevent the DOL from adopting standard statistical methods to combat nonresponse bias in the WHD survey itself.

Opposition to implementing standard statistical methods to mitigate nonresponse bias only makes sense if the DOL is not actually seeking to promote accurate DBA determinations. Using these techniques would generally prevent union rates from prevailing under either the 30% or majority wage rules. If the DOL's actual goal is to align DBA rates more closely with union rates, regardless of whether union rates prevail, then rejecting statistical methods makes sense. But if the DOL's stated goal of promoting survey accuracy is not pretextual, then it would be arbitrary and capricious for the DOL to make those peripheral and definitional changes without also combating the nonresponse bias that makes WHD's DBA surveys statistically meaningless.

---

[161] U.S. Department of Labor, Office of Inspector General, *Inaccurate Data Were Frequently Used in Wage Determinations Made Under the Davis–Bacon Act*, p. 19.

[162] ABC notes that BLS already has access to benchmark administrative data—derived from payroll tax filings—on the size of every construction firm. Weighting or imputation on the basis of firm size would be routine. The department could get benchmark data on union status through a number of ways. This could involve working with unions and trade associations to report the union status of in-sample firms to WHD staff simply calling the firms and asking if they are unionized. A simple survey asking a single, easily answered question would have much higher response rates than the department's current burdensome DBA survey forms.

**7. DOL's Proposal Should Require State and Local Prevailing Wage Surveys to Utilize Statistical Methods**

ABC also proposes that, if the DOL retains its proposed new paragraph §1.3(h), it modifies subparagraph (1) to read:

> "The State or local government sets wage rates, and collects relevant data, using a survey or other process that use appropriate statistical methods, such as sampling, weighting, or imputation, to obtain statistically representative results."

The DOL explains that its requirement that state or local prevailing wage determinations be open to full participation by all interested parties is meant to:

> "[E]nsure that WHD will not adopt a prevailing wage rate where the process to set the rate artificially favors certain entities, such as union or non-union contractors. Rather, the state or local process must reflect a good-faith effort to derive a wage that prevails in the relevant geographic area within the meaning of the Davis-Bacon Act statutory provisions."

As discussed above, the DOL's proposed language seems likely to undermine this goal, because it can be read as excluding surveys that use statistically representative sampling, preventing nonsampled participants from self-selecting into the survey. Economists have documented that some state prevailing wage determinations are highly inaccurate.[163] The DOL's language could be interpreted to only permit the use of such inaccurate determinations and forbid the use of scientific surveys that use representative sampling techniques.

The DOL can better realize its objective by instead requiring state or local determinations to use appropriate statistical methods to obtain statistically representative results to be used for DBA determinations. This would limit inclusion to high-quality, scientific surveys that accurately measure prevailing wages, screening out state or local determinations that are not representative of local labor markets. At the very least, if the DOL retains its proposed §1.3(h), it should clarify that statistically representative sampling, where all respondents have a proportionate likelihood of inclusion in the sample, qualifies as "full participation by all interested parties" within the meaning of the regulation. Excluding such surveys would exclude surveys that make a good faith effort to derive an accurate prevailing wage.

## III.  The Proposed Rule Illegally Expands Coverage and Scope of DBA Regulations to New Types of Activity and Workers

The DOL proposes eight (8) changes that expand the DBA and its accompanying regulatory bureaucracy further into industries whose employers have employees who traditionally do not

---

[163] For example, applying California prevailing wage requirements set by the state's Department of Industrial Relations to low-income housing increased total costs by between 9% and 37%. The California DIR uses a methodology similar to the WHD's to estimate California prevailing wages. See Sarah Dunn, John M. Quigley, and Larry A. Rosenthal, "The Effects of Prevailing Wage Requirements on the Cost of Low-Income Housing," *Industrial and Labor Relations Review*, vol. 59, no.1 (October 2005), pp. 141-157.

perform construction duties—defined in the DBA statute as a "laborer or mechanic"—such as surveyors, flaggers, prefabrication and modular manufacturers, material suppliers and truckers—or who have traditionally not been covered by DBA regulations except in very limited and specific circumstances. The proposal also expands DBA coverage to new types of construction and construction-related activity, such as private green energy projects, public-private partnerships, private projects with improvements to space leased or used by government agencies and additional demolition, surveying and flagging activities.

The DBA expressly states that its coverage is limited to construction performed at the "site of the work."[6] Numerous court decisions during the 1990's rejected DOL efforts to expand the scope of DBA coverage to pre-fabrication activities away from the construction site or transportation to and from the site.[164] As DOL acknowledges in the NPRM, the current rule 5.2(l) was adopted in 2000 expressly in order to comply with the appeals court rulings and end the frequent litigation that preceded the rule.[165] Yet DOL now proposes to reopen this previously settled issue by expanding the definition of the construction "site" to include "secondary worksites."[166] The proposed expansion plainly defies the plain language of the DBA and the settled court rulings and will lead to unnecessary, wasteful, and counterproductive litigation. This ill-advised proposal should certainly be withdrawn.

For similar reasons, the proposed expansion of the scope of the DBA to include material suppliers previously declared NOT to be covered by the Act in the *Midway Excavators* case,[167] directly violates the DBA and the *Midway* decision and should be withdrawn. There is no statutory basis for the distinction the NPRM seeks to draw between material suppliers and other types of subcontractors who pick up and transport material away from a construction jobsite. Likewise, the proposal to change the definition of covered "construction" to include "transportation" violates the plain language of the DBA, as does the expansion of coverage to include surveyors and flaggers who do not perform work at the site of construction.[168]

### 1. Modular Work[169]

The rule proposes to revise Section 5.2 to cover off-site construction of "significant portions" of a building or work. It defines "significant portion" to mean "one or more entire portion(s) or module(s) of the building or work, as opposed to smaller prefabricated components, with minimal construction work remaining other than the installation and/or assembly of the portions or modules at the place where the building or work will remain." This would be a significant change from existing rules which apply to prefabrication **at a site of work "*specifically established*"** [emphasis added] for the performance of a Davis-Bacon contract or project.[170]

---

[164] *See Ball, Ball & Brosamer, Inc. v. Reich*, 24 F.3d 1447 (D.C. Cir. 1994); *L.P. Cavett Co. v. U.S. Dep't of Labor*, 101 F.3d 1111 (6th Cir. 1996),
[165] 87 Fed. Reg. at 15730.
[166] Id. at 15731.
[167] *Building & Const. Trades Dep't, AFL-CIO v. U.S. Dept of Labor Wage Appeals Board (Midway)*, 932 F.2d 985, 990 (D.C. Cir. 1991).
[168] Id. at 15731-32.
[169] See language: https://www.federalregister.gov/d/2022-05346/p-1104
See discussion: https://www.federalregister.gov/d/2022-05346/p-352
[170] *See also Midway Excavators*, 932 F. 2d at 991.

Many prefabrication/modular operations are located in a manufacturing facility in a fixed location and are established to provide modular components to multiple private jobsites and public works project jobsites whose coverage by the DBA is incidental. Many of these manufacturers may not know if their products will end up at a DBA project directly, or in another prefabricated component that will end up on a DBA jobsite or a private jobsite as some components may be manufactured in a facility and shipped directly to a jobsites where additional work is done to install and customize the work for the jobsite that is covered by the DBA.

This proposed change replaces a clear and well-established regulatory requirement with one that puts a new regulatory burden on manufacturers and/or DBA contractors to determine which prefabricated components meet the "significant portion" test.  This will both increase the inflationary effects of Davis-Bacon prevailing wages while also imposing unnecessary administrative costs on contractors and disrupting the entire industry of manufacturers of modular construction. ABC fully opposes this change and recommends that the DOL keep its existing policy.

Of note, the proposal fails to define what is a "significant portion" of work and or to establish bright lines triggering this threshold regulatory coverage. In addition, the proposal fails to clarify if the required prevailing wage and benefit rates should reflect local area rates paid at the manufacturing location of the modular/prefabricated facility, or reflect the area standards of the site of the project originally covered by the DBA. If WHD were to make this ill-advised change, it should consider the regulatory costs, confusion and burden on manufacturers compensating their workforce different wage and benefit rates depending on which piece of modular product it is manufacturing, which "trades" might do this work on a traditional construction jobsite at the eventual DBA project where the modular product is going and will eventually be installed (note, this might change from region to region and trade to trade). In addition, has the DOL considered if the prefabrication/modular construction firm is responsible for any portions of the modular construction work or materials produced by subcontractors in multiple locations that might become part of the final modular assembly? What rate would those subcontractors have to pay if their work is located in a different locality?

Finally, the DOL WHD should be cautious about expanding the reach of the DBA to modular/prefabricated construction because the regulatory burden of the DBA will chill the broad use of modular construction in government contracting, which has emerged as an industry innovation to eliminate materials waste, control product quality, minimize delays and labor shortages, save production costs, keep workers safe and create well-paying jobs in fixed manufacturing facilities.  Regulatory overreach will wipe out the benefits of modular/prefab and undermine other policies advanced by DOL that modular/prefab supports related to safety, job creation, and opportunities for underserved communities and jobseekers etc.

ABC opposes this change entirely and strongly suggests that the DOL abandon this ill-conceived idea. If anything, DOL should issue a new proposal subject to a notice and comment period following extensive discussions with the prefabricated and modular manufacturers and industry trade associations, in order to understand the business models

and challenges DBA regulation and its accompanying bureaucracy would have on these businesses.

## 2. Expands the Definition of "Public Works or Buildings"[171]

The NPRM purports to "clarify" in Section 3.2 that projects constructing "only a portion of public buildings or works is covered under the Act.[172] It is remarkable that the discussion omits any reference to the most important and recent ruling on the definition of public buildings or public works, i.e., *District of Columbia v. Department of Labor*.[173] In that case, the D.C. Circuit held that the DBA did not apply to a mixed-use development project located in the District of Columbia to which the government was not a party and which was not the recipient of any government funds for construction. In particular, the court found that lease agreements similar to agreements described in the NPRM did not qualify as "contracts for construction" even though construction was contemplated on portions of buildings pursuant to the lease(s). The court found that DOL had exceeded the bounds of its statutory authority and vacated DOL's attempt to impose DBA coverage on the project. The court also found DOL's reading of its regulations to impose DBA coverage in the absence of federal funding was unlawful. To the extent the NPRM is making another attempted end run around judicial interpretation of the DBA's statutory coverage, that attempt should be withdrawn.

## 3. Green energy projects are explicitly covered.[174]

The NPRM extends DBA coverage to solar panels, wind turbines, broadband installation, and installation of electric car chargers. The expansion of DBA coverage to these projects will serve as a barrier to rapid expansion of green energy systems.175 For example, if the Biden administration is serious about increasing the number of EV charging stations across America from 48,000 to 500,000 by 2030,176 it needs all hands on deck, not just contractors familiar with DBA regulations., It's a huge administrative burden for developers and small businesses installing EV stations to follow the DBA's bureaucracy and red tape, which increases compliance costs and kills the efficient use of labor on private projects. Besides its negative impact on the environment, consumers and energy ratepayers, it will be especially devastating to local, small, veteran-, disabled-, women- and minority-owned contractors and their workers, because the majority of them are nonunion and do not perform work subject to the Davis-Bacon bureaucracy.

Additionally, DOL should consider evidence from prior attempts to expand DBA to cover green infrastructure projects. A February 2010 U.S. Government Accountability Office report[177] found that several federal agencies reported that the expansion of the DBA onto new types of green construction projects had a negative impact on the American Recovery and Reinvestment Act

---

[171] See discussion: https://www.federalregister.gov/d/2022-05346/p-295
See language: https://www.federalregister.gov/d/2022-05346/p-1005
[172] 87 Fed Reg 15725.
[173] 819 F.3d 444 (D.C. Cir. 2016).
[174]See language: https://www.federalregister.gov/d/2022-05346/p-1005.
See discussion: https://www.federalregister.gov/d/2022-05346/p-294.
[175] Ben Brubeck "Sweetheart Union Deal Will Undermine Swift Transition to Clean Energy," Real Clear Policy, Dec. 21, 2021.
[176] Bent Halvorson, "Infrastructure bill: $7.5B toward nationwide network of 500,000 EV charges," Green Car Reports, Nov. 7, 2021.
[177] See GAO report "Project Selection and Starts Are Influenced by Certain Federal Requirements and Other Factors." February 2010.

program administration and goals that resulted in needless delays, increased costs and complaints from stakeholders harmed by the policy change.

A related February 2010 U.S. Department of Energy Office of Inspector General report[178] cited DBA regulations as the prime factor holding up the launch of its Weatherization Assistance Program, which did not begin work until October 2009, eight months after President Obama signed ARRA into law. A March 4, 2010, GAO report[179] determined that, "as of Dec. 31, 2009, 30,252 homes had been weatherized with Recovery Act funds, or about 5% of the approximately 593,000 total homes that DOE originally planned to weatherize using Recovery Act funds." This bureaucratic boondoggle helped shape the narrative that ARRA failed at funding and creating shovel-ready jobs.

DOL should withdraw these provisions to ensure that clean energy projects are not unnecessarily impacted by increases in administrative and labor costs.

## 4. Expands the Application of the DBA to More Transportation/Trucking Activity[180]

The NPRM proposes to amend the definition of "construction, prosecution, completion or repair in Section 5.2–for the first time in the history of the DBA–to include "transportation."[181] This is a plain violation of the DBA, which already defines its coverage and is limited to "construction, alteration, or repair, including painting and decorating, of public buildings and public works…."[182]

## 5. Expands the Application of the DBA to Material Suppliers[183]

The DOL's proposed revisions to Section 5.2, resulting in expansion of the scope of the DBA to include material suppliers previously declared *not* to be covered by the DBA in the *Midway Excavators* case,[184] directly violates the DBA and the *Midway* decision and should be withdrawn. There is no statutory basis for the distinction the NPRM seeks to draw between material suppliers and other types of subcontractors who pick up and transport material away from a construction jobsite. Likewise, the proposal to change the definition of covered "construction" to include "transportation" violates the plain language of the DBA, as does the expansion of coverage to include surveyors and flaggers who do not perform work at the site of construction.[185]

Under the proposed definition, suppliers that establish portable equipment on construction sites would now be identified as contractors. This is an unworkable standard and does not reflect the reality of the current work environment. Federally funded infrastructure projects

---

[178] See IG report "Progress in Implementing the Department of Energy's Weatherization Assistance Program Under the American Recovery and Reinvestment Act," February 2010.
[179] See GAO report, "Recovery Act: Factors Affecting the Department of Energy's Program Implementation" March 2010.
[180] See discussion: https://www.federalregister.gov/d/2022-05346/p-371.
See language: https://www.federalregister.gov/d/2022-05346/p-1074.
[181] 87 Fed Reg 15733-34.
[182] 40 U.S.C. 3142.
[183] See discussion: https://www.federalregister.gov/d/2022-05346/p-362.
See language: https://www.federalregister.gov/d/2022-05346/p-1092.
[184] *Building & Const. Trades Dep't, AFL-CIO v. U.S. Dept of Labor Wage Appeals Board (Midway)*, 932 F.2d 985, 990 (D.C. Cir. 1991).
[185] Id. at 15731-32.

require a significant amount of concrete, asphalt and aggregates material, in many cases millions of tons of product. To accommodate this demand, material suppliers will establish temporary crushers and material processing equipment on job sites to produce building materials that can be used immediately at that construction site. This allows for recycling of old materials and reduces truck hauls to aggregates and production facilities that are miles away. This current model significantly reduces truck traffic, thereby reducing transportation emissions and keeps the cost of materials low.

If defined as contractors or sub-contractors, these mobile material suppliers will face great regulatory costs that will drive production further away from construction sites and increase the cost of materials. Further, this change will significantly reduce the ability to recycle materials on infrastructure projects and increase truck traffic and emissions, as longer hauls will be needed to source aggregates, asphalt and concrete. With the current workforce challenges facing the trucking industry, regulatory obstacles that move material production further away from job sites will only cause greater delay in our ability to efficiently supply needed construction materials.

## 6. Expands the Application of the DBA to Surveyors[186]

The NPRM does not propose to change rules covering surveyors under the DBA, but requests comments on "guidance to the effect that surveyors who perform physical/manual work are covered by the DBA." ABC opposes adding any provisions to the rule that could expand DBA coverage to include surveyors who are neither laborers nor mechanics.

Secretary of Labor Arthur Goldberg in 1962 ruled that members of survey crews were exempt from DBA.  He noted that such workers are covered only to the extent to which they "perform manual work, such as clearing brush and sharpening stakes," which he said, "are not commonplace".

The proposed rule fails to acknowledge the Goldberg standard. Rather, it suggests a new standard to apply to members of survey crews as laborers or mechanics under the DBA, which is unprecedented and is outside of the boundaries of the DBA and the regulations.

The proposed rule fails to recognize the reality of surveying practice, in which members of survey crews are engaged in activities that are predominately intellectual, analytical, and judgmental in nature, not physical or manual.[187] DOL should withdraw these provisions to avoid expanding DBA regulations beyond the intention of Congress.

## *IV. The proposal makes 28 changes to regulatory compliance and enforcement aspects of the DBA*

---

[186] See discussion: https://www.federalregister.gov/d/2022-05346/p-332
[187] *See also* FOH 15e20 ("As a general matter, members of the survey party who hold the leveling staff while measurements of distance and elevation are made, who help measure distance with a surveyor chain or other device, who adjust and read instruments for measurement or who direct the work are not considered laborers or mechanics.").

The proposal makes 28 changes to recordkeeping, compliance and enforcement aspects of DBA regulations, which will further reduce competition, create more compliance burdens, increase costs and expose firms to more legal and compliance risks for contractors.

## 1. Expansion of Recordkeeping Requirements[188] [189]

The NPRM expands the recordkeeping requirements for covered contractors, subcontractors and federal assistance recipients in two significant and overburdensome areas. First, the NPRM proposes to revise Section 5.5(a)(3)(i)(B) of the rules to add a requirement to disclose worker telephone numbers and email addresses. This additional information constitutes an invasion of employee privacy and exposes employees to the increased possibility of identity theft. At a minimum, such information should be redacted and not publicly disclosed under any circumstances.

Even more burdensome on covered contractors is the new proposal to add paragraph (a)(3)(iii) to Section 5.5 to require all contractors, subcontractors and recipients of federal assistance to maintain and preserve Davis-Bacon contracts, subcontracts and related documents for three years after all the work on the prime contract is completed, including bids and proposals as well as amendments, modifications and extensions to contracts, subcontracts or agreements. No adequate justification for this burdensome new requirement is provided in the NPRM other than being a "good business practice"—not DOL's concern. This additional burden is not reflected in the DOL's regulatory cost analysis.

## 2. New Record Request Sanction[190]

The NPRM adds a new and arbitrary sanction in Section 5.5(a)(3)(iv)(B) against contractors and "other persons" who fail to submit required records. According to the new sanction, contractors that fail to comply with record requests will not be allowed to later introduce the specified records during administrative proceedings. There are many reasons why contractors are uncertain or unable to comply immediately with unreasonable WHD document requests. The new sanction opens the door to unreasonably coercive tactics against contractors, and the exclusion of evidence on this basis alone would violate the due process rights of employers.

## 3. Back Wages Interest[191]

The NPRM proposes to revise Section 5.10(a) to establish that interest will be calculated based on dates of underpayment, using underpayment of taxes interest rate and compounded daily. This is unfair to contractors who may be unaware of any wage underpayments until they are notified by the DOL at or near the end of a construction project. Absent knowledge and/or willful underpayment, interest compounding should not be imposed until after the DOL properly notifies contractors of an unremedied liability.

---

[188] See discussion: https://www.federalregister.gov/d/2022-05346/p-388. See Language: https://www.federalregister.gov/d/2022-05346/p-1143.
[189] See discussion: https://www.federalregister.gov/d/2022-05346/p-399. See language: https://www.federalregister.gov/d/2022-05346/p-1142.
[190] See discussion: https://www.federalregister.gov/d/2022-05346/p-405. See language: https://www.federalregister.gov/d/2022-05346/p-1157.
[191] See discussion: https://www.federalregister.gov/d/2022-05346/p-457. See language: https://www.federalregister.gov/d/2022-05346/p-1214.

## 4. Fringe Benefit Annualization[192]

The NPRM purports to add new paragraph (c) to existing Section 5.25 in order to "codify the principle of annualization" as that principle is currently described in DOL guidance materials. The DOL has long required most fringe benefits to be "annualized," reducing the credit contractors are allowed to take when their employees receive some of the benefits on private work. But the DOL proposal appears to engage in a significant, but unacknowledged, policy change, by inserting the new requirement that fringe benefits will only avoid annualization if they are not "continuous in nature."[193] The "non-continuous" requirement to avoid annualization does not currently appear in the Field Operations Handbook or other guidance materials of the DOL. The DOL's plan to change the annualization policy without acknowledging or justifying the change constitutes a classic example of arbitrary and capricious rulemaking in violation of the APA.[194]

Worse still, the DOL proposes to apply its new "continuous benefit" policy to defined contribution pension plans that provide for immediate participation and accelerated vesting (i.e., vesting after a worker works no more than 500 hours).[195] Historically, the DOL has not imposed any requirement that DCPPs be "noncontinuous" in nature in order to avoid annualization.[196] However, the DOL now proposes to do so while also including a proposed subparagraph (2) allowing for "exceptions requests." The proposed subparagraph (2) would impose a huge burden on thousands of contractors who have long provided DCPP benefits to their employees, by forcing longstanding DCPPs and other bona fide fringe benefits to be submitted to the WHD for a new seal of approval.

The DOL should withdraw provisions requiring all fringe benefit plans seeking an exception from the annualization requirement to submit a written request that must be approved by the WHD administrator in the context of DCPPs. This requirement establishes significant administrative burdens for contractors and plan administrators. By imposing new regulatory burdens, contractors will be further discouraged from pursuing DBA projects. This added administrative complexity could discourage small businesses or new entrants from pursuing opportunities covered by the DBA or DBRA.

Construction workers are already likely to have lower retirement savings on average, and increasing difficulty of compliance means DBA contractors will be less likely to offer retirement savings benefits, conflicting with Congress's stated policy positions [197]

---

[192]  See discussion: https://www.federalregister.gov/d/2022-05346/p-470. See language: https://www.federalregister.gov/d/2022-05346/p-1258.
[193] See language: https://www.federalregister.gov/d/2022-05346/p-1263.
[194] See *FCC v. Fox Television,* 556 U.S. 502, 515 (2009).
[195] See *Tom Mistick & Sons v. Reich,* 54 F.3d 900 (D.C. Circuit Court, 1995) rejecting the DOL's previous attempt to impose annualization on defined contribution pension trust; see also WHD Opinion Letter DBRA-134 (June 6, 1985).
[196] See FOH 15f14(f), which explicitly permits DCPPs to receive full credit (without annualization), so long as the plan "provides for immediate participation and immediate or essentially immediate vesting schedules." There is no "non-continuous" requirement.
[197] *See* March 29, 2022, floor statement of Richard Neal, Chairman, House of Representatives Ways and Means Committee (https://neal.house.gov/news/documentsingle.aspx?DocumentID=2466) on the Securing a Strong Retirement Act of 2022.

Instead of making the usage of DCPPs more difficult, the DOL should be encouraging employers to establish and contribute to such plans. The additional regulatory requirements of the proposed rule directly contradict the DOL's mission and should be withdrawn.

## 5. Irrevocable Payments to Third Parties[198]

The NPRM proposes a "non-substantive technical correction" to Section 5.26, without explanation, that appears to make an important and adverse substantive change. Specifically, the proposed revision for the first time imposes a "fiduciary responsibility" for a nontrustee "third party." In the absence of any explanation, it is unclear what the purpose of such a change might be, but it potentially imposes new legal requirements on nontrustee "third parties" without justification and should be withdrawn.

## 6. Unfunded Benefit Approval[199]

Apart from the annualization requirement, the DOL is also proposing a new requirement in Section 5.28 requiring contractors to obtain DOL review and approval of unfunded fringe benefits meeting the DOL's longstanding four-part criteria. The ostensible purpose of this change is to promote "regulatory clarity," because a similar requirement already appears in Section 5.29(e). ABC agrees with the goal of regulatory clarity and consistency. But the better way to achieve such consistency would be to eliminate the advance approval requirement from both provisions. Such advance approvals should be voluntary on the part of contractors and should not be mandatory for unfunded benefit plans that otherwise meet all the statutory criteria.

## 7. Administrative Costs Fringe Benefits[200]

The DOL's NPRM adds a new Section 5.33 that imposes new restrictions on allowing contractors to take DBA credit for the administrative costs of fringe benefit plans. Contrary to the NPRM, the cost of administering claims should be fringe-creditable, with all other expenses treated as noncreditable employer administrative expenses. Self-insured funded plans pay not only for benefits and claims administration but also for other types of expenses that are merely employer overhead; thus, self-insured funded plans provide less fringe value than nonfunded plans providing insured benefits. All plan expenses should be creditable, not just claims administration expenses.

The DOL specifically requests comment "regarding whether it should clarify this principle further with respect to third-party administrative costs." In response, ABC opposes any further restriction on the types of administrative costs for which employers may receive credit.

If the DOL does address this issue in a final rule, it should adopt a rule that broadly provides that reasonable administrative expenses incurred by a contractor or subcontractor related to fees incurred with the administration of a fringe benefit plan should be creditable as fringe

---

[198] See language: https://www.federalregister.gov/d/2022-05346/p-1268.
[199] See discussion: https://www.federalregister.gov/d/2022-05346/p-478. See language: https://www.federalregister.gov/d/2022-05346/p-1277.
[200] See discussion: https://www.federalregister.gov/d/2022-05346/p-486. See language: https://www.federalregister.gov/d/2022-05346/p-1297.

benefits, to the extent those fees are paid to a third party and are directly related to the provision of fringe benefits to satisfy a DBRA obligation. If the third-party expense would not have been incurred "but for" the provision of fringe benefits, it should be creditable. This would encompass both administrative costs associated with providing fringe benefits to employees, and the administration and delivery of benefits. As outlined below, there are compelling policy reasons for the DOL to adopt this position.

Third-party fees are and should be considered creditable whenever they administer and deliver benefits because the expenses related to the provision of fringe benefits are inextricably tied to the value of those same benefits. Contractors use qualified third parties to assist with the administration of benefits because that is the most effective way to ensure that the highest quality benefits are provided in an efficient manner to covered employees. Allowing employers to receive credit for reasonable expenses paid to third-party providers encourages them to utilize providers who are able to efficiently maximize the value to covered employees.

## 8. Third-Party Fringe Benefit Costs[201]

The NPRM seeks comment on how WHD should treat third-party fringe benefit entities that both perform administrative functions and actually deliver benefits. No change is currently proposed. ABC opposes any change to the current approved status of such programs, both with regard to their administrative functions and their delivery of benefits, which are inherently interrelated and should both be credited toward DBA obligations.

## 9. Anti-Retaliation Contract Clauses[202] and Anti-Retaliation Remedies[203]

The NPRM revises Section 5.5(a)(11) adds a new anti-retaliation provision to all contracts stating it is unlawful to fire, intimidate, etc., workers filing complaints regarding DBA violations. The NPRM then proposes to add a new Section 5.18 with new provisions enforcing this new mandate. But both the contract provision and the enforcement provisions and penalties exceed the scope of the DOL's statutory authority and should be withdrawn.

Under the DBA, the DOL's remedial authority is limited to withholding funds from a contract to enforce payment of back wages and possible liquidated damages and to debar contractors for reckless disregard of their statutory obligations.[204] Nothing in the statute authorizes the DOL to create a new and overbroad remedial authority to file retaliation claims against contractors on behalf of individual employees. Where Congress has seen fit to grant authority to agencies to take remedial action on behalf of employee complainants, Congress has done so expressly and with limitations. This is true regarding the NLRB, the EEOC and OSHA, all of whose remedies for retaliation are the subjects of statutory language, as is also true of the WHD with regard to FLSA retaliation claims.[205] The WHD has no independent statutory authority to

---

[201] See discussion: https://www.federalregister.gov/d/2022-05346/p-487.
[202] See discussion: https://www.federalregister.gov/d/2022-05346/p-503. See language: https://www.federalregister.gov/d/2022-05346/p-1168 and https://www.federalregister.gov/d/2022-05346/p-1184.
[203] See discussion: https://www.federalregister.gov/d/2022-05346/p-506. See language: https://www.federalregister.gov/d/2022-05346/p-1252.
[204] 40 U.S.C. 3142.
[205] 29 U.S.C. 215(a)(3).

create a new regime of anti-retaliation requirements, penalties and bureaucracy; this aspect of the NPRM should therefore be withdrawn.

## 10. Operation of Law[206]

The NPRM adds a new paragraph at Section 5.5(e) that states that labor standards/wage determinations will henceforth be in effect by "operation of law" if wrongfully excluded from a contract. The result of this new and unauthorized provision is to hold contractors and subcontractors responsible for alleged violations of the DBA without providing them any contractual notice of the DBA's requirements on individual projects.

Until now, contractors have not been held responsible for DBA compliance unless they were properly notified of DBA's application to a project via contract clauses. The DOL is now proposing to impose DBA requirements "by operation of law," increasing the risk of violation without any notice to contractors. This not only violates basic notions of due process but is also inconsistent with the statutory language of the DBA. The DBA is structured as a statutory amendment to contracts between the government and government contractors. For this reason, the DBA requires stipulations in any contract within its coverage. Absent such stipulations incorporating the act's prevailing wage provisions, no DBA violation can be found. This provision of the NPRM must therefore be withdrawn.

## 11. Agency Post-Award Incorporation[207]

The NPRM proposes new provisions at Section 1.6(f)(1) to allow contracting agencies to make post-award wage determination incorporations without a determination from WHD of special circumstances justifying such incorporation as required by current rules. ABC opposes this proposal, which threatens contractors with improper changes to their government contracts post-award.

## 12. Agency Withholding Requirements[208]

The NPRM's proposed new language at Section 1.6(f)(3)(vi) imposes new withholding and cross-withholding requirements that violate longstanding understandings of the contract-based scope of the DBA and FAR contract requirements. The DOL has ample resources available to enforce findings of violations on a particular DBA-covered contract. As noted above, the statutory language is tied to individual contracts where alleged violations occur. The DBA does not permit cross-withholding of funds on entirely separate contracts to recover wages allegedly owed under different contractual terms.

## 13. Post-Award Incorporation[209]

The NPRM purports to revise Section 5.6(a)(1) to "clarify" that if a contract is awarded without a required DBA clause, contracting agencies must incorporate DBA clauses or ensure federal

---

[206] See discussion: https://www.federalregister.gov/d/2022-05346/p-522. See language: https://www.federalregister.gov/d/2022-05346/p-1191.
[207] See discussion: https://www.federalregister.gov/d/2022-05346/p-555. See language: https://www.federalregister.gov/d/2022-05346/p-978.
[208] See discussion: https://www.federalregister.gov/d/2022-05346/p-561. See language: https://www.federalregister.gov/d/2022-05346/p-986.
[209] See discussion: https://www.federalregister.gov/d/2022-05346/p-564. See language: https://www.federalregister.gov/d/2022-05346/p-1193.

assistance recipients do so. Such a provision again holds contractors responsible without notice of DBA requirements. Until now, contractors have not been held responsible for DBA compliance unless they were properly notified of DBA's application to a project via contract clauses. Changing contract requirements after award is forbidden unless specific requirements of the FAR are satisfied. The NPRM is unclear or else fails to justify the apparent expansion in the scope of the DBA's coverage.

## 14. DBRA Debarment Standard[210] and Three-Year Period[211]

The NPRM would improperly expand the DOL's debarment and withholding powers under Section 5.12. The DOL proposes for the first time ever to apply the same ("reckless disregard") debarment standard for both DBA projects and projects performed under the "Related Acts."

The NPRM would revise Section 5.12(a)(1) and (2) to for the first time impose a mandatory three-year debarment period under the DBRA. The NPRM would thereby change the standard for debarment under the Related Acts for the first time in more than 70 years. No specific justification is provided for this radical change, and it should be withdrawn.

As acknowledged in the preamble,[212] the debarment standard for the Related Acts was established in 1951 immediately following issuance of Reorganization Plan No. 14 of 1950. Whereas the DBA itself sets debarment for a mandatory three-year period based on a standard of "reckless disregard" for the DBA's obligations, the Related Acts contained no statutory language authorizing debarment. Likely for this reason, the Truman DOL provided for a more flexible and deliberate standard for debarment, the "willful and aggravated" test, which can be reduced to less than three years as a remedial measure.

The NPRM would do away with the willful and aggravated standard under the guise of creating a "unitary" standard. But if Congress had wanted to impose the inflexible and easier to prove debarment test of the DBA in the Related Acts it could easily have done so; Congress chose not to adopt the DBA debarment standard, and the DOL is not free to unilaterally impose a unitary debarment test.

## 15. DBRA Responsible Officers/Interest Debarment[213]

Equally problematic is the NPRM's proposal to revise Section 5.12(a)(2) to include responsible officers and entities with "substantial interest" in debarment order. The NPRM offers little guidance as to how responsible officers will be determined or what constitutes a substantial interest in a debarred company. Additional guidance is requested in this provision.

## 16. DBRA Debarment Scope[214]

---

[210] See discussion: https://www.federalregister.gov/d/2022-05346/p-583. See language:  https://www.federalregister.gov/d/2022-05346/p-1225.
[211] See discussion: https://www.federalregister.gov/d/2022-05346/p-592. See language: https://www.federalregister.gov/d/2022-05346/p-1226.
[212] See discussion: https://www.federalregister.gov/d/2022-05346/p-496.
[213] See discussion: https://www.federalregister.gov/d/2022-05346/p-600. See language: https://www.federalregister.gov/d/2022-05346/p-1226.
[214] See discussion: https://www.federalregister.gov/d/2022-05346/p-603. See language: https://www.federalregister.gov/d/2022-05346/p-1225.

The NPRM purports to broaden the scope of DBRA debarments in Section 5.12(a) to include all federal contracts covered by the DBA as well. But the DOL does not have statutory authority to regulate contracts that are not covered by the DBA. For this reason, this provision exceeds the DOL's jurisdiction and should be withdrawn.

### V. The NPRM fails throughout to consider viable regulatory alternatives and misses numerous opportunities to provide regulatory clarity to regulated stakeholders

As discussed extensively above, the DOL proposal fails to consider multiple reasonable regulatory alternatives with respect to moving all or portions of the WHD's DBA prevailing wage determination process to the BLS—or adopting sound BLS methodology—in order to determine an accurate and timely prevailing wage and benefit determination.

The same defect applies to most, if not all, of the NPRM's 50-plus regulatory changes to DBA-related rules. Failure to consider and adopt such reasonable alternatives before changing long-established agency policies constitutes arbitrary conduct violating the APA. *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (U.S. 2020); <u>*Motor Vehicle Manufacturers Association of the United States, Inc.* v. *State Farm*, 463 U.S. 29</u> (1983) ("When an agency rescinds a prior policy, its reasoned analysis must consider the alternatives that are within the ambit of the existing policy."). In addition, the NPRM's proposed reversal of the Reagan reforms of the wage survey process, improper expansion of the DBA's coverage and imposition of new post-award contractual requirements and penalties without notice to contractors adversely impacts the reliance interests of the regulated contracting community, another indicator of arbitrary decision-making. *Id.* Courts have also found agency reversals to be arbitrary where the agency has failed to deal with the important aspects of the problem addressed by the rule it purports to reconsider. *See, e.g.*, *U.S. Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. at 1910 (2020); *Motor Vehicle Manufacturers Association*, 463 U.S. at 43 ("An agency's action is arbitrary and capricious, however, where it fails to consider important aspects of the problem."). Agencies' reversals of course have also been vacated where they rely on factors that they should not have considered, and where they offer explanations for new rules that run counter to the evidence. *Id.*; *see also FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 515 (2009). The use of internally contradictory reasoning also indicates arbitrary action. *See Southwestern Elec. Power Co. v. EPA*, 920 F.3d 999, 1030 (5th Cir. 2019) ("[T]he agency's rationales contradict themselves... and therefore cannot stand."). The agency must also consider costs to regulated parties, as well as the reliance interests of the regulated parties. *Encino Motorcars v. Navarro*, 136 S. Ct. 2117, 2125-26 (2016); *Clean Air Council v. Pruitt*, 862 F.3d 1, 7 (D.C. Circuit Court, 2017). Indeed, an agency must consider costs even where the agency action at issue merely continues the status quo. *See Texas Association of Manufacturers. v. U.S. Consumer Product Safety Commission*, 989 F.3d 368, 387 (5th Circuit Court, 2021).

The DOL's reversals of policy in this NPRM suffer from all of the forgoing defects and must therefore be withdrawn or else face judicial scrutiny with a strong likelihood that a litigation challenge will succeed.

**1. In addition, the DOL's proposal fails to consider and deliver additional regulatory clarity to the regulated community.**

ABC members frequently cite unclear and onerous DBA regulations as a reason why they do not pursue public works projects subject to federal, state or local prevailing wage laws.

In a 2022 survey of ABC membership, 65% of contractors that had not performed a federal or federally assisted construction project covered by the DBA in the last five years said they would be more likely to bid on DBA contracts if DBA regulations were easier to understand and comply with. In addition, 81% said they would bid on federal and federally assisted projects currently covered by the DBA if it were repealed.

For example, the DOL's failure to provide detailed information about job duties that correspond to each published wage rate makes it difficult to determine the appropriate wage rate for many construction-related jobs. These wage determinations force federal contractors to use outdated and inefficient union job classifications that ignore the productive work practices successfully used in the merit shop construction industry.

Further, the DOL has failed to give contractors notice of many of its letter rulings and, with rare exceptions, has not posted such rulings on its website.

In a 2022 survey of ABC member contractors, 84% of contractors who performed DBA-covered work in the last five years responded that lack of regulatory clarity in complying with job classifications and work rules is moderately to extremely challenging.

To provide fair notice to contractors of the scope of work to be performed by specific trades listed in wage determinations, the DOL should post hyperlinks to union collective bargaining agreements "scope of work" sections in the public wage determination whenever union wage rates are considered prevailing. Failure of the unions to provide such links to their scope of work provisions would bar any attempt by the DOL to claim the employer had misclassified its employees. Where more than one union claims to do the work in question according to their collective bargaining agreements, or where nonunion area practices otherwise prevail, then contractors should be able to classify their workers in accordance with either the union's CBA orthe nonunion area practice.

To increase transparency and remove the unfair lack of notice to merit shop contractors on DBA-covered projects, ABC urges the DOL to require a hyperlink to any union CBA scope-of-work provision found to be prevailing in a wage determination.

For decades, the regulated community has asked the DOL to publish union collective bargaining agreements to help contractors comply with this aspect of DBA regulations.[215] A lack of regulatory clarity has resulted in confusion from government and private sector

---

[215] See written congressional testimony by ABC General Counsel Maury Baskin before House Education and Workforce Subcommittee on Workforce Protections, June 18, 2013, https://www.abc.org/Portals/1/Documents/Newsline/2013/ABC%20Testimony_Baskin_House%20EW%20Wkfc%20Protections%20Subcmte_Hearing_061813_FINAL.pdf and hearing transcript at https://www.govinfo.gov/content/pkg/CHRG-113hhrg81435/html/CHRG-113hhrg81435.htm.

stakeholders, unintentional violations and costly litigation resulting in fees, penalties and back pay that undermines a company's ability to be profitable in an industry with extremely low profit margins. Critics of the DBA suggest the DOL's decades-long omission of this information is intentional because it creates a pathway to weaponize the DBA against contractors not familiar with union CBAs.

It is very unfortunate and puzzling that DOL's WHD has not taken steps to provide this regulatory clarity for decades, nor has it contemplated this commonsense request from the business community in this proposed rule considering recent roundtable discussions and requests by industry stakeholders prior to the issuance of the proposed rule.

If the DOL is serious about its mission of preventing violations from happening in the first place by providing regulatory clarity and creating regulatory certainty by enforcing the law fairly, addressing the need to publish accompanying union collective bargaining agreements with union rates in the rulemaking should be a top priority.

## VI. The DOL's Rulemaking Relies on an Erroneous Analysis of Associated Regulatory Burdens and Costs to DBA Contractors and Taxpayers

DOL's regulatory analysis[216] estimating the cost of this "significant regulatory action"[217] is grossly inadequate and not grounded in fact.

For example, the DOL's regulatory analysis claims it will take just 90 minutes "of a human resources staff member's time" to review[218] and implement the regulation,[219] at a cost of $78.97 in Year 1 for each of the tens of thousands of contractors the DOL estimates will be affected by this NPRM.[220] The truth is this proposal will collectively cost regulated businesses hundreds of millions of dollars to evaluate and implement in Year 1, in contrast to the DOL's meager estimate of $12.6 million in Year 1.[221]

## 1. Regulatory Familiarization Costs Are Flawed

When the DOL estimated the regulatory familiarization cost of the rulemaking at $10.1 million in Year 1, it presumed, "1 hour of a human resources staff member's time will be spent reviewing the rulemaking" at $52.46 per hour, multiplied by 192,400 public works contractors estimated to be covered by DBA regulations.[222] However, reading the 432-page NPRM— clocking in at a robust 118,450 words—would actually take 8.3 hours per person at an average

---

[216] Specifically, section IV Paperwork Reduction Act (https://www.federalregister.gov/d/2022-05346/p-646); section V. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improved Regulation and Regulatory Review (https://www.federalregister.gov/d/2022-05346/p-679); and section VI Initial Regulatory Flexibility Act (IRFA) Analysis (https://www.federalregister.gov/d/2022-05346/p-846) of the NPRM.
[217] The Office of Management and Budget's Information and Regulatory Affairs has determined this DOL proposed rule is a "significant regulatory action" because it meets one of the four criteria of Section 3 (f) of Executive Order 12866. See 58 FR 51735, 51741 (Oct. 4, 1993). See determination in NPRM at https://www.federalregister.gov/d/2022-05346/p-679.
[218] See discussion: https://www.federalregister.gov/documents/2022/03/18/2022-05346/updating-the-davis-bacon-and-related-acts-regulations#p-745.
[219] See discussion: https://www.federalregister.gov/d/2022-05346/p-747.
[220] See discussion: https://www.federalregister.gov/d/2022-05346/p-757.
[221] See discussion: Table 5–Summary of Costs (2020 dollars), https://www.federalregister.gov/d/2022-05346/p-757.
[222] See discussion: Table 5–Summary of Costs (2020 dollars), https://www.federalregister.gov/d/2022-05346/p-757.

silent reading rate.[223] This more realistic and conservative estimate would increase the regulatory familiarization costs of the regulated community to $83.83 million in Year 1 alone.

In addition, the added regulatory familiarization costs incurred by regulated firms are likely to be much greater than estimated by the DOL because review of the rulemaking is not limited to one person in most companies, according to feedback from ABC member companies. The new regulation must be read by attorneys, human resources personnel, IT employees, estimators and even foremen in the field—at varying levels of hourly compensation—in order for it to be discussed and implemented correctly. This multiplies the rule's regulatory familiarization costs exponentially, depending on the size of a company, the type of work performed and the location of the project.

ABC members indicated it would likely take an average-sized ABC member company five people—or the equivalent of five people—to read and synthesize the impact of the rule on business operations. This estimate is likely to be similar across other firms in the industry affected by this rulemaking. Conservatively, this adjustment would bump the regulatory costs of familiarization to $419.15 million ($83.83 million x 5 people per firm) in Year 1 and does not take into account additional implementation regulatory costs.

Of note, the DOL's estimate of one hour *per company* to review the rule is erroneously justified by the DOL because firms "do not need to familiarize themselves with methodology used to develop those prevailing wage rates in order to comply with them."[224] This a stunning argument by the DOL, especially if the DOL is serious about its mission to educate and partner with the regulated community to prevent violations from happening in the first place. Reading the rulemaking is step one of extensive compliance efforts by most companies performing DBA-covered work given the DBA's historically complicated rules and unclear practices.

Likewise, the NPRM does not exclusively address newly published wage rates as the DOL erroneously asserts. The NPRM extends new regulations and accompanying complicated policies, practices and red tape to existing DBA contractors, as well as new types of construction and new industries and occupations—like modular construction manufacturers, material suppliers, surveyors, flaggers and truckers—who have generally never been covered by the DBA in the manner this NPRM proposes because they are not laborers or mechanics, etc. These are firms that are generally not captured in the data used by the DOL to estimate the number of federal contractors (192,400) impacted by this NPRM's regulatory familiarization cost analysis.[225]

The DOL's flawed regulatory cost analysis fails to estimate the number of firms and employees—or consider and account for any additional regulatory familiarization costs—specific to these newly regulated industries and occupations and types of construction activity.

---

[223] Research suggests the average silent reading rate for adults in English is 238 words per minute for nonfiction, meaning it would take 497.68 minutes or 8.3 hours just to read the proposed rule from beginning to end. Marc Brysbaert, "How many words do we read per minute? A review and meta-analysis of reading rate," Ghent University, April 2019.

[224] See section V of NPRM at: https://www.federalregister.gov/d/2022-05346/p-744.

[225] See data sources and calculations discussed in I Firms Currently Holding DBA Contract at https://www.federalregister.gov/d/2022-05346/p-698; II All Potentially Affected Contractors (DBA Only) at https://www.federalregister.gov/d/2022-05346/p-704; and III Firms Impacted by the Related Acts at https://www.federalregister.gov/d/2022-05346/p-709.

However, the DOL's flawed analysis justifies their exclusion through erroneous reasoning.[226] There absolutely is an added regulatory cost to newly regulated firms above baseline regulations, and this needs to be accounted for in this estimate. In reality, the regulatory familiarization costs would take much more time and be much more expensive for these newly regulated stakeholders than just one hour per company, as incorrectly estimated by the DOL. For the purposes of this analysis, a conservative estimate would be 5 people per firm at 8.3 hours per person at various wage rates multiplied by the unknown number of new firms regulated by this NPRM.

## 2. Regulatory Implementation Costs Are Also Flawed

Regarding the DOL's inadequate and flawed implementation costs estimate, the DOL claims it will take 30 minutes for one person from each of the 93,320[227] potentially affected firms experiencing new implementation costs by this NPRM at a cost of $2.5 million ($26.32x93,320 firms) in Year 1.[228]

However, according to ABC's 2022 survey of ABC member contractors, the majority of contractor members who performed DBA work within the last five years estimated that the proposed rule would take more than 30 minutes to implement.[229]

ABC member firms reported that implementation would require multiple personnel across various estimating, payroll, accounting and field employees within a company.

Conservatively, a more accurate regulatory implementation cost estimate is more likely closer to 10-15 hours per impacted company, in total. The more likely regulatory implementation cost total is to $81.29 million to $122 million ($52.65 multiplied by 10-15 hours = $526.50 to $789.75, multiplied by 154,500 firms).

This further indicates the inaccuracy of the DOL estimate, and ABC urges the DOL to reconsider this analysis and recalculate the implementation cost of this regulation accurately while assessing implementation costs by the industry.

---

[226] The DOL says, "New entrants will not incur any additional regulatory familiarization costs attributable to this rule; had this rule not been proposed, they still would have incurred the costs of regulatory familiarization with existing provisions," https://www.federalregister.gov/d/2022-05346/p-745. This is flawed logic. New firms will have to familiarize themselves with this new regulation. This NPRM is an added regulation and cost, regardless of whether firms have been previously covered or not.

[227] ABC objects to the DOL's methodology used to establish the estimate for the number of firms (93,320) with implementation costs. The implementation costs would impact the same number of contractors as those who experience familiarization costs discussed previously because the NPRM creates new regulatory implementation costs regardless of whether the firm is engaging on a project with CBA rates. The DOL rationalizes that the population of firms facing new implementation costs is less than the 192,400 experiencing regulatory familiarization costs at https://www.federalregister.gov/d/2022-05346/p-753. "According to section V.D., 24 percent of rates are CBA rates under the current method, meaning 37,080 firms (0.24 × 154,500) might already be affected by changes in prevailing wages in any given year. Combining this number with the 24,100 firms calculated above, 61,180 firms in total would not incur additional implementation costs with this rule. The Department welcomes comments and data on what is the appropriate share of firms who already update wage rates due to CBA increases. Therefore, 93,320 firms (154,500 firms − 61,180 firms) are assumed to not update prevailing wage information in any given year because prevailing wage rates were unchanged in their areas of operation and would therefore incur implementation costs." ABC suspects this estimate of 93,320 companies is incorrect and does not adequately capture newly regulated firms and undercounts firms. While recognizing the DOL is doing its best to develop an inexact estimate given data limitations, 154,500 firms is likely the more accurate number of firms affected with regulatory implementation costs.

[228] See discussion: Table 5—Summary of Costs (2020 dollars), https://www.federalregister.gov/d/2022-05346/p-757.

[229] Open-ended responses to this particular survey question by ABC members suggested that it would take much more time than 30 minutes to implement. In addition, operationalizing this cost would require multiple personnel within a company, such as estimators, project managers, payroll, IT and HR, as well as attorneys interpreting this regulation and change any company operations.

## 3. Other Costs Not Factored in Estimate

The DOL estimates there may be additional costs but does not have sufficient data to calculate these costs.[230] While these additional costs may not be quantifiable, these are hidden costs on taxpayers and regulated businesses in addition to excessive administrative burdens and costs already inherent with baseline DBA regulations. In ABC's 2022 survey of contractor members, 72% indicated that DBA regulations increase administrative costs by 11% or more, with 41% indicating increases of 21% or more.

## 4. New Fringe Benefit Program Regulatory Costs Unknown

Finally, the DOL proposes a new requirement that contractors obtain DOL review and approval of existing fringe benefits plans with an exception to the annualization principle, including but not limited to DCPPs, meeting DOL's longstanding criteria, within 18 months after the published rule.[231]

This process will dramatically increase regulatory burdens on contractors and the DOL itself. It is unclear if the DOL has accurately accounted for the need for additional DOL personnel and time to review such plans from an unknown number of the federal contractors impacted by this provision. Has the DOL considered what happens to contractors whose plans have not been approved due to a lack of DOL personnel—but are willing and capable of competing, winning and fulfilling DBA-covered contracts?

Given the short amount of time afforded to ABC and other stakeholders to comment, ABC is unable to estimate the regulatory costs of this new requirement (as well as additional new requirements related to recordkeeping and certified payrolls requiring the recording of employee email address and telephone numbers discussed previously).

Together, this NPRM will increase the regulatory costs on impacted businesses by unknown and known amounts. ABC estimates the added regulatory costs of this rulemaking are at least $500 million to $541 million of additional known regulatory costs ($419 million in familiarization costs plus $81.29 million to $122 million in implementation costs) and an unknown number of additional costs in Year 1 and an unknown number of additional costs on an annual basis in the future.

## *VII. Added Regulatory Costs and Burdens Will Harm Small Businesses*

As discussed previously, the vast majority of ABC's contractor members are small businesses. This is consistent with the Census Bureau and Small Business Administration's Office of Advocacy's findings that the construction industry has one of the highest concentrations of small businesses (82% of all construction firms have fewer than 10 employees)[232] and industry

---

[230] See discussion: Other Provisions Not Analyzed, https://www.federalregister.gov/d/2022-05346/p-758.
[231] See discussion: https://www.federalregister.gov/d/2022-05346/p-474.
[232] U.S. Census Bureau 2019 County Business Patterns,
https://data.census.gov/cedsci/table?q=CBP2019.CB1900CBP&n=23&tid=CBP2019.CB1900CBP&hidePreview=true and
https://www.census.gov/programs-surveys/cbp/data/tables.2019.html.

workforce employment (more than 82% of the construction industry is employed by small businesses).[233] In fact, construction companies that employ fewer than 100 construction professionals compose 99% of construction firms in the United States; they build 63% of U.S. construction, by value, and account for 68% of all construction industry employment.[234] ABC member small businesses and construction industry small businesses generally view existing DBA regulations as a barrier to winning federal and federally assisted construction contracts covered by the DBA for a variety of compelling reasons.[235]

For example, in a 2022 survey of ABC members, more than 75% of surveyed small business contractors strongly or somewhat agree with the statement that DBA regulations discourage competition from small business contractors. Likewise, in a 2020-21 survey of ABC members, just 3% of contractor respondents said that a project covered by prevailing wage regulations would result in the increased hiring of small businesses compared to its procurement without prevailing wage regulations (44% said it would decrease small business hiring and 54% said it would make no difference).[236]

In the 2022 survey of ABC membership, small business contractors expressed several concerns regarding existing DBA regulations:

- 73% stated they have not participated in a single wage determination survey in the past five years, indicating that prevailing wages often fail to reflect small business wage data.
- Less than 13% of small businesses strongly or somewhat disagreed with the statement that DBA regulations favor union contractors and workers.
- 55% somewhat or strongly agreed that prevailing union work rules lack clarity.
- Almost 89% of small businesses strongly or somewhat agreed that DBA regulations inflate wage and fringe benefit rates above market rates.
- Almost 93% of small businesses strongly or somewhat agreed with the statement that DBA regulations result in more administrative burdens and costs than non-DBA projects.
- More than 93% of small businesses said DBA regulations increase the overall cost of construction.

Small businesses also estimated the regulatory burdens of the DBA, with 73% responding that DBA increases administrative costs on covered projects by 11% or more (41% said administrative costs on covered projects will increase by 21% or more).

For these reasons, of the surveyed ABC members operating small businesses, 72% support full repeal of the DBA and 81% support reform of the DBA.

---

[233] "2020 Small Business Profile," pg. 3, U.S. Small Business Administration Office of Advocacy (2020).
[234] U.S. Census County Business Patterns by Legal Form of Organization and Employment Size Class for the U.S., States and Selected Geographies: 2019, available at https://thetruthaboutplas.com/wp-content/uploads/2021/07/Construction-firm-size-by-employment-2019-County-Business-Patterns-Updated-071321.xlsx.
[235] The SBA defines small businesses in the construction industry using the following size standards: A $39.5 million average annual receipts for general building and heavy construction contractors and a $16.5 million average annual receipts for special trade construction contractors, according to Page 5 of the U.S. SBA Table of Small Business Size Standards Matched to North American Industry Classification System Codes.
[236] "Survey Says: ABC Members Strongly Support Repeal or Reforms to Costly Davis-Bacon Act and Prevailing Wage Laws," ABC, March 2021.

DBA regulations continue to be a key reason standing in the way of growth and new contracting opportunities for small businesses. Of the ABC member small businesses surveyed in 2022 that have not performed DBA work within the past five years, 81% said they would be more likely to bid on federal and federally assisted construction projects if the DBA were repealed and 64% said they would be more likely to bid on more federal and federally assisted construction contracts if the Davis-Bacon Act were easier to understand and comply with.

Construction industry small businesses' aversion to the DBA is supported by additional data. According to ABC's 2022 survey, the majority of all companies that perform DBA work have been in business for over 10 years, demonstrating how DBA regulations reduce competition from newer firms with less capability to deal with compliance burdens. Approximately 80% of companies have been performing DBA work for at least 10 years, and 90% have been doing so for at least five years. Roughly 58% of contractors bidding on DBA contracts said they had been in business at least five years before first trying to compete for DBA work.

It is remarkable that the DOL's NPRM did little to address decades of concern about the DBA reducing small business competition on DBA contracts. Unfortunately, as previously discussed, the NPRM will likely exacerbate the regulatory burdens and costs on small businesses and discourage them from competing for DBA-covered contracts as supported by additional opinions expressed in the 2022 survey of ABC members:

- Almost 65% of non-DBA small business firms said the DOL's NPRM would make them less likely to pursue DBA projects.
- While the DOL NPRM regulatory analysis indicates small businesses will only need to spend 90 minutes on familiarization and implementation with the updated regulations as discussed above, 85% of small business members expect significant increases in time spent on compliance if the proposed rule is finalized.
- 84% of small business members somewhat or strongly disagreed that DBA regulations should be expanded to off-site prefabrication.
- 70% believe that cross consideration of urban/rural wage rates will decrease accuracy of prevailing wages.
- 56% of respondents believe the change to the 30% rule will decrease accuracy, with only 13% believing it will increase accuracy.

It is undeniable that the DBA is an impediment to efforts by federal, state and local government efforts to create attractive contracting opportunities for small business—who tend to be disproportionately owned by minorities, women and veterans—in the face of declining participation by small businesses in DBA contracting. For example, as illustrated in table 1 and 2, the number of construction industry small business firms that have been awarded federal contracts has shrunk by 57%, from 15,114 small business federal contractors in 2010 to 6,389 small business federal contractors in 2020.

Table 1: Vendor Counts of Small Businesses in Federal Construction



Source: Small Business Goaling Report, FY09 - FY20

Table 2: Data on Vendor Counts of Small and Disadvantaged Businesses in Federal Construction

Vendor Counts of Small Businesses in Construction

| FY | Small Business | SDB | SDVOSB | HUBZone | WOSB | 8A | SBGR |
|------|------|------|------|------|------|------|------|
| 2009 | 13960 | 3460 | 1268 | 1721 | 2245 | 2024 | 16186 |
| 2010 | 15114 | 3946 | 1555 | 1892 | 2473 | 2225 | 17644 |
| 2011 | 13803 | 3896 | 1491 | 1726 | 2333 | 2168 | 16335 |
| 2012 | 12400 | 3696 | 1400 | 1416 | 2156 | 2047 | 14510 |
| 2013 | 11000 | 3976 | 1292 | 1199 | 1903 | 1856 | 12690 |
| 2014 | 11147 | 4466 | 1216 | 1067 | 1936 | 1819 | 12706 |
| 2015 | 10115 | 4298 | 1163 | 995 | 1805 | 1707 | 11724 |
| 2016 | 9818 | 4429 | 1133 | 937 | 1838 | 1682 | 12465 |
| 2017 | 9583 | 4495 | 1160 | 946 | 1827 | 1631 | 12146 |
| 2018 | 9338 | 4592 | 1202 | 948 | 1817 | 1616 | 11424 |
| 2019 | 8596 | 4363 | 1202 | 975 | 1664 | 1528 | 10504 |
| 2020 | 8389 | 4451 | 1184 | 1012 | 1644 | 1486 | 10191 |

57

Table 3: Amount of Federal Contracting in Construction Awarded by Small Business Category



**Federal Contracting in Construction by Small Business Category**

Source: Small Business Goaling Report, FY09 - FY20

*Note: The construction industry is defined as obligations in NAICS 23

58

Table 4: Amount of Federal Contracting in Construction Awarded by Small Business Category Data

Federal Contracting in Construction (NAICS 23) by Small Business Category

| FY | Small Business | SDB | SDVOSB | HUBZone | WOSB | 8A | SBGR |
|----|----|----|----|----|----|----|----|
| 2009 | $17,975,449,017 (59.1%) | $10,696,130,306 (35.2%) | $2,766,995,200 (9.1%) | $6,131,281,433 (20.2%) | $3,289,364,897 (10.8%) | $7,371,932,416 (24.3%) | $30,396,390,622 |
| 2010 | $19,180,589,331 (42.7%) | $10,978,973,024 (24.4%) | $3,633,541,634 (8.1%) | $6,279,314,000 (14.0%) | $3,629,604,314 (8.1%) | $6,661,083,856 (14.8%) | $44,965,538,391 |
| 2011 | $15,447,695,557 (49.6%) | $9,034,658,503 (29.0%) | $3,412,275,927 (11.0%) | $4,607,398,554 (14.8%) | $2,985,373,601 (9.6%) | $5,340,956,043 (17.2%) | $31,132,247,815 |
| 2012 | $15,146,975,728 (52.8%) | $8,850,234,730 (30.9%) | $3,304,785,031 (11.5%) | $3,756,725,696 (13.1%) | $2,723,801,404 (9.5%) | $4,826,383,369 (16.8%) | $28,660,536,583 |
| 2013 | $12,164,387,983 (53.0%) | $6,924,571,591 (30.2%) | $2,991,296,568 (13.0%) | $2,834,458,178 (12.4%) | $2,190,029,172 (9.5%) | $3,510,725,603 (15.3%) | $22,941,459,265 |
| 2014 | $14,953,972,384 (55.9%) | $9,035,547,715 (33.8%) | $3,226,985,616 (12.1%) | $3,179,865,214 (11.9%) | $2,610,283,328 (9.8%) | $4,886,934,545 (18.3%) | $26,733,962,777 |
| 2015 | $13,020,367,583 (53.1%) | $7,597,122,800 (31.0%) | $2,963,307,086 (12.1%) | $2,813,209,419 (11.5%) | $2,363,369,023 (9.6%) | $3,942,722,979 (16.1%) | $24,537,106,936 |
| 2016 | $14,468,720,687 (51.2%) | $8,669,056,872 (30.7%) | $3,345,912,677 (11.8%) | $2,744,495,687 (9.7%) | $2,669,962,298 (9.4%) | $4,291,555,990 (15.2%) | $28,276,903,941 |
| 2017 | $13,542,559,656 (44.8%) | $7,929,822,030 (26.2%) | $3,023,936,221 (10.0%) | $2,460,352,886 (8.1%) | $2,482,921,363 (8.2%) | $3,853,992,584 (12.7%) | $30,249,476,570 |
| 2018 | $16,652,501,236 (50.2%) | $10,049,489,228 (30.3%) | $3,836,509,006 (11.6%) | $3,482,458,923 (10.5%) | $2,919,102,522 (8.8%) | $4,360,020,019 (13.1%) | $33,166,943,233 |
| 2019 | $16,923,163,831 (42.9%) | $10,171,212,160 (25.8%) | $3,870,463,312 (9.8%) | $3,758,343,355 (9.5%) | $3,254,060,272 (8.3%) | $4,026,228,463 (10.2%) | $39,419,998,771 |
| 2020 | $17,822,539,170 (40.0%) | $11,541,606,346 (25.9%) | $3,975,254,397 (8.9%) | $4,462,033,088 (10.0%) | $3,086,313,661 (6.9%) | $4,582,543,967 (10.3%) | $44,590,269,389 |

It is puzzling why the DOL's flawed NPRM and its initial regulatory flexibility act analysis[237] did not contemplate whether expanded DBA regulations would contribute to the decline in construction industry small business contractor participation in federal contracts (and presumably DBA-covered contracts procured by state and local governments). In contrast, the DOL's flawed NPRM may accelerate the trending decline in the number of construction industry small businesses that have won federal contracts.

In addition, the NPRM fails to adequately assess added costs of this rulemaking on small businesses because it uses the same flawed methodology and assumptions discussed in the previous section of this comment letter. Finally, the NPRM fails to address decades of complaints by small businesses about DBA regulations serving as a barrier to pursuing federal contracts.

The DOL's NPRM attempts to quantify the number of small businesses and employees of small business affected by the NPRM:

> "In 2019, $55.4 billion was spent on DBA covered contracts (see section V.B.2.) and of that, $19.8 billion (36percent) was awarded to small business prime contractors.[187] Data on expenditures by firm size are unavailable for the Related Acts (Table 10). Therefore, the Department assumed the same percentage applies to such expenditures as for Davis-Bacon contracts. In total, an estimated 424,800 workers are employed by potentially affected small businesses."[238]

---

[237] See discussion: Initial Regulatory Flexibility Act (IRFA) Analysis at https://www.federalregister.gov/d/2022-05346/p-846.
[238] See Table 9 and Table 10 of section VI. Initial Regulatory Flexibility Act (IRFA) Analysis at https://www.federalregister.gov/d/2022-05346/p-860.

The NPRA's IFRA estimates that "Year 1 direct employer costs for small businesses are estimated to total $8.7 million. Average annualized costs across the first 10 years are estimated to be $2.6 million (using a 7 percent discount rate). On a per firm basis, direct employer costs are estimated to be $78.97 in Year 1."

The IFRA suffers from the same flaws as the regulatory cost analysis discussed in Section VI of this comment letter for all businesses affected by this NPRA. The IFRA presumes one person from *each of the small business contractors* impacted by the rulemaking will spend a total of 90 minutes—at an average rate of $52.65 per hour—on regulatory familiarization ($7.1 million) and implementation ($1.6 million).[239]

Using the same alternative assumptions and formulas discussed in Section VI, the regulatory familiarization costs for small businesses are likely to be exponentially greater and at least $295.4 million of additional known costs in Year 1 (8.3 hours per firm, multiplied by 5 people=41.5 hours per firm; 41.5 hours multiplied by $52.65=$2,184.97. $2,184.97 multiplied by 135,200 firms=$295,408,620).[240]

In addition, the majority of ABC small businesses surveyed said it would take longer than 30 minutes to implement the NPRM's changes. Conservatively, implementation might take two to three hours of time from five employees per impacted firm. Using the same alternative assumptions and formulas discussed in Section VI's regulatory cost estimates, the regulatory implementation costs for small businesses is likely to be exponentially greater and at least $54.54 million to $81.81 million of additional known costs in Year 1 ($52.65 multiplied by 10 to 15 hours per firm=$526.5 to $789.75 per firm. This cost per firm multiplied by the 103,600 small firms with DBA contracts[241] is likely to be $54.54 million to $81.81 million).

Finally, the DOL proposes a new requirement that contractors obtain DOL review and approval of existing fringe benefits plans with an exception to the annualization principle, including but not limited to DCPPs, meeting DOL's longstanding criteria, within 18 months after the published rule.[242]

This process will dramatically increase regulatory burdens on small business contractors and the DOL itself. It is unclear if DOL has accurately accounted for the need for additional DOL personnel and time to review such plans from an unknown number of the federal contractors affected by this provision. Has the DOL considered what happens to small business contractors whose plans have not been approved due to a lack of DOL personnel, but are willing and capable of competing, winning and fulfilling DBA-covered contracts?

Given the short amount of time afforded to ABC and other stakeholders to comment, ABC is unable to estimate the regulatory costs of this new requirement, as well as additional new

---

[239] See Table 11, Direct Employer Costs to Small Businesses: https://www.federalregister.gov/d/2022-05346/p-868.
[240] See discussion of implementation costs: https://www.federalregister.gov/d/2022-05346/p-868.
[241] 103,600 small firms is the most likely number as opposed to 62,574, per discussion in previous section. See discussion of implementation costs: https://www.federalregister.gov/d/2022-05346/p-868.
[242] See discussion: https://www.federalregister.gov/d/2022-05346/p-474.

requirements related to recordkeeping and a certified payroll requiring the recording of employee email address and telephone numbers discussed previously, on small businesses.

Together, this NPRM will increase the regulatory costs on affected small businesses by unknown and known amounts. ABC estimates the added regulatory costs of this rulemaking on small businesses are at least $350 million to $377.2 million ($295.4 million in familiarization costs plus $54.54 million to $81.81 million in implementation costs) and an unknown number of additional costs in Year 1 and an unknown number on an annual basis in the future.

In its present form, the NPRM clearly violates the Small Business Regulatory Enforcement Fairness Act, 5 U.S.C. 601-612. Under SBREFA and the Regulatory Flexibility Act, agencies promulgating a rule that will have a significant impact on small entities are required to prepare and make available for public comment an initial regulatory flexibility analysis that describes the impact of the proposed rule and describes steps the agency has taken to minimize the significant economic impact of the rule on small entities. The DOL's SBREFA analysis is woefully inadequate to comply with the statute. The DOL has greatly underestimated the costs of compliance with the revised rule and has greatly exaggerated the benefits of compliance. For this reason as well, the NPRM should be withdrawn.

### VIII. This Proposed Rule Will Inflate Costs and Could Not Come at a Worse Time For the Industry or Taxpayers

In short, the DOL's proposed anti-competitive and costly revisions to DBA regulations could not come at a worse time for the construction industry, taxpayers and U.S. economy. The U.S. construction industry currently faces supply chain disruptions,[243] unprecedented materials cost inflation,[244] declining investment in nonresidential structures[245] and a projected skilled labor shortage of 650,000 people in 2022.[246] [247] The DOL's proposal is likely to exacerbate all of these headwinds facing the construction industry, increase costs and fail to improve the timeliness and quality of taxpayer-funded construction projects. In short, the DOL's proposal will ultimately result in less value and job creation from taxpayer-funded government investment in infrastructure—including the $550 billion of new infrastructure funding via the Infrastructure Investment and Jobs Act[248]—to improve America's roads, bridges, transportation systems, schools, affordable housing and water, energy and broadband utilities.

The DOL NPRM's flawed regulatory cost analysis fails to contemplate additional annual costs to taxpayers as a result of the adoption of inflated nonmarket wage rates and reduced competition from small and large businesses pursuing federal and federally assisted construction projects subject to the DBA. In addition, it fails to acknowledge the added costs associated with DBA regulations. The NPRM fails to suggest changes to drive down cost increases by reducing regulatory burdens, providing additional regulatory clarity and attracting more competition.

---

[243] Sam Barnes, "Missing Links," Construction Executive, April 2022.
[244] "Monthly Construction Input Prices Increase in April, Says ABC," ABC, May 2022.
[245] "GDP: U.S. Economy Contracts, Investment in Structures Down Again, Says ABC," ABC, April 2022.
[246] "ABC: Construction Industry Faces Workforce Shortage of 650,000 in 2022," ABC, February 2022.
[247] "Construction Job Openings Increased in March; Demand for Labor Remains Strong, Says ABC," ABC, May 2022.
[248] The Infrastructure Investment and Jobs Act (P.L. 117-58).

Volumes of research point to the inflationary impact of the federal DBA and related state and local prevailing wage laws on taxpayer-funded construction costs.

Hardworking taxpayers are ultimately the owners of publicly funded construction projects and deserve the best possible product at the best possible price, which the DBA and related state prevailing wage laws appear to negatively affect based on the following points of research:

- o *Anti-growth:* Prevailing wage mandates are expensive to administer and result in less construction output per tax dollar. Therefore, taxpayers pay more and get less, resulting in fewer roads, schools and bridges without a measurable return in quality, safety or value.
- o *Increased costs:* A May 2022 study[249] from the Beacon Hill Institute finds the flawed method used by the federal government to calculate "prevailing wages" under the DBA adds at least 7.2% to the cost of federal and federally assisted projects and inflates wages by 20.2% compared to local market averages. This costs taxpayers an extra $21 billion annually.
- o In addition, researchers at Suffolk University found in a 2008 study[250] that DBA requirements add 9.9% to construction costs and cost U.S. taxpayers an additional $8.6 billion annually.
- o *Above-market government-set rates:* According to a 2011 Joint Economic Committee report,[251] government-determined DBA wages inflated labor costs an average of 22% above market rates.
- o *Waste:* The Congressional Budget Office has estimated that repealing the DBA would save the federal government $17.1 billion between 2021 and 2030.[252]
- o The Congressional Budget Office's DBA repeal savings estimates do not reflect the true cost savings to taxpayers if Davis-Bacon is repealed. The NPRM estimates that the DBA applies to roughly 62% of all public construction put in place by governments, as many state and local projects are partially or wholly funded with federal dollars that trigger DBA requirements. In 2021, $346.3 billion of public construction was put in place. If two-thirds of the spending ($228.6 billion) was 10% less expensive, as indicated in the 2022 BHI report, that would save taxpayers roughly $22.8 billion per year and more than $228 billion over the next decade.

State and local prevailing wage studies show government-determined prevailing wages drive up local construction costs:

---

[249] William F. Burke, BSBA, David G. Tuerck, Ph.D., "The Federal Davis -Bacon Act: Mismeasuring the Prevailing Wage." The Beacon Hill Institute for Public Policy Research, May 2022.
[250] Sarah Glassman, MSEP, Michael Head, MSEP, David G. Tuerck, Ph.D., Paul Bachman, MSIE, "The Federal Davis-Bacon Act: The Prevailing Mismeasure of Wages," The Beacon Hill Institute for Public Policy Research, February 2008.
[251] "Highway Robbery," Joint Economic Committee Republicans, March 2011.
[252] CBO, "Repeal the Davis-Bacon Act:" https://www.cbo.gov/budget-options/56809.

o May 2021 research conducted by the Mackinac Center for Public Policy found that wages increased and the number of construction workers employed increased following repeal of Indiana's prevailing wage law in 2015.[253]

o A May 2020 study conducted by the Wisconsin Institute for Law and Liberty examines the cost impact of the DBA to contractors in Wisconsin.[254] Key findings include:

  ▪ Costs are increased for counties across the state: Costs to taxpayers were found to be 20% higher across the professions in southeast Wisconsin. Increased costs of 1%-20% were found in the southwest and northwest portions of the state.

  ▪ The DBA impedes competition: 68% of construction companies in the WILL survey said that a repeal of the legislation would make them more likely to bid on projects.

  ▪ The DBA raises employment costs: 87% of construction companies in the survey said that compliance with the DBA makes a project more expensive.

o A March 2020 study by the Terner Center for Housing Innovation at the University of California, Berkeley, found that prevailing wage requirements on affordable housing projects cost an average of $30 more per square foot than those without wage requirements.[255]

o Following the full repeal of West Virginia's prevailing wage law in 2016, a 2018 study conducted by the University of Kentucky Center for Business and Economic Research found that total costs for public school construction in West Virginia declined by more than 7%.[256] Additionally, the CBER found no evidence that repealing this mandate had any impacts on safety or quality of construction.

o In California, a 2017 study by Blue Sky Consulting Group found that prevailing wage requirements on privately financed residential construction would "lead to a reduction in the number of new market rate houses built, fewer affordable housing units and a decrease in the number of construction jobs in the state." The report concluded, "Overall, our analysis shows that expanding prevailing wage requirements to include privately financed housing construction in California would also increase the costs of building new homes. Requiring prevailing wage rates for residential construction would increase hourly labor costs by 89% on average, with some parts of the state experiencing increases of more than 125%. We estimate that this increase could translate to a 37% increase in construction costs, or about $84,000 for a typical new home."[257]

o In New York, a 2017 report released by the Empire Center for Public Policy found that prevailing wage requirements inflate the cost of publicly funded

---

[253] Paul Kersey, "The Effects of Michigan's Prevailing Wage Law," The Mackinac Center, May 2021.

[254] William Flanders, Ph.D., Jessical Holmberg, "The Effect of the Davis-Bacon Act in Wisconsin," May 2020.

[255] Hayley Raetz, Teddy Forscher, Elizabeth Kneebone, Carolina Reid, "The Hard Costs of Construction: Recent Trends in Labor and Materials Costs for Apartment Buildings in California," Terner Center for Housing Innovation, March 2020.

[256] Mike Clark, Kenneth Tester, "An Evaluation of How Repealing West Virginia's Prevailing Wage Law Affected the Cost of Public Construction," Center for Business and Economic Research, Gatton College of Business and Economics, University of Kentucky, August 2018.

[257] Matthew Newman, Shawn Blosser, "Impacts of a Prevailing Wage Requirement for Market Rate Housing in California," Blue Sky Consulting Group, August 2017.

construction projects in the state by 13% to 25%. Taxpayers can expect to pay billions in extra costs, given the tens of billions of dollars the state plans to spend on public projects over a five- to 10-year period.[258]

o In 2016, the New York Independent Budget Office released a report on the impact prevailing wage requirements would have on affordable housing projects built with the 421a property tax break. IBO estimated prevailing wage requirements would cost the city an additional $4.2 billion, increasing affordable housing construction costs by 23%, or $80,000 per unit.[259]

o In Illinois, a 2014 study commissioned by the nonpartisan Anderson Economic Group found that, from 2002 through 2011, the state of Illinois and local governments could have saved an estimated $1.6 billion on school construction costs by eliminating prevailing wage requirements.[260]

o In Minnesota, the prevailing wage calculation process is flawed and outdated, leading to inaccurate wage rates on construction projects. A 2018 study released by the Minnesota Center for Fiscal Excellence found a disproportionate 75% of prevailing wages reflected union rates in the period analyzed in the study, even though just 32% of private construction workers in Minnesota belong to a union.[261]

o In 2002, a report by the Legislative Bureau of the Ohio Legislature determined that rescinding prevailing wage requirements for school construction saved $487.9 million in aggregate school construction during the post-examination period, an overall savings of 10.7%. Repeal had no negative impact on school construction quality or wages of construction workers building applicable schools.[262]

**1. The DOL fails to acknowledge the impact of its proposal on state and local governments with prevailing wage laws, which will multiply DBA cost inflation and harm taxpayers.**

The changes to the WHD's rate determination methodology proposed in the DOL rulemaking will extend flawed and inaccurate government-determined wage rates onto projects procured by certain state and local governments.

Twenty-eight states have passed state prevailing wage laws that require contractors to pay a government-determined prevailing wage and fringe benefit rate on an hourly basis to covered workers performing certain state and state-assisted construction projects.[263]

---

[258] E.J. McMahon, "Prevailing Waste," Empire Center, April 2017.
[259] "Report on Prevailing Wages," New York City Independent Budget Office, February 2016.
[260] Alex L. Rosaen, Traci Taylor, "Illinois' Prevailing Wage Law and the Cost of Education Construction," Anderson Economic Group, June 2014.
[261] "Minnesota's Prevailing Wage: An Evaluation of the Rate-Setting Process," Minnesota Center for Fiscal Excellence, February 2018..
[262] "The Effects of the Exemption of School Construction Projects from Ohio's Prevailing Wage Law," Ohio Legislative Service Commission, May 2002.
[263] Since 2015, six states—Arkansas (2016), Indiana (2015), Kentucky (2017), Michigan (2017), West Virginia (2016) and Wisconsin (2018)— have repealed their state prevailing wage law, dropping the total number of states with a prevailing wage law to 28. For information on the 28 state prevailing wage laws, visit ABC State Prevailing Wage Law Database, available at https://www.abc.org/Portals/1/2021%20Files/State%20Prevailing%20Wage%20Law%20Research%20Database%20Updated%20060121.xlsx?ver=2021-06-29-114958-697.



Likewise, an unknown number of municipal governments have passed ordinances requiring prevailing wage and benefits rates on local and locally assisted construction projects.

Rather than administering their own surveys and wage determination process for state and state-assisted construction projects, eight states (Colorado, Connecticut, Hawaii, Illinois, Nebraska, Rhode Island, Texas and Virginia) and the District of Columbia adopted the federal DBA wage and benefit determinations as the rate for their state prevailing wage laws.[264] Presumably, an unknown number of local governments in these states and perhaps in other municipalities across the country have adopted federal WHD wage determinations as well.

The ill-advised changes in the DOL's proposal to WHD wage determination methodology and new rates will compound the inaccurate and inflationary aspects of the DBA onto projects procured by states and localities with their own prevailing wage law(s) that are tied to federal DBA rates (although not directly covered by the DBA via federal assistance).

It is unknown what these added costs to taxpayers and regulatory costs to affected businesses might be, but the DOL's proposed rule has failed to consider this impact, which will have a dramatic impact on the budgets of state and local government officials and negatively impact businesses and taxpayers.

---

[264] See ABC State Prevailing Wage Law Database, available at https://www.abc.org/Portals/1/2021%20Files/State%20Prevailing%20Wage%20Law%20Research%20Database%20Updated%20060121.xlsx?ver=2021-06-29-114958-697.

## Conclusion

ABC is extremely concerned with the DOL's rulemaking. The proposal threatens to further increase costs and compliance burdens for government stakeholders and the construction industry pursuing federal and federally assisted construction contracts at a time when construction contractors are currently facing historic global supply chain disruptions, rising materials prices and a workforce shortage of 650,000 in 2022.

For the reasons outlined in these substantive comments, ABC requests that the DOL withdraw this rulemaking and instead pursue reforms that will increase the accuracy of DBA wage determinations, alleviate needless red tape and compliance burdens disproportionately harming small businesses and provide regulatory clarity to the regulated community.

Thank you for the opportunity to submit comments on this matter.

Respectfully submitted,

Ben Brubeck
Vice President of Regulatory, Labor and State Affairs
Associated Builders and Contractors
brubeck@abc.org

Of Counsel:  Maurice Baskin, Esq.
             Littler Mendelson, P.C.
             815 Connecticut Ave. NW
             Washington, DC 20006

**Appendix**

Associated Builders and Contractors analyzed data from the outgoing rotation groups of the January 2015 through March 2022 Current Population Survey. This timeframe captured significant participation before and after the COVID-19 crisis hit and enabled a sufficient sample size to evaluate union density at the MSA level.

ABC defined a worker as being covered by a union if they either reported being a member of the union or being represented by a union at work, despite not being a member. ABC defined a worker as a construction worker if they worked in the construction industry (NAICS sector 23). ABC defined a worker as being a blue-collar construction worker if they worked in the construction industry and worked in construction and extraction, installation and repair, production or material moving occupations. This definition excludes employees in management, professional and office and administrative support occupations.

ABC examined national union coverage among private sector construction workers and blue-collar construction workers separately. ABC also examined union coverage among private sector blue-collar construction workers in MSAs with at least 200 respondents who fell into that category during the sample period. All results were weighted using the CPS ORG earnings weights.

For the Nevada calculations, ABC analyzed data the department provided on Davis-Bacon determinations by union and nonunion status. The department's data showed that there were 1,133 union and 1,594 nonunion county-job classifications in Nevada in 2018. The department's data indicated the wage determination number the county-job classifications came from. ABC used these wage determination numbers to identify the counties each determination covered. ABC then weighted the number of each county's job classifications by its share of Nevada construction sector employment in 2018. Data on total county construction employment came from the BLS Quarterly Census of Employment and Wages.