IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| ASSOCIATED BUILDERS AND CONTRACTORS OF SOUTHEAST TEXAS, INC. AND ASSOCIATED BUILDERS AND CONTRACTORS, | § § § § § | |
| *Plaintiffs,* | § § § | |
| VS. | § § § | |
| JULIE SU, ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, in her official capacity, JESSICA LOOMAN, ADMINISTRATOR, DIVISION OF WAGE AND HOUR, U.S. DEPARTMENT OF LABOR, in her official capacity, and UNITED STATES DEPARTMENT OF LABOR, | § § § § § § § § § § | CIVIL ACTION NO. 1:23-CV-00396 JUDGE MICHAEL J. TRUNCALE |
| *Defendants.* | § § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT JULIE SU'S, JESSICA LOOMAN'S, AND THE U.S. DEPARTMENT OF LABOR'S PARTIAL MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

Before the Court is Defendant Julie Su's,[1] Jessica Looman's,[2] and the U.S. Department of Labor's (collectively, "Defendants") Partial Motion to Dismiss the First Amended Complaint. [Dkt. 23]. Defendants filed their motion in this Court on March 20, 2024. *Id.* Plaintiffs Associated Builders and Contractors of Southeast Texas, Inc. ("ABCSETX") and Associated Builders and Contractors, Inc. ("ABC National") (collectively, "Plaintiffs") submitted their Response on April 2, 2024. [Dkt. 25]. Defendants subsequently submitted a Reply on April 9, 2024. [Dkt. 27]. After the briefing had closed, Defendants filed a Notice of

---

[1] Defendant Su was sued in her official capacity and, at the time relevant for this litigation, was the acting Secretary of Labor for the United States Department of Labor. On February 7, 2025, Su was terminated as a defendant in this matter by a Text Notice. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . resigns, or otherwise ceases to hold office while the action is pending."). At the time Su was terminated as a defendant, she did not have a successor, so "Secretary of Labor, United States Department of Labor" was substituted in her place. *See id.* Since the briefing in this matter occurred while Su was still a defendant, the Court will use Su's name throughout the Order.

[2] Defendant Looman was sued in her official capacity and, at the time relevant for this litigation, was the administrator of the Wage and Hour Division of the United States Department of Labor. On February 7, 2025, Looman was terminated as a defendant in this matter by a Text Notice. *See* FED. R. CIV. P. 25(d). At the time Looman was terminated as a defendant, she did not have a successor, so "Administrator, Division of Wage and Hour, US Department of Labor" was substituted in her place. *See id.* Since Looman is not discussed in this Order, this substitution has no effect.

Decision on June 25, 2024; this informed the Court of a relevant case out of the Northern District of Texas.[3]

[Dkt. 28]. The next day, Plaintiffs filed a Notice of Supplemental Authority which spotlighted particular aspects of the same opinion. [Dkt. 29]. The Court fully considered both notices and is now ready to rule.

For the reasons stated below, the Defendants' partial motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

This case involves a challenge to a rule promulgated under the Davis-Bacon Act ("DBA"). For organization, the Court will first discuss this enabling statute. Then it will discuss the regulation that sprouted from it before delving into the Plaintiffs' challenges.

### a.    Statutory Background

The DBA, as amended, requires the payment of locally prevailing wages and fringe benefits to workers on federal construction contracts. 40 U.S.C. § 3141 *et seq.* The Supreme Court has described the DBA as "a minimum wage law designed for the benefit of construction workers." *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 178 (1954); *see* 40 U.S.C. §§ 3141, 3142. The DBA was enacted in 1931 and was subsequently extended to 71 other statutes under which federal agencies provide grants, loans, loan guarantees, or other assistance to construction projects ("Related Acts").[4] *See* 29 C.F.R. Part 5, Subpart A (providing a full list of the 71 Related Acts). At the time of its enactment, a nationwide economic depression had created a surplus of available workers (i.e., available workers outnumbered available jobs). Congress worried that these conditions would allow non-local contractors to import and employ workers at suppressed wages—wages which fell beneath the prevailing rates in the local market. *See Bldg. & Const. Trades' Dep't, AFLCIO v. Donovan*, 712 F.2d 611, 613–14 (D.C. Cir. 1983) (citing S. Rep. 332, 74th Cong.,

---

[3] On June 24, 2024, Senior Judge Cummings issued a nationwide preliminary injunction enjoining Defendants from enforcing particular provisions of the Rule at-issue in this matter ("Preliminary Injunction Order"). [Dkt. 28 at 1]. Specifically, the Order enjoined Defendants from implementing provisions regarding (1) truck drivers (29 C.F.R. § 5.2), (2) material suppliers (29 C.F.R. § 5.2), and (3) the operation of law change (29 C.F.R. § 5.5(e)). *Id.* at 1, 38–39. The Court will discuss the effect of this Order on the present suit below.

[4] For clarity, whenever the Court refers to the DBA hereafter, that term encompasses the Related Acts.

1st Sess. pt. 2, at 4 (1935)); *see also Univs. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 773 (1981) (citation omitted).

> As amended, the DBA imposes the following requirement on federal construction contracts:
>
> The advertised specifications *for every contract in excess of $2,000, to which the Federal Government . . . is a party, for construction*, alteration, or repair . . . of public buildings and public works of the Government or the District of Columbia that are located in a State or the District of Columbia and which *requires or involves the employment of mechanics or laborers shall contain a provision stating the minimum wages to be paid* various classes of laborers and mechanics.

40 U.S.C. § 3142(a) (emphasis added). In the DBA, Congress granted the Secretary of Labor the authority to set minimum wages on covered contracts (i.e., contracts falling within the sweep of § 3142(a)) based on the prevailing wage in the local area:

> The minimum wages shall be based on the wages *the Secretary of Labor determines to be prevailing* for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work *in the civil subdivision of the State in which the work is to be performed*, or in the District of Columbia if the work is to be performed there.

*Id.* § 3142(b) (emphasis added).[5] Under the DBA, "prevailing wages" includes both "the basic hourly rate of pay" and "bona fide fringe benefits."[6] *Id.* § 3141(2)(A)-(B). Beyond this, the DBA does not flesh out the term "prevailing" or outline any procedures for determining "prevailing wages"—that determination was left to the Secretary of Labor. *Id.* § 3142(b); *see also id.* § 3145(a) (emphasis added) (stating that "[t]he Secretary of Labor *shall prescribe reasonable regulations* for contractors and subcontractors engaged in constructing . . . public buildings, public works, or buildings or works that at least partly are financed by a loan or grant from the Federal Government."). The Department of Labor's ("DOL") regulations implementing the DBA are codified at 29 C.F.R. parts 1, 3, and 5. Parts 1 and 5 are relevant to the present matter, so the Court will focus its attention there.

---

[5] All covered contracts must contain stipulations that "the contractor or subcontractor shall pay all mechanics and laborers employed directly on the site of the work . . . the full amounts accrued at time of payment, computed at wage rates not less than those stated in the advertised specifications[.]" *Id.* § 3142(c)(1).

[6] "[B]ona fide fringe benefits" include "medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, [ ] insurance to provide any of the forgoing, [ ] unemployment benefits, life insurance, disability and sickness insurance, [ ] accident insurance, [ ] vacation and holiday pay, [and] defraying the costs of apprenticeship or other similar programs." *See* 40 U.S.C. § 3141(2)(B).

### b.  Regulatory Background

The Wage and Hour Division ("WHD"), an agency within DOL, administers the DBA in partnership with the federal agencies that enter into DBA-covered contracts or provide DBA-covered assistance to state and local governments. *See* Updating the Davis-Bacon and Related Acts Regulations, 88 Fed. Reg. 57,526, 57,530 (codified at 29 C.F.R. parts 1, 3, 5) (hereinafter, "Final Rule"). WHD sets the prevailing wage rates for different types of construction jobs in local areas around the country based on survey data collected from contractors and other interested parties. *Id*. Each year, WHD updates the prevailing wages for a small number of states or collections of counties. *See id.* at 57,704–05 n.310. If a contract is covered by the DBA, it must include the applicable wage rates and other DBA-required clauses. While a contract is in effect, contractors must provide the contracting agency with certified payrolls demonstrating compliance. *Id.* at 57,530–31.

WHD and contracting agencies have authority to investigate DBA-covered contracts. *Id.* If a contractor violates the DBA, the contracting agency may recover underpayments, suspend payments on the contract until the withheld amount is enough to compensate workers for the underpayments, and, if the relevant contract does not have sufficient funds for that purpose, "crosswithhold" funds owed to the contractor on other DBA-covered contracts. *Id.* If WHD determines that DBA wage determinations and contract clauses were omitted from a contract that should have been covered, regulations have required contracting parties to modify the contract so that prevailing wages apply; these changes "must be retroactive to the date of contract award or start of construction if there is no award." *Id.* (citing 29 C.F.R. § 1.6(f)(3)(i) (2022)). Contractors "must be compensated for any increases in wages resulting from incorporation of a missing wage determination." 29 C.F.R. § 1.6(f)(3)(iv).

### i.  The 2022 Proposed Rule

On March 18, 2022, DOL issued a notice of proposed rulemaking that proposed changes to its DBA regulations "to provide greater clarity and enhance their usefulness in the modern economy." *See* Updating the Davis-Bacon and Related Acts Regulations, 87 Fed. Reg. 15,698, 15,698 (hereinafter, "Proposed Rule"). DOL had last undertaken a comprehensive review of its DBA regulations in the early 1980s. *Id.* at 15,699 &

n.3. Since then, the agency noted, "Congress has expanded the reach of the Davis-Bacon labor standards significantly"; they now apply to approximately $217 billion in construction spending per year and provide minimum wage rates for over 1.2 million workers. *Id.* at 15,699. DOL also explained that, in the intervening forty years, the federal contracting system had undergone significant changes; the agency had received feedback from stakeholders, the Government Accountability Office (GAO), and DOL's Office of the Inspector General regarding its wage survey and wage determination process; and the agency had encountered enforcement challenges. *Id.* All of this persuaded DOL that the time was ripe for review and modernization of its DBA regulatory scheme.

### ii.  The 2023 Final Rule

After considering public comments,[7] DOL promulgated the Final Rule on August 23, 2023, adopting the changes in the Proposed Rule with some modifications. *See* Final Rule, 88 Fed. Reg. at 57,528. The Final Rule took effect on October 23, 2023. *Id.* at 57,526. It introduced six changes to the DBA regulatory scheme that are relevant to this litigation.

### 1.  Methodology for Determining "Prevailing Wages"

The Final Rule changed the methodology for determining "prevailing wages" under 40 U.S.C. § 3142(b). From 1935 to 1982, DOL used a three-step process to calculate "prevailing wages" for a particular classification of workers in a given locality: identify "(1) any wage rate paid to a majority of workers; and, if there was none, then (2) the wage rate paid to the greatest number of workers, provided it was paid to at least 30 percent of workers, and, if there was none, then (3) the weighted average rate." Final Rule, 88 Fed Reg. at 57,532.

In the 1980s, during the Reagan Administration, DOL cut out the second step—known as the "30 percent rule"—such that the prevailing wage would be either the majority wage (step 1) or, if there was no such wage, the weighted average wage (step 3). *Id.* at 57,529. In the Final Rule, DOL concluded that eliminating the 30 percent rule had "ultimately resulted in an overuse of *average* rates," and that this chafed

---

[7] DOL received 40,938 comments during the 60-day comment period "from a broad array of constituencies." *See* Final Rule, 88 Fed. Reg. at 57,527.

against the common understanding of "prevailing" as "predominant" or "most frequent." *Id.* at 57,532 (emphasis added). Accordingly, the Final Rule returned to the three-step process for determining "prevailing wages" and revived the 30 percent rule. *See* 29 C.F.R. § 1.2 (2023).

### 2.   Metropolitan-Rural "Prevailing Wages"

The Final Rule changed how "prevailing wages" would be calculated when there was insufficient data to make a wage determination in the relevant "civil subdivision." 40 U.S.C. § 3142(b). By default, the "prevailing wage" for a classification of workers is determined at the county level. *See* Final Rule, 88 Fed. Reg. at 57,578. If there is insufficient county-level data, WHD expands the geographic scope of data first to the "group" level (surrounding counties), then to the "super group" level (a more expansive set of similar counties), and finally to statewide data, as needed. *See* Final Rule, 88 Fed. Reg. at 57,556; *see also* 29 C.F.R. § 1.7 (2023).

There was a limitation in place before the Final Rule; data from "metropolitan" counties could not be used for wage determinations for "rural" counties, and vice versa. *See* 29 C.F.R. § 1.7(b) (2022). This was designed to prevent the inflation of rural rates based on non-representative metropolitan rates. *See id.* The Final Rule lifted this limitation to (1) "better distinguish between metropolitan-adjacent [rural] counties that are part of a larger metropolitan construction market and . . . rural counties that are not economically integrated with any nearby metropolitan areas"; (2) "set more wage determinations at smaller levels of geographic aggregation"; and (3) "include more classifications in wage determinations overall." *See* Final Rule, 88 Fed. Reg. at 57,582.

### 3.   Fringe Benefits

Under a principle called "annualization," DOL controls the credits contractors receive (which they can allocate towards their "prevailing wage" obligations) from fringe benefit plans that they provide for their workers.[8] *See id.* at 57,644–45; *see also* 29 C.F.R. § 5.28. These credits must be reduced in proportion

---

[8] Under the DBA, two acts qualify as credit-worthy contributions to fringe benefits plans. *See* 40 U.S.C. § 3141(B). Contractors and subcontractors can make an irrevocable contribution "to a trustee or to a third person under a fund, plan, or program." *Id.* § 3141(2)(B)(i). These are known as "funded" fringe benefit plans. *See* Final Rule, 88 Fed. Reg. at 57,649.

to the time workers spend on private, non-DBA work. *See* Final Rule, 88 Fed. Reg. at 57,644–45. DOL adopted this change to ensure that contractors cannot take credit against their "prevailing wage" obligations for benefits attributable to private work. *Id.* at 57,645. A contractor may be exempted from the annualization principle, but only if DOL determines, upon review, that "(1) the benefit provided is not continuous in nature; (2) the benefit does not provide compensation for both public and private work; and (3) the plan provides for immediate vesting."[9] *Id.*; *see also* 29 C.F.R. §§ 5.25(c).

### 4.  Covered Worker Types

The Final Rule clarified the categories of workers who could be covered under the DBA. *See* 40 U.S.C. § 3142(c)(1) (emphasis added) (specifying that the DBA covers "*mechanics and laborers* employed directly on the site of the work"). It did so in several ways. First, the Final Rule clarified in its preamble that certain members of survey crews "who perform primarily physical and/or manual work" while employed on a DBA contract could qualify as "mechanics"; whether they would is a fact-bound inquiry. *See* Final Rule, 88 Fed. Reg. at 57,614. Second, the Final Rule codified a DOL policy that "flaggers"—workers who perform activities such as setting up barriers or cones, or directing traffic or heavy equipment—who work "adjacent or virtually adjacent to the primary construction site" (i.e., within a few blocks or a short distance down a highway) are working on the "site of the work" and are therefore covered workers. *Id.* at 57,620. Third, the Final Rule clarified which employers qualify for the "material supplier" exemption from DBA coverage. The Final Rule cabined this exemption with a bright-line rule; it only applies to entities who are identified as

---

Contractors and subcontractors can also contribute "the rate of costs" they "reasonably anticipate[] in providing benefits to laborers and mechanics pursuant to an enforceable commitment to carry out a financially responsible plan or program which was communicated in writing to the laborers and mechanics affected." 40 U.S.C. § 3141(2)(B)(ii). These are known as "unfunded," "self-insured," or "self-funded" fringe benefit plans. *See* Final Rule, 88 Fed. Reg. at 57,649. However, to qualify as a fringe benefit plan within the meaning of the DBA, these plans must be approved by DOL. *See* 29 C.F.R. § 5.28(b), (c) (2023). So in summary, contractors with "unfunded" fringe benefit plans face two hurdles: (1) they must obtain DOL approval for their plans to qualify as a bona fide fringe benefit plans within the meaning of the DBA, and (2) they must apply for an annualization exemption (if they desire one).

[9] The Final Rule provides that "annualization is not required for defined contribution pension plans (DCPPs) that provide for immediate participation and essentially immediate vesting." *See* Final Rule, 88 Fed. Reg. at 57,645. In other words, the Final Rule does not require contractors with these specific fringe benefit plans to apply for an exception from annualization. *Id.* at 57,647.

material suppliers by contract. *Id.* at 57,623.[10] And fourth, the Final Rule codified guidance regarding truck drivers. It required covered contractors to pay DBA wages "to delivery drivers for onsite time related to offsite delivery," so long as that period of time is not *de minimis*. *Id.* at 57,626.[11]

### 5.  "Site of the Work"

The Final Rule clarified what constitutes the "site of work" for purposes of 40 U.S.C. § 3142(c)(1). The Final Rule strove to account for modern construction processes that enable some companies to "construct entire portions of public buildings or works offsite, leaving only assembly or placement of the building or work remaining." *Id.* at 57,615–16. The Final Rule provides that certain "secondary construction sites" can be considered part of the "site of the work," but only if (1) a "significant portion of a building or work" for the final project is constructed there and (2) the secondary site is either (i) "established specifically for" the project in question, or (ii) for a specific period of time, the secondary site is "dedicated exclusively, or nearly so" to the project. *Id.* at 57,617–18. Requirement (2)(i) was part of the prior regulatory scheme; as such, DOL stated that its change was an "incremental expansion." *Id.* at 57,618; *see also* 29 C.F.R. § 5.2 (2023).

### 6.  Operation of Law

Lastly, the Final Rule updated the procedures through which DBA requirements were enforced upon contractors and subcontractors for contracts that wrongfully omitted required clauses and "prevailing wage" determinations. *See* Final Rule, 88 Fed. Reg. at 57,526. This change made DBA-required clauses[12] and "prevailing wage" determinations "effective by 'operation of law' notwithstanding their mistaken omission from a contract." *Id.* at 57,529. This was an "extension of the retroactive modification procedures"

---

[10] In doing so, the Final Rule superseded DOL's prior guidance which had generated confusion about the breadth of the material supplier exemption. *See* Final Rule, 88 Fed. Reg. at 57,623–24. In contrast to the Final Rule, the prior guidance assessed the material supplier exemption at a worker-by-worker, hour-by-hour level. *See id.*

[11] The changes regarding flaggers, material suppliers, and truckers can theoretically be placed in the following section since they relate to the "site of the work." *See, e.g.*, 88 Fed. Reg. at 57,621 (stating that the Final Rule "codifies [DOL's] interpretation that the site of the work encompasses flagger activities performed adjacent or virtually adjacent to the construction site."). The Court places these changes in their own section solely for cosmetic reasons.

[12] *See* 29 C.F.R. § 5.5(a)-(d).

that were in place during the Reagan Administration and was designed "to ensure the timely payment of prevailing wages to all workers who are owed such wages under the relevant statutes." *Id.* As indicated in the regulations, prime contractors would be reimbursed for any increases in wages that resulted from missing clauses or "prevailing wage" determinations. *Id.* at 57,709; *see also* 29 C.F.R. § 5.5(e).

### c.  Plaintiffs' Challenges

Plaintiff ABCSETX is a non-profit trade association headquartered in Nederland, Texas. [Dkt. 20 at ¶ 5]. It is comprised of more than two hundred construction-industry contractors and related firms who operate in Southeast Texas and around the country. [Dkt. 20 at ¶ 5]. ABCSETX alleges that many of its members perform work on DBA-covered contracts falling within the sweep of the Final Rule. *Id.* ABCSETX is a separately incorporated affiliate of ABC National. *Id.*

ABC National represents more than 22,000 member contractors and related firms, both in Texas and throughout the country, who share the philosophy that work in their industry should be awarded through fair and open competition based on merit, without regard to union affiliation. *Id.* at ¶ 6. ABC National and its 68 chapters, including ABCSETX, allegedly represent many members who regularly perform construction projects covered by the DBA and the Final Rule. *Id.*

Plaintiffs are concerned about fair enforcement of the DBA. *Id.* at ¶ 7. Between fiscal years 2009-2022, ABC National members won 55% of the $147 billion in direct prime construction contracts awarded by federal agencies that exceeding $25 million. *Id.* These federal contracts provide subcontracting opportunities to large and small contractors in the specialty trades, many of whom are ABC National members. *Id.* While some of ABC National's members are large contractors, the majority of ABC National's and ABCSETX's members are small businesses. *Id.* at ¶ 8. This comports with the predominance of small businesses throughout the construction industry writ large. *Id.*

Plaintiffs allege that, far from "updating" the DBA, the Final Rule instead reverts to the failed policies of the 1970s and upheaves key, bi-partisan reforms that have remained in place for forty years. *Id.* at ¶ 2. Plaintiffs point to regulations promulgated during the Reagan Administration. *Id.* at ¶ 37. In response to

9

criticism from the GAO's predecessor in 1979 that the DBA's enforcement was leading to inflationary and inaccurate "prevailing wage" determinations, the Reagan Administration spearheaded reforms to DOL's process for making "prevailing wage" determinations, including (1) setting a 50% threshold for how much of the workforce must be paid a single wage for that wage to constitute a "prevailing wage" (contrary to the previous 30 percent rule); (2) strictly limiting the importation of urban rates for projects in rural areas; and (3) limiting the use of wages paid on other covered federal projects in the determination of "prevailing wages" to prevent bias in the base rate. *Id.* Plaintiffs emphasize that this Reagan-era regulatory scheme garnered approval from the D.C. Circuit, which held that it was consistent with the DBA's language. *Id.* (citation omitted).

Plaintiffs allege that the Final Rule is a stark departure from the Reagan era, and that this departure is a misstep. To Plaintiffs, the Final Rule introduces sweeping changes that can be sorted into three, high-level buckets: (1) altering the process for determining "prevailing wages,"[13] (2) expanding the scope of the DBA to cover new construction-related activities and categories of workers, and (3) augmenting DBA regulatory enforcement and penalties. *See id.* at ¶¶ 50–118. According to Plaintiffs, these changes flout the plain meaning of the DBA and arbitrarily reverse longstanding policy. *See id.*

Plaintiffs allege that the Final Rule has harmed them as organizations. They allege that the Final Rule has not only frustrated their organizational mission, but has caused them to divert resources to deal with DOL's inflationary standard for prevailing wages and its expansion of the DBA's coverage. *Id.* at ¶ 9. Plaintiffs provide their members with a full range of services, including training on real-world operational and business challenges, construction best practices, safety, workforce development, and construction technology. *Id.* at ¶ 10. Plaintiffs allege that if the Final Rule remains in effect, they will have to scale back

---

[13] A repeated theme of the Plaintiffs' Complaint is that the Final Rule inflates "prevailing wages" to match union rates, even though union market share in the construction industry has declined significantly. [Dkt. 20 at ¶¶ 35, 38–39, 92–93, 103, 114]. More specifically, Plaintiffs allege that the 30 percent rule—which the Final Rule revives—will increase the odds of inflated union rates being deemed "prevailing" since union contractors are the most responsive in DOL's unscientific wage survey process. *See id.* at ¶¶ 36, 38, 44.

these services and devote additional resources to helping their members navigate the pitfalls of the Final Rule. *Id.* at ¶¶ 10–12.

In addition to direct organizational harm, Plaintiffs also allege that the Final Rule has harmed them in their associational capacity. *Id.* at ¶ 13. At a birds-eye view, Plaintiffs allege that the Final Rule will thrust inflated "prevailing wages" on their members that resemble union rates, subject them to a variety of compliance risks and costs, and hamper their ability to compete with unionized construction firms. *Id.* at ¶¶ 14–18. Plaintiffs allege that these harms are concrete and imminent since their members have regularly bid on DBA-covered contracts, have often been awarded said contracts, and they intend to continue bidding in the future. *Id.* at ¶ 19. Plaintiffs insist that they are "effectively the object of regulation under the Rule[.]" *Id.*

Plaintiffs provides a non-exhaustive list of members who allegedly are threatened with imminent injury "from each and every aspect of the Rule" *Id.* at ¶ 27. Plaintiffs list two members of both their associations who face imminent harm: Aggregate Technologies, Inc. ("ATI"), a concrete-cutting and demolition contractor, *id.* at ¶ 20, and Central Electric Ent. & Co. ("CE"), a family-owned business involved in commercial electrical construction, ground-up construction, renovations, historical remodeling, and energy upgrades. *Id.* at ¶ 21. The Complaint lists five ABC National members who face imminent harm from the Final Rule: (1) McKelvey Mechanical, Inc. ("McKelvey"), a Native-American, woman-owned small business, *id.* at ¶ 22, (2) Cajun Industries Holdings, LLC ("Cajun"), which provides engineering, procurement, and construction services, *id.* at ¶ 23, (3) Caddell Construction ("Caddell"), a general contractor, *id.* at ¶ 24, (4) American Electrical Contracting, Inc. ("AEC"), an electrical services contractor, *id.* at ¶ 25, and (5) Cianbro Corp. ("Cianbro"), another general contractor. *Id.* at ¶ 26.

Based on the foregoing facts, Plaintiffs filed suit on November 7, 2023. [Dkt. 1]. They attack the Final Rule on three main fronts. First, they allege that the Final Rule violates the Administrative Procedure Act (5 U.S.C. §§ 500–596, 701–706) ("APA"). [Dkt. 20 at ¶ 1]. Specifically, Plaintiffs allege that the Final Rule's changes are contrary to law (i.e., the DBA) ("Count I") and are arbitrary and capricious ("Count II")

under §§ 706(2)(A), (C) of the APA. *Id.* at ¶¶ 50–118. This comprises the brunt of Plaintiffs' challenge. *See id.* Second, Plaintiffs allege that the rulemaking process violated the Regulatory Flexibility Act,[14] which sits within the APA (5 U.S.C. §§ 601–613) ("Count III"). *Id.* at ¶¶ 119–131. And finally, Plaintiffs allege that Defendant Su lacked authority to issue the Final Rule under the Appointments Clause (U.S. CONST. art. II, § 2) since she was not nominated and confirmed as Secretary of Labor ("Count IV"). *Id.* at ¶¶ 132–146. Plaintiffs request this Court to (1) enter a declaratory judgment declaring the Final Rule invalid, (2) vacate and set aside the Final Rule in its entirety, and (3) permanently enjoin Defendants from enforcing the Final Rule. *Id.* at ¶ 147.

The pending motion to dismiss is limited in scope. In their motion to dismiss, Defendants argue that the Plaintiffs lack standing (as organizations and associations) to challenge the changes regarding (1) the methodology for determining "prevailing wages," (2) covered worker types, and (3) the "site of the work." [Dkt. 23 at 18]. At this juncture, Defendants do not assert that Plaintiffs lack standing to challenge the metropolitan-rural "prevailing wage" change, the fringe benefits change, or the operation of law change. *See id.*; *see also* [Dkt. 27 at 7 n.2 (explaining that while the Defendants do not concede Plaintiffs have standing to challenge the other parts of the Final Rule, they are not contesting standing on those grounds)]. Defendants also seek to dismiss Counts III and IV for failure to state a claim. [Dkt. 23 at 18].

## II.    LEGAL STANDARDS

### a.    Dismissal under Rule 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Xitronix Corp. v. KLA-Tencor Corp.*, 916 F.3d 429, 435 (5th Cir. 2019) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Without subject matter jurisdiction, federal courts have no authority to act. *Lower Colo. River Auth. v. Papalote Creek II, L.L.C.*, 858 F.3d 916, 927 (5th Cir. 2017).

---

[14] Paragraph 1 of the Complaint identifies this Act as the "Small Business Regulatory Enforcement Fairness Act (SBREFA)." *Id.* at ¶ 1. For brevity, the Court will use "Regulatory Flexibility Act" (RFA) as the title going forward.

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a case for lack of subject matter jurisdiction when the district court lacks statutory and constitutional power to adjudicate the case. *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998). If a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the Court will consider the jurisdictional attack under Rule 12(b)(1) before addressing any attack on the legal merits. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In deciding the motion, the Court may consider "(1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the [C]ourt's resolution of disputed facts." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008) (quoting *Barrera-Montenegro v. United States*, 74 F.3d 657, 659 (5th Cir. 1996)). The Court will accept as true all well-pleaded allegations set forth in the complaint and construe those allegations in the light most favorable to the plaintiff. *Truman v. United States*, 26 F.3d 592, 594 (5th Cir. 1994). Once a defendant files a motion to dismiss under Rule 12(b)(1) and challenges jurisdiction, the party invoking jurisdiction has the burden to establish subject matter jurisdiction. *See Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980). The Court will grant a motion to dismiss for lack of subject matter jurisdiction only if it appears certain that the claimant cannot prove a plausible set of facts to support a claim that would entitle it to relief. *Lane*, 529 F.3d at 557.

### b.  Dismissal under Rule 12(b)(6)

A court may dismiss a complaint for its "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a 12(b)(6) motion, the Court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007) (per curiam) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)). In doing so, the Court cannot "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citations omitted). To survive a 12(b)(6) challenge, a complaint must allege "enough [well-pleaded] facts to state a claim to

13

relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (Souter, J., dissenting) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* FED. R. CIV. P. 8(a)(2) ("A pleading that states a claim for relief must contain[] . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). A claim is "plausible on its face" if its well-pleaded facts lead to "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). By contrast, "if a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility." *Id.* (cleaned up). Determining whether a plausible claim exists is "a context-specific task that requires the . . . [C]ourt to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted).

### III.   DISCUSSION

#### a.   Article III Standing

Article III limits the judicial power to deciding "Cases" and "Controversies," U.S. CONST. art. III, § 2, which ensures that federal courts do not devolve into "forums for the ventilation of public grievances." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). To this end, a plaintiff must demonstrate standing; a plaintiff must prove that "(1) it has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Houston Chronicle Publ'g Co. v. City of League City, Tex.*, 488 F.3d 613, 617 (5th Cir. 2007) (citation omitted). An injury in fact is an invasion of a legally protected interest which is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[A]t the pleading stage, the plaintiff must clearly allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

"It is now beyond cavil that plaintiffs must establish standing for *each and every provision they challenge*."[15] *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (per curiam) (emphasis added) (citing *Gill v.*

---

[15] Although Plaintiffs cite the Preliminary Injunction Order as support for their standing approach, it actually supports a provision-by-provision standing analysis. *See* [Dkt. 28-1 at 9–11 (finding that the contractors were adversely impacted by the Final Rule's operation of law provision, its material supply provision, and its on-site trucking provision), 17 (concluding that these findings of fact established associational standing)].

14

*Whitford*, 585 U.S. 48, 73 (2018); then citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006); then citing *Lewis v. Casey*, 518 U.S. 343, 358 & n.6 (1996); then citing *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982)). Plaintiffs cannot "identify one injury and then bootstrap it to complain about others." *Id.* (citing *Lewis*, 518 U.S. at 358). And that is because "standing is not dispensed in gross." *Id.* (quoting *Lewis*, 518 U.S. at 358 n.6). "If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review." *Id.* Such a guardrail on standing "makes sense because, 'under our constitutional system[,] courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.'" *Id.* at 161 (modification in original) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973)). Instead, the role of federal courts is limited to deciding "cases" and "controversies." U.S. Const. art. III, § 2. The principle that standing is not to be dispensed in gross, and that standing must be shown for each challenged provision, is a linchpin of standing law. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (Scalia, J.) (emphasis in original) ("[R]espondents can demonstrate standing only if application of the regulations by the Government will affect *them* in the manner described above."); *see also Planned Parenthood Gulf Coast, Inc. v. Phillips*, 24 F.4th 442, 454 (5th Cir. 2022) (Elrod, J.) (citation omitted); *see also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342, 349 (5th Cir. 2024) (Willett, J.) (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)); *see also Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 369 (5th Cir. 2018) (citation omitted), *cert. denied*, 586 U.S. 871 (2018); *see also Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphasis added) (explaining that "the standing inquiry requires *careful judicial examination* of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted.").

Plaintiffs think otherwise. They argue that they don't have to establish standing "separately for each challenged provision of the Rule." [Dkt. 25 at 11]. In Plaintiffs' view, if they establish that they are injured by *one part* of the Final Rule, then they are free to challenge *all of its other* legal infirmities since the remedy they seek is vacatur of the entire rule. *Id.* at 11–12. Plaintiffs rely heavily on a case from the Fifth Circuit:

15

*Texas Ass'n of Manufacturers v. United States Consumer Prod. Safety Comm'n*, 989 F.3d 368 (5th Cir. 2021) (Owen, C.J.).

*Texas Ass'n of Manufacturers* involved a rule promulgated under the Consumer Product Safety Improvement Act (CPSIA). *Id.* at 372. The Consumer Product Safety Commission "issued a final rule prohibiting the manufacture and sale of any children's toy or child care article that contains concentrations of more than 0.1 percent of any one of five [listed] phthalates." *Id.* The petitioners were trade associations representing chemical manufacturers; they challenged the rule substantively and procedurally. *Id.* at 372, 376. The Fifth Circuit ultimately concluded that one of the petitioners (the Texas Chemical Council) had associational standing "to challenge the Final Rule *as it relates to DINP*" since one of its members (ExxonMobil Chemical Company) clearly produced the phthalate and faced imminent economic harm. *Id.* at 377 (emphasis added). Further, the Fifth Circuit echoed the following principle before walking through a set of cases: "standing is not dispensed in gross; plaintiffs must demonstrate standing 'for each claim [t]he[y] seek[ ] to press' and 'for each form of relief that is sought.'" *Id.* at 378 (citation omitted). Plaintiffs try to use the second half of this statement to scrub away the first half; in other words, they believe that the broad *remedy* they seek (vacatur) relieves them of any burden to granularly establish standing for *each part* of the Final Rule that they challenge. *See* [Dkt. 25 at 11]. And although Plaintiffs latch onto a paragraph from *Texas Ass'n of Manufacturers* that lends at least some support their approach to standing [Dkt. 25 at 12], the Court is hesitant to experiment with Article III standing as Plaintiffs request, especially since *Texas Ass'n of Manufacturers* can be read in Defendants' favor as well. Instead, it will err on the side of caution, taking the more trodden path established by other Fifth Circuit cases, Supreme Court precedent, and law from other circuits.[16] *See In re Gee*, 941 F.3d at 160; *see also Lewis*, 518 U.S. at 349 (citations omitted) (explaining that

---

[16] The other cases Plaintiffs cite do not fare any better. For instance, *WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) involved a challenge to the Bureau of Land Management's (BLM) decision to approve tracts of federal land for a competitive lease sale. *Id.* at 302. The plaintiffs argued that the sale violated the National Environmental Policy Act because BLM's environmental impact statement (EIS) was deficient. *Id.* The court noted that the plaintiffs had described an "'archetypal procedural injury'" and that, since this was tethered to their "respective members' concrete aesthetic and recreational interests [in the tracts at-issue]," they could challenge BLM's approval. *Id.* at 305–06. Notably, the court distanced itself from the context-bound "public interest" rationale from *Sierra Club v. Adams*—which resembles Plaintiffs' approach here—and even hinted at its tension with Supreme Court precedent. *Id.* at 307–08 (citing *Sierra Club v. Adams*, 578 F.2d 389, 392 (D.C. Cir. 1978) before contrasting it with *DaimlerChrysler Corp.* and *Lewis*). The D.C. Circuit "rest[ed]

the standing doctrine is "a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches"); *see also Gill*, 585 U.S. at 73 (emphasis added) (citation omitted) ("A plaintiff's remedy must be tailored to redress *the plaintiff's particular injury*."); *see also Davis v. Federal Election Comm'n*, 554 U.S. 724, 733–34 (2008) (applying the same principle and concluding that the plaintiff had standing to challenge one statutory provision, but not a neighboring provision); *see also Johnson v. U.S. Off. of Pers. Mgmt.*, 783 F.3d 655, 663 (7th Cir. 2015) (explaining that "the fact that [vacatur] would by coincidence redress plaintiffs' alleged injury would not provide them with standing to challenge aspects of that Rule that have not caused them injury.").[17]

With this groundwork laid, the Court will now analyze whether the Plaintiffs have adequately pled associational standing.

### i. Associational Standing

Plaintiffs are entitled to plead "associational" standing as the representative of their injured members if they allege the following: (1) the association's members would otherwise have standing to sue in their own right; (2) the association seeks to protect interests germane to its organizational purpose; and (3) neither the claims asserted nor the relief requested requires the individual members to participate.[18] *See Hunt v. Wash. State Apple Advertisement Comm'n*, 432 U.S. 333, 343 (1977); *see Associated Builders & Contractors of SE. Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *6 (E.D. Tex. Oct. 24, 2016). The first prong may

---

[its] holding on a different rationale. [That] [t]he Appellants may challenge each of the alleged inadequacies in the FEIS because *each* constitutes a procedural injury *connected to their members' recreational and aesthetic injuries*[.]" *Id.* at 307–08 (emphasis added). *See also DaimlerChrysler Corp.*, 547 U.S. at 353 n.5 (citing *Sierra Club* before explaining that it "[did] not establish that the litigant can, by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.").

[17] *Johnson* also undercuts Plaintiffs' argument that the Final Rule is susceptible to a sweeping attack based on its inseverability. *See* 783 F.3d at 662–63. "[R]egulations—like statutes—are presumptively severable[.]" *Bd. of Cnty. Commissioners of Weld Cnty., Colorado v. Env't Prot. Agency*, 72 F.4th 284, 296 (D.C. Cir. 2023). "If parts of a regulation are invalid and other parts are not, we set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together." *See id.*; *see also* Final Rule, 88 Fed. Reg. at 57,694 ("With respect to this final rule, it is the Department's intent that all provisions and sections be considered separate and severable and operate independently from one another."); *see also id.* at 57,591. The Court sees the Final Rule as a machine with many moving parts. For instance, it is conceivable that an entity could be subject to the new methodology for determining "prevailing wages," but not the "site of the work" provision.

[18] The second requirement is easily established. *See* [Dkt. 20 at ¶¶ 5–6, 20–27]. The third requirement is also satisfied here since the Plaintiffs bring a pure legal challenge against the Final Rule based on the APA and the Constitution.

be established if a plaintiff demonstrates that at least one of its members faces a threat of injury. *See Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012). To be cognizable, a future injury-in-fact must be "certainly impending," not "premised on a speculative chain of possibilities."[19] *Clapper v. Amnesty Int'l*, 568 U.S. 398, 409–10 (2013). In other words, for a future injury to be "imminent," "there must be at least a 'substantial risk' that the injury will occur." *Stringer v. Whitley*, 942 F.3d 715, 721 (5th Cir. 2019) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Defendants argue that Plaintiffs have failed to show that any of their members faces imminent injury from (1) the worker type changes, (2) the "site of work" changes, or (3) the changes to the "prevailing wages" methodology. [Dkt. 23 at 27–30]. Defendants further argue that Plaintiffs cannot make up for these shortages by pleading a generalized regulatory burden (i.e., that they are "objects of regulation under the Rule"). *Id.* at 30–31.

At the outset, the Court will discuss Plaintiffs' "object of the regulation" argument. Plaintiffs invoke *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258 (5th Cir. 2015) for the proposition that they have suffered cognizable harm since they are the object of the Final Rule. [Dkt. 20 at ¶¶ 19, 76; Dkt. 25 at 16]. This concept has some nuances. In *Contender Farms*, the Fifth Circuit initiated its standing analysis by asking whether the plaintiffs were the object of the challenged regulation. *See Contender Farms*, 779 F.3d at 264 (citing *Lujan*, 504 U.S. at 561). The court explained that, if a party was the object of a regulation, then said party would likely be able to satisfy Article III's requirements; on the other hand, if a party was not an object of the regulation, establishing standing would not be impossible, but it would be an uphill battle. *Id.* (citations omitted). In other words, the "object of the regulation" question is a "helpful *guidepost*" for the standing inquiry. *Id.* at 264–65 (emphasis added). Significantly, after concluding that the plaintiffs were indeed objects of the regulation, the Fifth Circuit proceeded to to analyze whether they "demonstrate[d] a concrete injury resulting from the Regulation that would be redressable by a favorable decision of this Court."

---

[19] Imminence is the only issue in this case. Causation and redressability are not contested. *See Tice-Harouff v. Johnson*, No. 6:22-CV-201-JDK, 2022 WL 3350375, at *6 (E.D. Tex. Aug. 12, 2022) (Kernodle, J.) (concluding that standing was adequately pled after analyzing injury-in-fact since causation and redressability were not challenged).

*Id.* at 266. Clearly, the "object of the regulation" question is a threshold inquiry that can inform the rest of the standing analysis; it is not a substitute for Article III's requirements. *Id.* at 264–67; *see also Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 802–04 (E.D. Tex. 2023).[20]

### 1. The Worker Type and "Site of Work" Changes[21]

At several points, Plaintiffs alleged that the worker type and "site of work" provisions will injure their members. The Complaint lists seven members who, allegedly, will be hamstrung by the Final Rule: ATI, CE, McKelvey, Cajun, Caddell, AEC, and Cianbro. [Dkt. 20 at ¶¶ 20–26, 27]. Although the Complaint emphasizes that this list is non-exhaustive, the Court's analysis is limited to the identified members. *See Summers*, 555 U.S. at 498.

Plaintiffs allege that ATI will be burdened by "higher direct labor costs, [and] increased uncertainty about coverage[.]" *Id.* at ¶ 20. The allegations for other members are more detailed. Plaintiffs allege that McKelvey will be forced "to comply with [ ] increased regulatory burdens . . . including the requirement to . . . *report payrolls for new types of workers and for workers working away from the immediate site of the work*[.]" *Id.* at ¶ 22 (emphasis added). The allegations for Cajun, AEC, and Cianbro bear a similar level of specificity. *See id.* at ¶ 23 (emphasis added) (alleging that Cajun will face burdens such as "includ[ing] *work on off-site secondary sites* in its calculations and reporting obligations" and "adjust[ing] its previously successful business model to address the increased prevalence of . . . work rules related to *union job*

---

[20] The Court has no trouble concluding that Plaintiffs are in fact the objects of the Final Rule. This is rather evident from the regulatory scheme and the allegations in the Complaint, which the Court must take as true. *See Contender Farms*, 779 F.3d at 265 ("Whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense."). The point is that the standing analysis does not stop there or hinge entirely upon that determination.

[21] The Preliminary Injunction Order (once again, from the Northern District of Texas) barred Defendants from implementing parts of the Final Rule pertaining to truck drivers and material suppliers. [Dkt. 28-1 at 38–39]. However, the mere existence (or, from the Plaintiffs' perspective, fortuity) of the Preliminary Injunction Order does not foreclose Plaintiffs from demonstrating an imminent injury. *See Massachusetts v. United States Dep't of Health & Hum. Servs.*, 923 F.3d 209, 220, 223 (1st Cir. 2019) (noting that the relevant rules were enjoined nationwide but nevertheless holding that the plaintiff "has demonstrated that there is a substantial risk of fiscal injury to itself"); *see also id.* at 223 n.8 ("No one disputes that, barring [the] injunctions, employers in the Commonwealth would have been subject to the [rules]."). A preliminary injunction is just that, a *preliminary* injunction. And another tick on the scorecard of non-finality is that the Preliminary Injunction Order has been appealed (on two of the three changes that were affected). *See Associated Gen. Contractors of Am. v. U.S. Dep't of Lab.*, No. 5:23-CV-0272-C, 2024 WL 3635540 (N.D. Tex. June 24, 2024), *appeal docketed*, No. 24-10790 (5th Cir. Aug. 28, 2024). Since a final determination has not been made, Plaintiffs can still plead an imminent injury based on the provisions affected by the Preliminary Injunction Order.

*classifications*."); *see id.* at ¶ 25 (alleging that AEC will be hampered by having to "report wages for work done at off-site locations."); *see id.* at ¶ 26 (alleging that Cianbro will be hampered by "expanded coverage beyond the site of work (and the accompanying requirements that expansion entails).").

Defendants argue that these allegations are insufficient to establish an imminent injury: "[Plaintiffs] do not explain, which, if any, of its members are working or are likely to work on DBRA-covered contracts employing the relevant types of workers[.]" [Dkt. 23 at 29]. Similarly, Defendants argue that Plaintiffs have failed to explain "how any of their members will be harmed or otherwise affected by the limited site-of-the-work-related changes" because "they have not identified any particular projects, worksites, or contractors that were not covered under the prior regulations but would be covered now." *Id.* at 30.

Defendants are diving too far into the weeds at this stage. *See Ashcroft*, 556 U.S. at 678 Plaintiffs allege that their members have been awarded covered contracts in the past and will pursue them in the future. They further allege that some of their members will have to stomach additional costs from the expansion of covered worker types and work sites. This is enough, at least at this juncture: "At the pleading stage, *general factual allegations* of injury resulting from the defendant's conduct *may suffice*, for on a motion to dismiss we 'presum[e] that general allegations *embrace those specific facts* that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (emphasis added) (citation omitted); *see also Tice-Harouff*, 2022 WL 3350375, at *5 (citing *Lujan*, 504 U.S. at 561); *see also Massachusetts v. HHS*, 923 F.3d at 225 (citing *Massachusetts v. EPA*, 549 U.S. 497, 523 n.21 (2007); then citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–55 (2010)) (rejecting an argument similar to Defendants' as an "effort to recast the imminence requirement as one of near certainty [in a way that] does not comport with the law"); *see also Texas Cable & Telecommunications Ass'n v. Hudson*, 265 F. App'x 210, 214, 219 (5th Cir. 2008) (Jolly, J.) (concluding that the plaintiff sufficiently alleged standing despite the defendants' arguments regarding "the lack of detail in the [plaintiff's] allegations."). Granted, Plaintiffs' burden of specificity will heighten, and Defendants' presses will carry more force, at later stages in this litigation. *See Lujan*, 504 U.S. at 561.[22]

---

[22] There is one case Defendants cite that is factually similar to the present case, but ultimately distinguishable. *See Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*, 720 F. Supp. 3d 461 (W.D. La. 2024). This case centered

20

Defendants also argue that Plaintiffs cannot demonstrate imminence since most of the changes regarding covered worker types had already been adopted in DOL interpretive guidance. [Dkt. 23 at 30]; *see* Final Rule, 88 Fed. Reg. at 57,614 (discussing survey crews), 57,621 (discussing flaggers), 57,626 (discussing truckers). However, the Court is not convinced that this disproves imminence. First, interpretive guidance and legislative rules are, for the most part, distinct species in administrative law. The APA exempts interpretive rules from the arduous notice-and-comment process. *See* 5 U.S.C. § 553(b)(A). But "that convenience comes at a price[] [since] [i]nterpretive rules do not have the force and effect of law[.]" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (internal quotation marks omitted) (citing *Shalala v. Guernsey Memorial Hospital*, 514 U.S. 87, 99 (1995)). Thus, even if the Final Rule's worker type provisions had predecessors in DOL guidance, that does not necessarily frustrate imminence: rules have teeth that most interpretive guidance documents lack.[23] Not only to the guidance documents fail to disprove imminence, they might help Plaintiffs in establishing it. They arguably evidence that the DOL has held its position regarding covered worker types for some time, making it more likely that the DOL will actually enforce the worker type provisions against the Plaintiffs. *See Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *13 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (second emphasis added) (citation omitted) (internal quotation marks omitted) ("A *substantial* threat can be shown by complaints based on violations of policy or warnings, statements, or *other pre-enforcement actions indicating an intent to enforce the policy*.").

---

on an Executive Order, issued by President Biden, that favored Project Labor Agreements in the procurement of federal construction projects. *Id.* at 464. The court found that the plaintiffs failed to demonstrate imminent injury: "Despite stating that there are current federal projects being discussed for bidding, none of the Individual Plaintiffs specify what those projects are, where the projects would take place, or the basis for their certainty that such projects will require a PLA." *Id.* at 469. However, this case involved a unique standard of review; Defendants submitted evidence outside the pleadings, which compelled the plaintiffs to marshal evidence of their own and prove standing by a preponderance of the evidence. *Id.* at 467–68. Here, the allegations in the Complaint control.

[23] At this time, the Court is cannot assess whether the interpretive guidance documents Defendants reference are the rare breed of guidance documents that actually carry the force of law. *See Association of Flight Attendants-CWA, AFL-CIO v. Huerta*, 785 F.3d 710, 717–19 (D.C. Cir. 2015); *see also National Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–53 (D.C. Cir. 2014).

### 2.    The "Prevailing Wage" Methodology

Defendants argue that Plaintiffs have not sufficiently pled imminent harm from the new "prevailing wage" methodology on three grounds: (1) the assumption that "prevailing wages" will rise across the board is speculative, (2) even if "prevailing wages" were to rise, contractors could factor those increases into their bids on future contracts,[24] and (3) the impact of any new "prevailing wage" determinations are far from imminent (since DOL only makes them for a small number of areas across the country at a time). [Dkt. 23 at 27–29]. The Court will address each of these arguments in turn.

### a.    Speculative Wage Increases

Defendants' speculative wage increase argument blends with the merits of Plaintiffs' APA challenge. *See* [Dkt. 20 at ¶¶ 81–101]. And that creates a problem.

Defendants argue that Plaintiffs reading of the "prevailing wage" methodology is grounded on a faulty assumption. Under the new methodology, the "prevailing wage" can increase, decrease, or remain the same depending on the given area. *See* Final Rule, 88 Fed. Reg. at 57,541. Defendants spotlight a table in the Final Rule (Table 9) that illustrates the "potential direction and magnitude of transfers that will be attributed to this provision" and shows a rough equipoise between increasing and decreasing rates. *Id.* at 57,111. On the other side, Plaintiffs insist that historical data (i.e., pre-1982 implementation of the DBA) demonstrates that the "prevailing wage" methodology will indeed inflate wages. [Dkt. 20 at ¶ 84; Dkt. 25 at 14–15]. Not only that, but Plaintiffs posit that "the [DOL's] study purporting to show the results could change in either direction *is itself speculative and contrary to the known facts*." *Id.* (emphasis added).

This merits-centered showdown is irrelevant for purposes of standing. *See Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 496 (5th Cir. 2024) (Elrod, J.) (citing *Warth v. Seldin*, 422 U.S. 490, 500 (1975)) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal . . . .")); *see also Hill v. City of Houston, Tex.*, 764 F.2d 1156, 1160 & n.4 (5th Cir. 1985) (collecting cases), *on reh'g*, 789 F.2d 1103 (5th Cir. 1986), *aff'd*, 482 U.S. 451 (1987); *see also Ass'n of Data Processing*

---

[24] The Court will group the first two arguments since they appear interrelated.

*Serv. Organizations, Inc. v. Camp*, 397 U.S. 150, 153 (1970) (distinguishing "[t]he question of standing" from the merits). In fact, the Court must actually *presume the validity of* Plaintiffs' APA challenge for the purposes of standing. *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) (emphasis added) (citing *Sierra Club v. E.P.A.*, 699 F.3d 530, 533 (D.C. Cir. 2012)) ("We *assume*, for purposes of the standing analysis, *that Texas is correct on the merits* of its claim that the Guidance was promulgated in violation of the APA."). The Plaintiffs allege that inflated "prevailing wages" will disrupt the business models of their members and put them a step behind non-merit-based contractors: this is a sufficiently pled imminent injury.[25] *See Clinton v. City of New York*, 524 U.S. 417, 433 (1998) (citation omitted) ("The Supreme Court routinely recognizes probable economic injury resulting from governmental actions that alter competitive conditions[.]"); *see also Inv. Co. Inst. v. Camp*, 401 U.S. 617, 620 (1971) (citation omitted); *see also Hudson*, 265 F. App'x at 217 (citing *Environmental Defense Fund v. Marsh,* 651 F.2d 983 (5th Cir.1981); then citing *Hollingsworth v. Harris,* 608 F.2d 1026, 1028 (5th Cir. 1979) (per curiam)) (stating that "the regulatory allowance of increased competition in a plaintiff's market has been established in our circuit as a clear injury-in-fact . . . even when such competition is inchoate[.]").

Defendants' argument that Plaintiffs can incorporate any increase in wages into their bids (and by extension, still win contracts) also does not disprove imminence. This sounds like a paradoxical attempt to prove speculativeness with speculativeness. *See Nat'l Infusion Ctr.*, 116 F.4th at 499 (rejecting a similarly speculative argument raised by the government about the approval of a generic version of a drug).[26] For these

---

[25] Additionally, Plaintiffs argue that "rate increases are not the [sole] source of harm to Plaintiffs' members" and that the Rule will impose union *job classifications* under the *Fry Brothers* standard, even if the unionized "prevailing wage" is lower. [Dkt. 25 at 14]; *see also* Final Rule, 88 Fed. Reg. at 57,595 ("the Department notes that classification decisions will be made in accordance with relevant legal precedent and subregulatory guidance, including the decision in Fry Brothers[.]"); *see also id.* at 57,547 n.90 ("In Fry Brothers, the Wage Appeals Board (WAB) described the importance of using [collective bargaining agreements] to help determine classifications based on job content where collectively bargained rates prevail."). Plaintiffs allege that these unfamiliar job classifications will undermine the "most efficient use of skilled labor" for their members and will "disrupt[] their business models," inflicting a competitive harm. *See, e.g.*, [Dkt. 20 at ¶¶ 14, 15, 21 (alleging that Cajun will "face increased competition from non-merit-based firms, which under the Rule will be insulated from competition from merit-based contractors . . . that could previously compete with more efficient labor models.")].

[26] The Court is aware that Plaintiffs' theory of standing cannot "rest on mere speculation about the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). But can Defendants run this idea in reverse? Can they use the speculative responses of third parties (here, the Plaintiffs' future counterparts in contract negotiations) to disprove imminence? The Court has some doubts.

reasons, Plaintiffs' allegations of imminent injury survive Defendants' arguments on speculative wage increases.

### b. Implementation Time-Lag

The incremental application of the "prevailing wage" methodology to different areas across the country does not disprove imminence. The Final Rule went into effect on October 23, 2023. *See* Final Rule, 88 Fed. Reg. at 57526. It is undeniable that its machinery has been set in motion. Plaintiffs allege that they have been involved and will continue to be involved in DBA-covered contracts. Though Plaintiffs' injury is "inescapably 'speculative' in the sense that it is not yet felt," the Court finds that Plaintiffs' alleged injuries would be "concretely felt in the logical course of probable events[.]" *See McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 520 (5th Cir. 2015); *see also Lujan*, 504 U.S. at 562 n.2 (noting that imminence is a "somewhat elastic concept" and that "its precise extent" need not be established); *see also Susan B. Anthony*, 573 U.S. at 158 ("When an individual is subject to such a threat [of enforcement of a law], an actual [harm] or other enforcement action is not a prerequisite to challenging the law."); *see also Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015) (emphasis added) (citing *Clapper*, 568 U.S. at 410–11) (noting that "the Neiman Marcus customers *should not have to wait until hackers commit identity theft or credit-card fraud* in order to give the class standing, because there [was] an 'objectively reasonable likelihood' that such an injury will occur."); *see also Contender Farms*, 779 F.3d at 267 (construing an argument similar to Defendants' as a ripeness issue and concluding that the dispute was ripe since "the USDA has promulgated a final rule, and it appears from this litigation that it has every intention of requiring HIOs to adopt the[ ] requirements[.]").

After raising their gradual implementation argument, Defendants also note that there is a "well-established process" for contractors to challenge "prevailing wage" determinations once they are made. [Dkt. 23 at 27–28 (citing 29 C.F.R. § 7.2)]. Although Plaintiffs never responded to this argument, it gives the Court pause. First, this seems to conflate an exhaustion requirement for an actual injury with an imminence issue. *See, e.g.*, *Houston Chronicle*, 488 F.3d at 617 (distinguishing between actual and imminent injuries); *see also*

*Clapper*, 568 U.S. at 414 n.5 (emphasis added) ("Our cases do not uniformly require plaintiffs to demonstrate that it is *literally certain* that the harms they identify will come about."). And second, tucked within this argument is an assumption that a § 7.2 petition for review would result in a favorable outcome for Plaintiffs. But once again, the Court is not sure speculation can be used to prove the speculative nature of an injury. *See Nat'l Infusion Ctr.*, 116 F.4th at 499.

For the foregoing reasons, the Court finds that Plaintiffs have associational standing to challenge the worker type, the "site of work," and the "prevailing wage" components of the Final Rule.

As mentioned above, the pending motion does not contest Plaintiffs' standing to challenge other parts of the Final Rule (the metropolitan-rural change, the fringe benefits change, or the operation of law change). But the Court must do its due diligence. "[I]t is well established that the court has an independent obligation to assure that standing exists, regardless of whether it is challenged by any of the parties." *Summers*, 555 U.S. at 499 (citing *Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 541 (1986)). The Court finds that Plaintiffs have sufficiently alleged associational standing to challenge these portions of the Final Rule. [Dkt. 20 at ¶¶ 18 (addressing the expected harms of the operation of law provision flowing from penalties like cross-withholding and the broad reach of the DBA through the Related Acts), 21 (alleging that CE "can no longer rely on the text of . . . contracts alone, as the [Final] Rule threatens to impose coverage without notice as a matter of law."), 59 (alleging that the metropolitan-rural change will "inflate rural wage determinations above the wages generally paid to workers in rural counties"), 112–13 (explaining the burdens that the fringe benefits change will impose on self-funded plans, which are standard for non-union contractors)]; *see also Young Conservatives of Texas Found. v. Smatresk*, 73 F.4th 304, 309 (5th Cir. 2023) (internal quotation marks omitted) (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006)) ("[A]n economic injury is the quintessential injury upon which to base standing."). The Court is satisfied that the Complaint sufficiently pleads associational standing.[27]

---

[27] As such, this makes the debate over the meaning of *Texas Ass'n of Manufacturers* inconsequential. *See* 989 F.3d at 380; *see* [Dkt. 25 at 11]. If Plaintiffs have successfully pled associational standing on a provision-by-provision basis, it makes no difference whether *Texas Ass'n of Manufacturers* allows standing to be plead with less granularity. *See id.*

### ii. Organizational Standing

For the reasons stated above, Plaintiffs have a leg to stand on for the standing analysis. For thoroughness, the Court will analyze whether they have two. They don't.

An organization may establish a cognizable injury-in-fact by showing that its "ability to pursue its mission is 'perceptibly impaired' because it has 'diverted significant resources to counteract the defendant's conduct[.]'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *N.A.A.C.P. v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). However, not every diversion of resources rises to an injury sufficient to confer standing. *City of Kyle*, 626 F.3d at 238. The organization's purportedly injurious counteractions must "'differ from its routine [ ] activities.'" *Tenth St. Residential Ass'n*, 968 F.3d at 500 (alterations in original) (quoting *City of Kyle*, 626 F.3d at 238); *see also US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001, at *6 (5th Cir. Sept. 30, 2022) (per curiam).

Both ABC National and ABCSETX promote the philosophy that "construction work, both public and private, should be awarded and performed through fair and open competition based on merit, regardless of labor affiliation." [Dkt. 20 at ¶¶ 5–6, 10]. ABC National "has been the voice of the merit-based construction industry for more than eighty years." *Id.* ¶ 10.

Plaintiffs allege that the Final Rule has frustrated their organizational mission and "is causing both Plaintiffs *to divert their resources* to deal with the Department's inflationary and arbitrary wage determinations, as well as the improper expansion of the Act's coverage, and the Department's failure to provide adequate guidance[.]" *Id.* at ¶ 9 (emphasis added).[28] Plaintiffs expand upon their diversion allegation. Plaintiffs normally "provide their members with a *full range of services*, including training on real-world operational and business challenges, construction best practices, safety, workforce development, and

---

[28] At the end of this paragraph, the Complaint incorporates ABC's comments to the Proposed Rule that they submitted in May of 2022. *Id.* & n.3. However, such a broad incorporation cannot demonstrate organizational standing. For starters, a Complaint must contain a "*short and plain statement* of the grounds for the court's jurisdiction[.]" *See* FED. R. CIV. P. 8(a)(1) (emphasis added). ABC's open-ended reference to a 67-page comment is anything but "short and plain." *See also Shelter Mut. Ins. Co. v. Pub. Water Supply Dist. No. 7*, 747 F.2d 1195, 1198 (5th Cir. 1984) (citations omitted) ("A pleading incorporating allegations from other documents must clarify which statements are to be incorporated."). Additionally, the Proposed Rule didn't go into effect on October 23, 2023, the Final Rule did (after revisions brought about by comments from stakeholders).

construction technology."[29] *Id.* at ¶ 10 (emphasis). However, Plaintiffs allege that the Final Rule constricts this "full range of services"; it will compel them "to scale back these services, or even stop providing some of them, and instead devote additional resources to helping members navigate the Rule's confusing and counterintuitive changes." *Id.* Plaintiffs further allege that this diversion has already been happening: "Plaintiffs have already been forced to conduct outreach services and explain to their members how to avoid running afoul of the new requirements." *Id.* at ¶ 11.

Defendants argue that "the Rule effectuated certain legal changes, and Plaintiffs must now spend time explaining those changes to their members," but that this is insufficient for organizational standing since this falls squarely within their organizational missions. [Dkt. 23 at 23]. To prove their point, Defendants pull language from ABC's website, which the Court will consider. *See* FED. R. EVID. 201(b)(2), (c)(1).

ABC's website describes ABC's overarching mission: "ABC and its 68 Chapters help members develop people, *win work and deliver that work safely, ethically and profitably* for the betterment of the communities in which ABC and its members work."[30] *See About ABC*, ASSOCIATED BUILDERS & CONTRACTORS, https://www.abc.org/About-ABC/About-ABC (last visited Feb. 6, 2025) (emphasis added). The website also provides a general list of services: "ABC's activities include government representation, legal advocacy, *education*, workforce development, communications, technology, recognition through national and chapter awards programs, employee benefits, *information on best practices*, and business development through an online contractor search directory." *See id.* (emphasis added). Defendants posit that this language proves Plaintiffs' outreach efforts fall "in the heartland of [their] ordinary operations." [Dkt. 23 at 24]. The Court agrees.

---

[29] In a subsequent paragraph, Plaintiffs explain that they normally provide "practical advice [to their members] on topics such [as] dealing with heat stress, navigating construction and design challenges, or developing the next generation of skilled construction workers." *Id.* at ¶ 11. Some of this advice is relayed through "online training tools" and "formal apprenticeship training program[s]." *Id.* at ¶ 12.

[30] ABCSETX's website has language that is substantially similar. *See About*, ABC SOUTHEAST TEX., https://www.abcsetx.org/about (last visited Feb. 6, 2025).

The Court is guided by several cases on this point. In *Louisiana Fair Hous. Action Ctr., Inc. v. Azalea Garden Properties, L.L.C.*, 82 F.4th 345 (5th Cir. 2023) (Wilson, J.), the Louisiana Fair Housing Action Center (LaFHAC) pled several diversionary injuries: "(1) expenditures from its investigation of the [defendant's apartment] complex, (2) expenditures from 'narrowly targeted' 'education and outreach activities,' and (3) the diversion of resources away from other planned activities." *Id.* at 351. But "[n]one of the three suffice[d] to establish an injury to support [    ] organizational standing." *Id.* The Fifth Circuit quickly dispatched with the first injury:

> Any diversion of resources caused by LaFHAC's use of testers to investigate Azalea Garden cannot be a cognizable injury. The investigation does not "differ from its routine [ ] activities" in the slightest—using testers to investigate *is* its routine activity. As LaFHAC explained in its complaint, "[t]o achieve [its] mission, LaFHAC engages in testing and other investigations of housing discrimination. It employs 'testers,' . . . to obtain information about the conduct of housing providers for the purposes of determining if housing discrimination is taking place." Thus, LaFHAC's use of testers and the expenses associated with its "investigations of housing discrimination" are not, without more, cognizable injuries. *See Tenth St. Residential Ass'n*, 968 F.3d at 500 (citation omitted).

*Id.* at 352. Although the second injury presented a "closer call," the Fifth Circuit concluded that it "ultimately prove[d] insufficient to substantiate standing for similar reasons"—such activities comported with the goal of eradicating housing discrimination in Louisiana. *Id.* The Fifth Circuit recognized that the third injury "comes closest to substantiating standing." *Id.* at 353. The complaint enumerated several activities that resources were drawn away from: "LaFHAC's annual fair housing conference, recruitment of sponsors for LaFHAC community events, fair housing training events for landlords, and other projects and activities." *Id.* (internal quotation marks omitted). However, the Fifth Circuit explained that (1) the complaint failed to allege how those efforts were cancelled, postponed, or curtailed, *id.* at 353, and (2) even if they were, any curtailment would not create a "perceptible impairment" to the organization's ability to carry out its mission: "On their face, the efforts taken to counteract alleged discrimination at Azalea Garden would appear *to advance*, rather than impair, LaFHAC's mission of eradicating housing discrimination." *Id.* at 354 (emphasis added). "'[D]iverting' resources *from one core mission activity to another*, i.e., prioritizing which 'on-

28

mission' projects, out of many potential activities, an entity chooses to pursue, does not suffice." *Id.* at 355 (emphasis added).

Similar reasoning has found purchase in this district. *See US Inventor Inc. v. Hirshfeld*, 549 F. Supp. 3d 549 (E.D. Tex. 2021) (Gilstrap, J.) [hereinafter, *US Inventor*]. US Inventor was an "advocacy, education and public outreach organization on matters of importance to individual inventors and small innovative businesses." *Id.* at 557 (internal quotation marks omitted). US Inventor grounded its diversionary injury on (i) having to advise its members about the possible need to divest from the U.S. patent system, (ii) dedicating website and personnel resources to collecting public comments to send to the Director of the United States Patent and Trademark Office (PTO), (iii) a member publishing commentary on two PTAB decisions, and (iv) having to file a petition for rulemaking. *Id.* But the court determine that "US Inventor is essentially arguing that it has been effectively harmed by pursuing its recognized mission and organizational purpose." *Id.* The court noted the damage that US Inventor's argument could inflict on standing jurisprudence:

> If US Inventor was correct, any organization displeased with an agency's action could manufacture standing by expending some nominal amount of time and resources in the hopes of countering the agency's action. This cannot be the case, "for then the injury-in-fact requirement would pose no barrier." *OCA-Greater Houston*, 867 F.3d at 611 (citing *City of Kyle*, 626 F.3d at 233).

*Id.* at 549[31]; *see also US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001, at *6 (5th Cir. Sept. 30, 2022) (per curiam) (affirming the district court's conclusion that US Inventor's endeavors reflected their "routine operations as a lobbying and educational group").

Although it is somewhat close, the Court finds overlap between the present case on the one hand and *Louisiana Fair Housing* and *US Inventor* on the other. Granted, Plaintiffs here have actually described activities that the Final Rule has allegedly diverted their resources from (for example, trainings about "dealing with heat stress, navigating construction and design challenges, or developing the next generation of skilled construction workers."). [Dkt. 20 at ¶ 11]. This helps distinguish Plaintiffs' case from some less favorable

---

[31] Plaintiffs attempted to distinguish this case, but actually distinguished another case that Defendants never cited: *US Inventor, Inc. v. United States Pat. & Trademark Off.*, No. CV 22-2218 (JDB), 2023 WL 4488913 (D.D.C. July 12, 2023). [Dkt. 25 at 18 n.3].

precedent. *See Vote.Org v. Callanen*, 89 F.4th 459, 470–71 (5th Cir. 2023) (citations omitted) (noting that the diversion evidence was "more detailed" than other cases since Vote.org proved it had to divert resources from specific "innovative work" because of a signature rule); *see also City of Kyle*, 626 F.3d at 238 (citing *Louisiana ACORN Fair Hous. v. LeBlanc*, 211 F.3d 298, 305 (5th Cir. 2000)) (noting that "Plaintiffs have not identified any specific project that [they] had to put on hold or otherwise curtail in order to respond to the revised ordinances."); *see also El Paso Cnty., Texas v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (noting a similar deficiency). However, the problem lies in what Plaintiffs' resources were allocated *towards*. *See Louisiana Fair Housing*, 82 F.4th at 355.

Plaintiffs are both proponents of the merit-based construction industry. They help their members "win work and deliver that work safely, ethically, and profitably[.]" *See About ABC*, ASSOCIATED BUILDERS & CONTRACTORS, https://www.abc.org/About-ABC/About-ABC (last visited Feb. 6, 2025). Importantly, they also provide "education" and "information on best practice[s]" to their members. *Id.* Although Plaintiffs seem to push back [Dkt. 25 at 17–18],[32] their outreach endeavors—explaining the Final Rule to its members and advising them about compliance risks—falls under this banner. Plaintiffs have sufficiently alleged a diversion of resources here, but that's not enough. *City of Kyle*, 626 F.3d at 238. They have failed to sufficiently allege that their resources were diverted towards *non-routine activities*. *See Louisiana Fair Housing*, 82 F.4th at 355 (explaining that "'diverting' resources from one core mission activity to another" is insufficient).

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) is the best case for Plaintiffs. Unfortunately, it is distinguishable. OCA's primary mission was voter outreach and civic education to encourage voter turnout amongst its members. *Id.* at 610. OCA's claimed injury-in-fact was the additional time and money it had to spend explaining provisions of the Texas Education Code to voters with limited English proficiency. *Id.* at 610. OCA had to carefully explain these provisions to individuals it contacted and

---

[32] Plaintiffs' position slices the bologna too thin. They appear to concede that providing industry-focused education to their members is part of their ordinary activities. [Dkt. 25 at 17]. But then they insist that their ordinary educational activities focus on "industry trends, construction best practices, and workforce development," which are, according to them, distinct from the compliance outreach in this case. *Id.* at 17–18. This is a game of semantics. Explaining a novel regulation, its implications, and how to navigate it clearly involves education about an "industry trend." This also is consistent with "information on best practices" and efforts to help members "win work"—phrases mentioned in ABC's mission statement.

"these in-depth conversations [took] more time than merely explaining the requirements of the [Voting Rights Act.]" *Id.* Since OCA had to spend more time on each call, the law prevented it from contacting as many prospective voters. *Id.* This informed the Fifth Circuit's conclusion that "the Texas statutes at issue 'perceptibly impaired' OCA's ability to 'get out the vote' among its members." *Id.* at 612 (citation omitted). While there was clearly a perceptible impairment of OCA's mission, the same cannot be said for Plaintiffs— in adjusting to the Final Rule, they undertook an activity that *advances* their mission.[33] *See Children's Health Def. v. Food & Drug Admin.*, 650 F. Supp. 3d 547, 557 (W.D. Tex. 2023) (Albright, J.) (emphasizing that "CHD . . . failed to show how its efforts in response to the FDA's emergency use authorizations differ from its ordinary activities."), *aff'd*, No. 23-50167, 2024 WL 244938 (5th Cir. Jan. 23, 2024), *cert. denied*, 144 S. Ct. 2687, 219 L. Ed. 2d 1302 (2024); *see also Clark v. Edwards*, 468 F. Supp. 3d 725, 748 (M.D. La. 2020) (Dick, C.J.) ("It cannot follow that every change in voting laws that causes voting advocacy groups to 'check and adjust' is an injury.").

Plaintiffs have surely established a setback to their abstract social interest. But this falls short of the bar for organizational standing. *See Tenth St. Residential Ass'n*, 968 F.3d at 500 (citation omitted); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) (stating that "[t]he plaintiff associations [    ] cannot assert standing simply because they object to FDA's actions" before rejecting a resource diversion argument that resembles Plaintiffs').[34]

---

[33] This helps distinguish the present case from other non-binding cases that Plaintiffs cite. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094–87 (D.C. Cir. 2015) (explaining that PETA's mission was perceptibly impaired since it had to go out of its way to expend resources based on the USDA's inaction in applying the Animal Welfare Act to birds and providing a means of redress for abuse); *see also Am. Anti-Vivisection Soc'y v. United States Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (applying the same reasoning). Although these cases also involved educational outreach, that is where the similarity ends; these void-filling, educational expenditures—of Herculean proportions—were clearly outside the scope of ordinary operations. *See PETA*, 797 F.3d at 1094–87; *see Am. Anti-Vivisection Soc'y*, 946 F.3d at 619.

The Court also finds *La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 504 (W.D. Tex. 2022) unpersuasive. There, the court interpreted *OCA* to mean that "the . . . Plaintiffs need not identify specific projects that they have placed on hold or otherwise curtailed" to demonstrate diversion of resources. *Id.* at 550. But the Court struggles to square this with precedents like *Louisiana Fair Housing*, *see* 82 F.4th at 353–54, and the *OCA* court's concern that the injury-in-fact requirements should at least impose somewhat of a barrier. *See* 867 F.3d at 611 (citing *City of Kyle*, 626 F.3d at 233).

[34] In their Response, Plaintiffs cite to several cases discussing competitive injuries. *See* [Dkt. 25 at 28]. But this cannot support *organizational* standing because Plaintiffs themselves do not engage in construction work. *See About ABC*, Associated Builders & Contractors, https://www.abc.org/About-ABC/About-ABC (last visited Feb. 6, 2025) (emphasis added) ("ABC's

### b. RFA Claim

Plaintiffs have failed to state a claim under the RFA. Under the RFA, when an agency promulgates a rule which requires notice-and-comment, it generally must issue both initial and final regulatory flexibility analyses. *See* 5 U.S.C. §§ 603, 604. Those analyses must include several components, but most relevant here is 5 U.S.C. § 604(a)(6), which requires a final rule to include

> [A] description of the steps the agency has taken *to minimize the significant economic impact on small entities*[35] consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

*Id.* (emphasis added). The RFA also requires an agency to respond to "any comments *filed by the Chief Counsel for Advocacy of the Small Business Administration* in response to the proposed rule, and [to provide] a detailed statement of any change made to the proposed rule . . . as a result of the comments." *Id.* § 604(a)(3) (emphasis added). Compliance with these provisions can be a subject of judicial review. *See id.* § 611(a)(1).

But that review is circumscribed; it only assesses "whether an agency has made a reasonable, good-faith effort to carry out the mandate of the RFA." *Alenco Commc'ns, Inc. v. F.C.C.*, 201 F.3d 608, 625 (5th Cir. 2000) (quoting *Associated Fisheries, Inc. v. Daley*, 127 F.3d 104, 114 (1st Cir. 1997)); *see also* 5 U.S.C. § 611(c) (emphasis added) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review *only in accordance with this section*."). The RFA imposes procedural requirements and judicial review is "'highly deferential' as to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule." *Council for Urological Ints. v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015) (quoting *Helicopter Ass'n Int'l, Inc. v. F.A.A.*, 722 F.3d 430, 438 (D.C. Cir. 2013)). As such, review for compliance with the RFA and arbitrary and capricious review are two distinct

---

membership represents all specialties within the U.S. construction industry and is *comprised* primarily *of firms that perform work in the industrial and commercial sectors*."); *see also* [Dkt. 20 at ¶¶ 5, 6].

[35] RFA challenges can only be brought by "small entities." *See* 5 U.S.C. § 611(a)(1). The Parties appear to agree that Plaintiffs fall under this umbrella. *See id.* § 601(3), (4), (6) (defining "small entity," which encompasses "small business[es]" and "small organization[s]").

Case 1:23-cv-00396-MJT   Document 40   Filed 03/19/25   Page 33 of 40 PageID #:  790

animals. *See Nat'l Tel. Co-op. Ass'n v. F.C.C.*, 563 F.3d 536, 540–42 (D.C. Cir. 2009) (segregating procedural compliance with the RFA from substantive arguments as to why the regulatory flexibility analysis was arbitrary and capricious).

Plaintiffs allege that the Final Rule "fails to provide a reasoned explanation of its assessment of several significant economic issues raised in public comments," and as such, runs afoul the RFA. [Dkt. 20 at ¶ 121]. Plaintiffs' argument is two-pronged. First, they allege that DOL received and discounted "evidence that it severely underestimated the amount of time a human resource staff member will spend reviewing the rulemaking." *Id.* They argue that DOL's conclusion that human resource staff could review the 800-page Final Rule in four hours (at a cost of $200 per contractor) was "unreasonable." *Id.* at ¶ 122. According to Plaintiffs, the Final Rule would take nearly eighteen hours for the average American reader to get through and would require the assistance of expensive labor lawyers, blowing the top off the $200 cost estimate. *Id.* Plaintiffs allege DOL got to its four-hour number by accounting for small businesses who would avoid participating in public contracting entirely (and thus, wouldn't bother reading the Final Rule)—in other words, according to Plaintiffs, DOL craftily used burdens on small business to offset the estimated burden for other small businesses. *Id.* at ¶¶ 124–25. Second, Plaintiffs allege that the DOL failed to properly respond to comments submitted by the Small Business Administration (SBA). *Id.* at ¶ 127. The SBA found the Proposed Rule deficient on three grounds: (1) it undercounted the number of small businesses affected by the proposal, (2) it severely underestimated the administrative burdens and compliance costs the proposal would impose on small businesses, and (3) it failed to examine less burdensome alternatives. *Id.* at ¶ 129. Plaintiffs allege that "[t]he Rule respond[ed] to none of these criticisms." *Id.*

At a high level, Defendants argue that all the RFA's procedural requirements were met and Plaintiffs' allegations reflect substantive disagreements with the RFA determination. [Dkt. 23 at 32]. The Court agrees.

DOL's formal regulatory flexibility analysis clearly checks all the boxes. *See* 5 U.S.C. § 604(a)(1)-(6); *see also* Final Rule, 88 Fed. Reg. at 57,716–21; *see also Nat'l Tel. Co-op. Ass'n*, 563 F.3d at 540 ("Because the analysis at issue here undoubtedly addressed all of the legally mandated subject areas, it

complies with the Act."); *see also Huntco Pawn Holdings, LLC v. U.S. Dep't of Def.*, 240 F. Supp. 3d 206, 230 (D.D.C. 2016) (citation omitted) ("Plaintiffs appear to essentially argue that the Department's decision was wrong, and that it should have accepted Advocacy's suggestion in full, . . . but it is not the Court's role to make that determination."); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Dep't Of Health & Hum. Servs.*, 224 F. Supp. 2d 1115, 1128 (S.D. Tex. 2002), *aff'd*, 67 F. App'x 253 (5th Cir. 2003). To be clear, the Court holds that the Final Rule's regulatory flexibility analysis complies with the RFA's *procedural* strictures. The question of whether it is arbitrary and capricious at the *substantive* level is a battle the Court leaves for another day. *See* [Dkt. 27 at 14 (reiterating that Defendants are not seeking dismissal of Plaintiffs' arbitrary and capricious challenge)].

### c. Appointments Clause Claim

Plaintiffs have failed to adequately plead an Appointments Clause claim. Under the Appointments Clause, the President appoints "Officers of the United States" "by and with the Advice and Consent of the Senate." U.S. CONST. art. II, § 2, cl. 2. Officer positions are "established by Law." *Id.* The Framers split responsibility between the executive and legislative branches to put a "check upon a spirit of favoritism in the President," "prevent the appointment of unfit characters," and provide a "source of stability in the administration." THE FEDERALIST NO. 76, at 457 (Alexander Hamilton) (C. Rossiter ed., 1961). The advice-and-consent requirement represents a "significant structural safeguard[ ] of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997); *see also Buckley v. Valeo*, 424 U.S. 1, 124 (1976) (noting that the "principle of separation of powers," which the Appointments Clause sprouts from, was "not simply an abstract generalization in the minds of the Framers").

This case involves the application of the Appointments Clause to an acting officer. The Federal Vacancies Reform Act of 1998 (FVRA), 5 U.S.C. § 3345 *et seq.*, is "the *exclusive means* for temporarily authorizing an acting official to perform the functions and duties of any office of an Executive agency . . . for which [appointment and consent are required.]" 5 U.S.C. § 3347(a) (emphasis added). The FVRA both safeguards the Senate's confirmation powers and prevents the president from running amok with temporary

appointments. *See N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 295 (2017) (describing the dubious temporary appointments that inspired the adoption of the FVRA in 1998). Under the FVRA, acting officials do not enjoy their powers in perpetuity:

> (a) Except in the case of a vacancy caused by sickness, *the person serving as an acting officer* as described under section 3345 *may serve* in the office--
> > (1) *for no longer than 210 days* beginning on the date the vacancy occurs; or
> > (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

*Id.* § 3346(a)(1)-(2) (emphasis added). If an appointment does not comply with the FVRA, regulations promulgated by the acting officer "shall have no force or effect." *Id.* § 3348(d). But there's a catch. The FVRA does not apply when "a statutory provision *expressly . . . designates* an officer or employee to perform the functions and duties of a specified office temporarily in an acting capacity[.]" *Id.* § 3347(a)(1)(B) (emphasis added). DOL's vacancy statute is one of these "statutory provision[s]." *See id.*; *see* 29 U.S.C. § 552; *see Noel Canning v. N.L.R.B.*, 705 F.3d 490, 511 (D.C. Cir. 2013) (emphasis added) (framing § 552 as a specific vacancy statute and the FVRA as addressing "the filling of vacancies in the executive branch *not otherwise provided for*"), *aff'd*, 573 U.S. 513 (2014). The issue of the FVRA's constitutionality is not before the Court, and it excepts DOL's vacancy statute from its strictures. Therefore, the million-dollar question is whether Defendant Su's tenure was valid under DOL's vacancy statute.[36]

Through DOL's vacancy statute, Congress "established in the Department of Labor the office of Deputy Secretary of Labor, which shall be filled by appointment by the President, by and with the advice and consent of the Senate." 29 U.S.C. § 552. "The Deputy Secretary shall perform such duties as may be prescribed by the Secretary of Labor or required by law." *Id.* "[I]n case of the death, *resignation*, or removal from office of the Secretary," the Deputy Secretary of Labor ("Deputy Secretary") shall "perform the duties

---

[36] Plaintiffs reference the constitutional avoidance doctrine. [Dkt. 25 at 27]. But that doctrine helps Defendants. It means the Court should not scrutinize the constitutionality of the FVRA or the DOL's vacancy statute (in light of the Appointments Clause) at this juncture. *See Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 197 (2009) (instructing courts to abide by a "usual practice" of "avoid[ing] the unnecessary resolution of constitutional questions").

of the Secretary *until a successor is appointed*." *Id.* (emphasis added). For our purposes, the appointment of a successor is the lone time limitation housed in DOL's vacancy statute.[37] *See id.*

Defendant Su was nominated by President Biden to serve as Deputy Secretary on February 13, 2021. *See* PN122 - Nomination of Julie A. Su for Department of Labor, 117th Congress (2021-2022), PN122, 117th Cong. (2021), https://www.congress.gov/nomination/117th-congress/122. She was confirmed by the Senate on July 13, 2021. *See id.* And she began serving as acting Secretary of Labor on March 11, 2023—after Secretary of Labor (hereinafter, "Secretary") Marty Walsh resigned. [Dkt. 20 at ¶ 135].

That same month, President Biden nominated Deputy Secretary Su for Secretary. *Id.* President Biden submitted his nomination to the Senate for approval, and the Senate held a hearing in April; but it did not vote to confirm or reject Defendant Su. *Id.* at ¶ 136. After Defendant Su's nomination for Secretary had expired at the end of Congress's 2023 session, President Biden renominated Defendant Su, despite indicia of opposition.[38] *Id.* at ¶ 137. Long story short, Defendant Su was never confirmed as Secretary, but she exercised the full powers of the position and issued the Final Rule roughly five months into her tenure as *acting* Secretary. *Id.* A successor to the Secretary position had not been appointed before she did so.

Plaintiffs argue this flouts the Appointment Clause's advice-and-consent requirement—Defendant Su enjoyed the full authority of a Secretary without paying the price of entry: confirmation by the Senate. *Id.* at ¶ 141. And even though the Deputy Secretary is empowered by statute to serve as the acting Secretary in the case of a resignation, § 552, according to Plaintiffs, only provides for *temporary* acting periods. *Id.* at ¶ 142.

---

[37] The only other time limitation pertains to the Secretary's "absence or sickness." 29 U.S.C. § 552. In these circumstances, the Deputy Secretary may "perform the duties of the Secretary *until such absence or sickness shall terminate*." *Id.* (emphasis added).

[38] Plaintiffs' Complaint cites to two letters on this point. The first is a letter from Senator Bill Cassidy to Senator Bernie Sanders imploring Senator Sanders to hold a second nomination hearing because of Defendant Su's "ill-advised policy decisions and consistent mismanagement." *See* [Dkt. 20 at ¶ 137 (citing Letter from Sen. Bill Cassidy, Ranking Member, to Sen. Bernie Sanders, Chair, U.S. Senate Committee on Health, Education, Labor, and Pensions (Feb. 13, 2024), https://aboutblaw.com/bcJd)]. The second is a letter from Senator Cassidy to President Biden discussing the statutory and constitutional quandary presented by Defendant Su's tenure as acting Secretary. *See* [Dkt. 20 at ¶ 139 (citing Letter from Sen. William Cassidy to President Joseph Biden (July 19, 2023), https://www.help.senate.gov/imo/media/doc/julie_su_nomination_letter1.pdf)].

Plaintiffs try to squeeze the spirit of the FVRA (i.e., its time limitations) into the clear text of DOL's vacancy statute. This they cannot do. Plaintiffs insist that "[n]othing in the [DOL vacancy statute] purports to authorize the Deputy Secretary to assume the Secretary's role *permanently*." [Dkt. 25 at 26 (emphasis added)]. But this logic can be flipped. Nothing in the DOL vacancy statute imposes a hard time limit, states that acting Secretary's can only serve "temporarily," or otherwise draws a line that Defendant Su's tenure crossed.[39] In fact, Plaintiffs seem to concede this: "The point is not that the Appointments Clause sets a deadline at five months, or twelve months, any other specific amount of time." *Id.* at 27. Moreover, if the FVRA proves anything, it's that Congress certainly new how to place firm expiration dates on an acting official's powers. *See* 5 U.S.C. § 3346(a)(1)-(2). Since (1) the DOL vacancy statute omits a 210-day limit, (2) it provides for a more open-ended acting period ("until a successor is appointed"), and (3) a successor was never appointed, Defendant Su's tenure comported with the DOL vacancy statute. *See Su v. Coway USA, Inc.*, No. 2:24-CV-08156-JLS-AJR, 2024 WL 5275528, at *5 (C.D. Cal. Dec. 4, 2024) (declining the "Defendant's invitation to impose a time limit on 29 U.S.C. § 552 beyond that clear from its text[.]"); *see also Su v. WiCare Home Care Agency, LLC*, No. 1:22-CV-00224, 2024 WL 3598826, at *17 (M.D. Pa. July 31, 2024) (applying the "until a successor is appointed" language and concluding Defendant Su acted with proper authority).

Defendant Su's acting period even complies with the FVRA. As the title of her position indicates, Defendant Su was the "first assistant" to the Secretary. *See* 5 U.S.C. § 3345(a)(1) ("the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity subject to the time limitations of section 3346[.]"). Defendant Su issued the Final Rule five months into her tenure as acting Secretary (more specifically, 165 days into her tenure). This satisfies the 210-day time limit imposed by the FVRA. *See id.* § 3346(a)(1). In sum, even under the statute that Plaintiffs prefer, Defendant Su wins.

---

[39] "Section 552 . . . cannot mean what [Plaintiffs] say it means." [Dkt. 25 at 26].

The two cases Plaintiffs rely on are distinguishable. In *Bullock v. United States Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112 (D. Mont. 2020), the court scrutinized a deputy director's authority to serve as the acting Director of the Bureau of Land Management (BLM). Unlike the present case, there was no agency-specific vacancy statute,[40] the FVRA applied with full force, and the deputy director's tenure as acting Director violated the FVRA in several ways. *Id.* at 1128–29. Plaintiffs' other case is even less analogous than *Bullock*. It broached an order of succession issue for the acting Secretary of Homeland Security position that § 552 easily resolves in this matter. *See Behring Reg'l Ctr. LLC v. Wolf*, 544 F. Supp. 3d 937, 940–41, 943–44 (N.D. Cal. 2021); *see* 29 U.S.C. § 552 (establishing the Deputy Secretary as next-in-line to the Secretary).

Plaintiffs emphasize that the DOL's vacancy statute does not "license the administration to *refuse to make a good-faith effort* to fill the [Secretary] position on a permanent basis." [Dkt. 25 at 26 (emphasis added)]. This mischaracterizes what occurred in this case. Defendant Su assumed her duties as acting Secretary in March of 2023. President Biden nominated her for Secretary on February 28, 2023. [Dkt. 20 at ¶ 135]. The Senate's Health, Education, Labor, and Pensions Committee held a nomination hearing for Defendant Su on April 20, 2023, but it did not issue a vote before the expiration of Congress's 2023 session. *Id.* at ¶ 136. What happened thereafter is packaged in interesting language: "Su's nomination expired with the end of Congress's 2023 session. Yet the administration not only failed to put forward *a different, more acceptable* candidate; it instead *renominated Su*." [Dkt. 20 at ¶ 137 (emphasis added)]. This does not reflect the Biden Administration's lack of a good-faith effort to fill the Secretary position on a permanent basis. In fact, it tried to do so—twice. But both times, *the Senate* failed to return a vote. Instead of bad faith, this shows a classic stalemate between the executive and legislative branches, one that prevented the appointment of a permanent Secretary, and as a result, extended Defendant Su's tenure as acting Secretary under § 552. This is what Congress contemplated when it enacted § 552.[41]

---

[40] The only relevant statute outside the FVRA provided that "[a]ppointments to the position of Director shall hereafter be made by the President, by and with the advice and consent of the Senate." *See* 43 U.S.C. § 1731(a).

[41] Another court chose to apply the FVRA to Defendant Su's tenure and noted that Plaintiffs' "good-faith effort" requirement could not be mined from the FVRA's text. *See Colt & Joe Trucking, LLC v. U.S. Dep't of Lab.*, No. 24-CV-00391-KWR-GBW, 2025 WL 56658, at *17 (D.N.M. Jan. 9, 2025). The same logic applies for § 552.

Lastly, Plaintiffs correctly explain that there are only two methods for appointing officers of the United States under the Appointments Clause. A president can nominate officers and appoint them with the advice and consent of the Senate. U.S. CONST. art. II, § 2, cl. 2. The president can also make temporary appointments during a recess of Congress. U.S. CONST. art. II, § 2, cl. 3. But then comes the error: "Defendant Su has received *neither* kind of appointment." [Dkt. 25 at 25 (emphasis added)]. She received the first type of appointment on July 13, 2021—the day she was confirmed as Deputy Secretary.[42]

In the end, Defendant Su's tenure illustrates an unsurprising, practical reality:

> The constitutional process of Presidential appointment and Senate confirmation . . . can take time: The President may not promptly settle on a nominee to fill an office; *the Senate may be unable, or unwilling, to speedily confirm the nominee once submitted*. Yet neither may desire to see the duties of the vacant office go unperformed in the interim.

*See N.L.R.B.*, 580 U.S. at 293–94 (emphasis added). Plaintiffs have failed to adequately plead their Appointments Clause challenge.

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED** that Defendant Julie Su's, Jessica Looman's, and the U.S. Department of Labor's Partial Motion to Dismiss the First Amended Complaint [Dkt. 23] is hereby **GRANTED IN PART AND DENIED**.

It is **ORDERED** that Defendants' motion to dismiss for lack of standing is hereby **DENIED**. Plaintiffs' challenges to the Final Rule under the Administrative Procedures Act **REMAIN LIVE** in this matter. *See* [Dkt. 20 at ¶¶ 50 –118].

It is further **ORDERED** that Defendants' motion to dismiss Plaintiffs' claim under the Regulatory Flexibility Act is hereby **GRANTED WITH PREJUDICE**.

---

[42] This rebuts Plaintiffs' claim that, through § 552, the Senate somehow abdicated its duty to vet and approve the president's nominees. [Dkt. 25 at 26 (citing *Clinton v. City of New York*, 524 U.S. 417, 439–40 (1998))].

It is further **ORDERED** that Defendants' motion to dismiss Plaintiffs' Appointments Clause claim is hereby **GRANTED WITH PREJUDICE**.

**SIGNED this 19th day of March, 2025.**

_____
Michael J. Truncale
United States District Judge

40